MAYER BROWN LLP
Duane-David Hough (*pro hac vice pending*)
dhough@mayerbrown.com
Brian W. Nolan (*pro hac vice pending*)
bnolan@mayerbrown.com
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

MAYER BROWN LLP
Cliff A. Maier (Bar No. 248858)
cmaier@mayerbrown.com
Elspeth V. Hansen (Bar No. 292193)
ehansen@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

MAYER BROWN LLP
Andrew S. DeCarlow (Bar No. 308091)
adecarlow@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Defendants Broadcom Limited,
Broadcom Corporation, Avago Technologies
Limited, and Apple Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The CALIFORNIA INSTITUTE OF TECHNOLOGY, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>BROADCOM LIMITED, BROADCOM CORPORATION, AVAGO TECHNOLOGIES LIMITED, and APPLE INC.,<br><br>Defendants. | CASE NO. 2:16-cv-3714-GW(AGRx)<br><br>**ANSWER, DEFENSES, AND COUNTERCLAIMS OF DEFENDANTS BROADCOM LIMITED, BROADCOM CORPORATION, AVAGO TECHNOLOGIES LIMITED, AND APPLE INC. TO PLAINTIFF'S COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br>Judge: Hon. George H. Wu<br>Complaint Filed: May 26, 2016 |

1
2
3
4
5
6
7
8

BROADCOM LIMITED ,
BROADCOM CORPORATION,
AVAGO TECHNOLOGIES LIMITED
and APPLE INC.,

                Counterclaim-Plaintiffs,

      v.

The CALIFORNIA INSTITUTE OF
TECHNOLOGY, a California
corporation,

                Counterclaim-Defendants.

9
10
11
12
13
14
15
16

     Defendants Broadcom Limited ("Broadcom Ltd."), Broadcom Corporation
("Broadcom Corp."), and Avago Technologies Limited ("Avago Ltd.")
(collectively, "Broadcom") and Apple Inc. ("Apple") (collectively "Defendants"),
by and through their undersigned attorneys, hereby answer the Complaint for Patent
Infringement filed by the Plaintiff,  the California Institute of Technology
("Caltech" or "Plaintiff"), as follows, with each paragraph of the Answer below
responding to the corresponding numbered or lettered paragraph of the Complaint.

17
18

<u>**ANSWER**</u>

<u>**NATURE OF THE ACTION**</u>

19
20
21

    1.    Defendants admit that Caltech's Complaint purports to state a cause of
action under the patent laws of the United States.  Defendants deny the remaining
allegations of paragraph 1 of the Complaint.

22

    2.    Defendants deny the allegations of paragraph 2 of the Complaint.

23
24
25
26
27

    3.    Defendants deny that U.S. Patent No. 7,116,710, U.S. Patent No.
7,421,032, U.S. Patent No. 7,916,781, and U.S. Patent No. 8,284,833 (collectively,
"the Asserted Patents" or the patents-in-suit") were duly and legally issued.
Defendants acknowledge that Caltech seeks injunctive relief and monetary
damages, but denies that it is entitled to any such damages or relief.  Defendants are

28

1

without knowledge or information sufficient to admit or deny the remaining

allegations of paragraph 3 of the Complaint and therefore deny them.

### THE PARTIES

4.      On information and belief, Defendants admit that Caltech purports to be a non-profit private university organized under the laws of the State of California, with its principal place of business at 1200 East California Boulevard, Pasadena, California  91125.

5.      Defendants are without knowledge or information sufficient to admit or deny the allegations contained in paragraph 5 of the Complaint and therefore deny them.

6.      Defendants admit the allegations in paragraph 6 of the Complaint.

7.      Defendants admit the allegations in paragraph 7 of the Complaint.

8.      Defendants admit the allegations in paragraph 8 of the Complaint.

9.      Defendants admit the allegations in paragraph 9 of the Complaint.

### JURISDICTION AND VENUE

10.      Defendants admit that this Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1338(a).

11.      Paragraph 11 of the Complaint sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, however, Defendants deny the allegations of paragraph 11 of the Complaint, except that Broadcom Ltd., for the purpose of this action only, does not contest personal jurisdiction in this matter.

12.      Paragraph 12 of the Complaint sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, however, Defendants deny the allegations of paragraph 12 of the Complaint, except that Broadcom Corp., for the purpose of this action only, does not contest personal jurisdiction in this matter.

13.     Paragraph 13 of the Complaint sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, however, Defendants deny the allegations of paragraph 13 of the Complaint, except that Avago Ltd., for the purpose of this action only, does not contest personal jurisdiction in this matter.

14.     Paragraph 14 of the Complaint sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, however, Defendants deny the allegations of paragraph 14 of the Complaint, except that Apple, for the purpose of this action only, does not contest personal jurisdiction in this matter.

15.     Paragraph 15 of the Complaint sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, however, Defendants deny the allegations of paragraph 15 of the Complaint, except that Defendants admit, for purposes of this action only, that venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400.

## CALTECH'S ASSERTED PATENTS

16.     Defendants admit that Plaintiff purports to attach a copy of U.S. Patent No. 7,116,710 (the "'710 Patent") to its Complaint as Exhibit A, that the '710 Patent is entitled "Serial Concatenation of Interleaved Convolutional Codes Forming Turbo-Like Codes", and bears an issue date of October 3, 2006. Defendants are without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 16 of the Complaint, and therefore deny them.

17.     Defendants admit that Plaintiff purports to attach a copy of U.S. Patent No. 7,421,032 (the "'032 Patent") to its Complaint as Exhibit B, that the '032 Patent is entitled "Serial Concatenation of Interleaved Convolutional Codes Forming Turbo-Like Codes", that it bears an issue date of September 2, 2008, and that it states on its face that it is a continuation of the application that led to the '710 Patent.  Defendants are without knowledge or information sufficient to admit or

1   deny the remaining allegations in paragraph 17 of the Complaint, and therefore

2   deny them.

3       18.     Defendants admit that Plaintiff purports to attach a copy of U.S. Patent

4   No. 7,916,781 (the "'781 Patent") to its Complaint as Exhibit C, that the '781

5   Patent  is entitled "Serial Concatenation of Interleaved Convolutional Codes

6   Forming Turbo-Like Codes", that it bears  an issue date of March 29, 2011, and it

7   states on its face that it is a continuation of the application that led to the '032

8   Patent, which is a continuation of the application that led to the '710 Patent.

9   Defendants are without knowledge or information sufficient to admit or deny the

10   remaining allegations in paragraph 18 of the Complaint, and therefore deny them.

11       19.     Defendants admit that Plaintiff purports to attach a copy of U.S. Patent

12   No. 8,284,833 (the "'833 Patent") to its Complaint as Exhibit D,  that the '833

13   Patent is entitled "Serial Concatenation of Interleaved Convolutional Codes

14   Forming Turbo-Like Codes", that it bears an issue date of October 9, 2012, and

15   that it states on its face that it is a continuation of the application that led to the '781

16   Patent, which is a continuation of the application that led to the '032 Patent, which

17   is a continuation of the application that led to the '710 Patent.  Defendants are

18   without knowledge or information sufficient to admit or deny the remaining

19   allegations in paragraph 19 of the Complaint, and therefore deny them.

20       20.     Defendants admit that the Asserted Patents state on their face that their

21   inventors are Hui Jin, Aamod Khandekar, and Robert J. McEliece.  Any remaining

22   allegations of paragraph 20 are denied.

23       21.     Defendants are without knowledge or information sufficient to admit

24   or deny the allegations in paragraph 21 of the Complaint, and therefore deny them.

25       22.     Defendants deny the allegations in paragraph 22 of the Complaint.

26   ## BACKGROUND TO THIS ACTION

27   ### Caltech's IRA Code Patents

28       23.     Defendants deny the allegations in paragraph 23 of the Complaint.

4

24.     Defendants deny the allegations in paragraph 24 of the Complaint.

25.     Defendants admit that Plaintiff purports to attach a paper titled "Irregular Repeat-Accumulate Codes" to its Complaint as Exhibit E.  Defendants admit that Exhibit E states on its face that the authors are Hui Jin, Aamod Khandekar, and Robert McEliece.  Defendants admit that Exhibit E states on its face that the paper is to be presented at the Second International Conference on Turbo Codes in September 2000.  Defendants are without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25 of the Complaint, and therefore deny them.

26.     Defendants admit that Plaintiff purports to attach a paper titled "Design Methods for Irregular Repeat-Accumulate Codes" to its Complaint as Exhibit F.  Defendants admit that Exhibit F states on its face that the authors are Aline Roumy, Souad Guemghar, Giuseppe Caire, and Sergio Verdú.  Defendants admit that Exhibit F contains a header stating "IEEE Transaction on Information Theory, Vol. 50, No. 8, August 2004".  Defendants are without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 26 of the Complaint, and therefore deny them.

## IEEE 802.11 Wi-Fi Standard

27.     Defendants admit the allegations in paragraph 27 of the Complaint.

28.     Defendants admit that the 802.11 standardization process began in the 1990s, but are without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 28 of the Complaint and therefore deny them.

29.     Defendants deny the allegations in paragraph 29, except to admit that the 802.11n standard provides for a High Throughput (HT) mode that provides for the use of LDPC codes as an optional feature.

30.     Defendants deny the allegations in paragraph 30, except to admit that the 802.11ac standard provides for a Very High Throughput (VHT) optional mode.

5

31.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 31 of the Complaint and therefore deny them.

32.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 32 of the Complaint and therefore deny them.

**Broadcom**

33.     Defendants deny the allegations in paragraph 33 of the Complaint.

34.     Defendants admit that at least some of the accused products, such as BCM4350 are described as "802.11ac-complaint transmit beamforming, low-density parity check codes (LDPC) and space-time block code (STBC) for extended coverage" and "[f]ull IEEE 802.11a/b/g/n dual-band legacy compatibility with enhanced performance," but are without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 34 and therefore deny them.

35.     Apple is without knowledge or information sufficient to admit or deny the allegations in paragraph 35 of the Complaint and therefore denies them. Broadcom admits that it strives to provide quality products and superior technical support to its customers.  Broadcom is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 35 of the Complaint and therefore denies them.

36.     Broadcom Ltd., Avago Ltd., and Broadcom Corp. admit that Broadcom Corp. markets and sells Broadcom products in the United States through a direct sales force and through distributors and manufacturers' representatives, but deny the remaining allegations in paragraph 36 of the Complaint.  Apple is without knowledge or information sufficient to form a belief as to the allegations in paragraph 36 and therefore denies them.

37.     Defendants deny the allegations of paragraph 37 of the Complaint, except that Defendants admit that Broadcom Corp. markets and sells Wi-Fi products to customers, including Apple.

1

**Apple**

2          38.     Defendants deny the allegations in paragraph 38 of the Complaint.

3          39.     Defendants deny the allegations in paragraph 39 of the Complaint,

4    except that Defendants admit that Apple announced the release of the iPhone 5 in

5    September 2012.

6

**Broadcom's Relationship with Apple**

7          40.     Defendants admit that Apple is one of Broadcom Corp.'s customers

8    and that Broadcom Corp.'s 2014 Form 10-K reported that sales to Apple in 2012,

9    2013, and 2014 represented 14.6%, 13.3%, and 14.0% of Broadcom Corp.'s net

10   revenue, respectively.  Defendants deny the remaining allegations in paragraph 40

11   of the Complaint.

12         41.     Defendants admit Broadcom Corp.'s Wi-Fi design wins have included

13   design wins for iPhones, iPads, Mac computers, and the Apple Watch.  Defendants

14   deny the remaining allegations of paragraph 41 of the Complaint.

15         42.     Paragraph 42 of the Complaint sets forth conclusions of law to which

16   no response is required.  To the extent a response is deemed to be required,

17   however, Defendants deny the allegations of paragraph 42 of the Complaint.

18

<u>**COUNT I**</u>

19

<u>**Infringement of the '710 Patent**</u>

20         43.     Defendants refer to and incorporate their responses set forth in

21   paragraphs 1-42, above, as if fully set forth herein.

22         44.     Defendants deny each and every allegation in paragraph 44 of the

23   Complaint.

24         45.     Defendants deny each and every allegation in paragraph 45 of the

25   Complaint.

26         46.     Defendants deny each and every allegation in paragraph 46 of the

27   Complaint.

28

7

47.     Defendants deny each and every allegation in paragraph 47 of the Complaint, except that Defendants admit that Broadcom Corp. directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

48.     Defendants deny each and every allegation in paragraph 48 of the Complaint, except that Defendants admit that Apple directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

49.     Defendants deny each and every allegation in paragraph 49 of the Complaint.

50.     Defendants deny each and every allegation in paragraph 50 of the Complaint.

51.     Defendants deny each and every allegation in paragraph 51 of the Complaint, except that Defendants admit that Broadcom Corp.'s website references "802.11ac-complaint transmit beamforming, low-density parity check codes (LDPC) and space-time block code (STBC)" and "IEEE 802.11a/b/g/n dual-band legacy compatibility with enhanced performance".

52.     Defendants deny each and every allegation in paragraph 52 of the Complaint, except that Defendants admit that Apple's website references under "Cellular and Wireless" for the iPhone 6 "All models 802.11a/b/g/n/ac Wi-Fi."

53.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 53 of the Complaint and therefore deny them.

54.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 54 of the Complaint and therefore deny them.

8

1    55.    Defendants deny each and every allegation in paragraph 55 of the
2    Complaint.

3    56.    Defendants deny each and every allegation in paragraph 56 of the
4    Complaint.

5    57.    Defendants deny each and every allegation in paragraph 57 of the
6    Complaint.

7    58.    Defendants deny each and every allegation in paragraph 58 of the
8    Complaint.

## COUNT II

### Infringement of the '032 Patent

11    59.    Defendants refer to and incorporate their responses set forth in
12   paragraphs 1-58, above, as if fully set forth herein.

13    60.    Defendants deny each and every allegation in paragraph 60 of the
14   Complaint.

15    61.    Defendants deny each and every allegation in paragraph 61 of the
16   Complaint.

17    62.    Defendants deny each and every allegation in paragraph 62 of the
18   Complaint.

19    63.    Defendants deny each and every allegation in paragraph 63 of the
20   Complaint, except that Defendants admit that Broadcom Corp. directly and/or
21   through intermediaries, for certain of the accused products, advertises, distributes,
22   publishes instructional materials, specifications and/or promotional literature, offers
23   technical assistance, training, and/or consulting services to customers, partners,
24   and/or end users.

25    64.    Defendants deny each and every allegation in paragraph 64 of the
26   Complaint, except that Defendants admit that Apple directly and/or through
27   intermediaries, for certain of the accused products, advertises, distributes, publishes
28   instructional materials, specifications and/or promotional literature, offers technical

9

assistance, training, and/or consulting services to customers, partners, and/or end users.

65.    Defendants deny each and every allegation in paragraph 65 of the Complaint.

66.    Defendants deny each and every allegation in paragraph 66 of the Complaint.

67.    Defendants deny each and every allegation in paragraph 67 of the Complaint, except that Defendants admit that Broadcom Corp.'s website references "802.11ac-complaint transmit beamforming, low-density parity check codes (LDPC) and space-time block code (STBC)" and "IEEE 802.11a/b/g/n dual-band legacy compatibility with enhanced performance".

68.    Defendants deny each and every allegation in paragraph 68 of the Complaint, except that Defendants admit that Apple's website references under "Cellular and Wireless" for the iPhone 6 "All models 802.11a/b/g/n/ac Wi-Fi."

69.    Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 69 of the Complaint and therefore deny them.

70.    Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 70 of the Complaint and therefore deny them.

71.    Defendants deny each and every allegation in paragraph 71 of the Complaint.

72.    Defendants deny each and every allegation in paragraph 72 of the Complaint.

73.    Defendants deny each and every allegation in paragraph 73 of the Complaint.

74.    Defendants deny each and every allegation in paragraph 74 of the Complaint.

## COUNT III

## Infringement of the '781 Patent

75.     Defendants refer to and incorporate their responses set forth in paragraphs 1-74, above, as if fully set forth herein.

76.     Defendants deny each and every allegation in paragraph 76 of the Complaint.

77.     Defendants deny each and every allegation in paragraph 77 of the Complaint.

78.     Defendants deny each and every allegation in paragraph 78 of the Complaint.

79.     Defendants deny each and every allegation in paragraph 79 of the Complaint, except that Defendants admit that Broadcom Corp. directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

80.     Defendants deny each and every allegation in paragraph 80 of the Complaint, except that Defendants admit that Apple directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

81.     Defendants deny each and every allegation in paragraph 81 of the Complaint.

82.     Defendants deny each and every allegation in paragraph 82 of the Complaint.

83.     Defendants deny each and every allegation in paragraph 83 of the Complaint, except that Defendants admit that Broadcom Corp.'s website references

11

"802.11ac-complaint transmit beamforming, low-density parity check codes (LDPC) and space-time block code (STBC)" and "IEEE 802.11a/b/g/n dual-band legacy compatibility with enhanced performance".

84.     Defendants deny each and every allegation in paragraph 84 of the Complaint, except that Defendants admit that Apple's website references under "Cellular and Wireless" for the iPhone 6 "All models 802.11a/b/g/n/ac Wi-Fi."

85.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 85 of the Complaint and therefore deny them.

86.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 86 of the Complaint and therefore deny them.

87.     Defendants deny each and every allegation in paragraph 87 of the Complaint.

88.     Defendants deny each and every allegation in paragraph 88 of the Complaint.

89.     Defendants deny each and every allegation in paragraph 89 of the Complaint.

90.     Defendants deny each and every allegation in paragraph 90 of the Complaint.

## COUNT IV

### Infringement of the '833 Patent

91.     Defendants refer to and incorporate their responses set forth in paragraphs 1-90, above, as if fully set forth herein.

92.     Defendants deny each and every allegation in paragraph 92 of the Complaint.

93.     Defendants deny each and every allegation in paragraph 93 of the Complaint.

94.     Defendants deny each and every allegation in paragraph 94 of the Complaint.

12

95.    Defendants deny each and every allegation in paragraph 95 of the Complaint, except that Defendants admit that Broadcom Corp. directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

96.    Defendants deny each and every allegation in paragraph 96 of the Complaint, except that Defendants admit that Apple directly and/or through intermediaries, for certain of the accused products, advertises, distributes, publishes instructional materials, specifications and/or promotional literature, offers technical assistance, training, and/or consulting services to customers, partners, and/or end users.

97.    Defendants deny each and every allegation in paragraph 97 of the Complaint.

98.    Defendants deny each and every allegation in paragraph 98 of the Complaint.

99.    Defendants deny each and every allegation in paragraph 99 of the Complaint, except that Defendants admit that Broadcom Corp.'s website references "802.11ac-complaint transmit beamforming, low-density parity check codes (LDPC) and space-time block code (STBC)" and "IEEE 802.11a/b/g/n dual-band legacy compatibility with enhanced performance".

100.   Defendants deny each and every allegation in paragraph 100 of the Complaint, except that Defendants admit that Apple's website references under "Cellular and Wireless" for the iPhone 6 "All models 802.11a/b/g/n/ac Wi-Fi."

101.   Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 101 of the Complaint and therefore deny them.

102.   Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 102 of the Complaint and therefore deny them.

13

1    103.   Defendants deny each and every allegation in paragraph 103 of the

2  Complaint.

3    104.   Defendants deny each and every allegation in paragraph 104 of the

4  Complaint.

5    105.   Defendants deny each and every allegation in paragraph 105 of the

6  Complaint.

7    106.   Defendants deny each and every allegation in paragraph 106 of the

8  Complaint.

9                        **<u>PRAYER FOR RELIEF</u>**

10    (a)    Defendants deny that Caltech is entitled to the relief requested in

11  paragraph (a).

12    (b)    Defendants deny that Caltech is entitled to the relief requested in

13  paragraph (b).

14    (c)    Defendants deny that Caltech is entitled to the relief requested in

15  paragraph (c).

16    (d)    Defendants deny that Caltech is entitled to the relief requested in

17  paragraph (d).

18    (e)    Defendants deny that Caltech is entitled to the relief requested in

19  paragraph (e).

20    (f)    Defendants deny that Caltech is entitled to the relief requested in

21  paragraph (f).

22    (g)    Defendants deny that Caltech is entitled to the relief requested in

23  paragraph (g).

24    (h)    Defendants deny that Caltech is entitled to the relief requested in

25  paragraph (h).

26                        **<u>GENERAL DENIAL</u>**

27    Defendants deny each and every allegation of the Complaint that is not

28  specifically admitted above.

14

## DEFENSES

107.   Without admitting or acknowledging that Defendants bear the burden of proof as to any of them, Defendants assert the following defenses:

## FIRST DEFENSE

### (Non-Infringement)

108.   Defendants have not in the past infringed and do not now infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the Asserted Patents.

## SECOND DEFENSE

### (Invalidity)

109.   On information and belief, the claims of each of the Asserted Patents are invalid for failure to comply with the conditions for patentability under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

## THIRD DEFENSE

### (Laches, Waiver, Estoppel, Unclean Hands)

110.   On information and belief, Caltech's claims are barred in whole or in part by laches, waiver, estoppel, and/or unclean hands.

111.   Caltech alleges in paragraphs 29-32 of its Complaint that the LDPC code used in IEEE 802.11n and 802.11ac implement Caltech's patented IRA code technology.

112.   Caltech further alleges that Defendants' products infringe Caltech's patents because they comply with 802.11n and/or 802.11ac.

113.   On information and belief, IEEE 802.11n was published in October 2009.

114.   Broadcom Corp. has been selling products that meet the 802.11n standard since at least January 2009.

15

115.   Caltech did not file its complaint until May 26, 2016, more than six years after the publication of 802.11n.

116.   On information and belief, Caltech and/or its predecessors' unreasonable and inexcusable delay in filing suit and prosecuting the asserted claims have caused material prejudice to Defendants.

## FOURTH DEFENSE

### (Injunctive Relief Unavailable)

117.   On information and belief, Caltech is not entitled to injunctive relief, *inter alia*, because it does not make, use, or sell, any product that practices any claim of the Asserted Patents.  Any alleged injury to Caltech is neither immediate nor irreparable, and Caltech has an adequate remedy at law.

## FIFTH DEFENSE

### (Limitation on Damages)

118.   The relief sought by Caltech based on Defendants' alleged infringement of the Asserted Patents is limited by 35 U.S.C. § 286, which prohibits recovery for any alleged infringement committed more than six years before the filing of the Complaint.

## SIXTH DEFENSE

### (Inequitable Conduct)

119.   The Asserted Patents are directed to Irregular Repeat-Accumulate codes ("IRA codes").  Repeat-Accumulate codes ("RA codes") were well known in prior art.  The purported novelty of the Asserted Patents is irregularity (switching from "RA" to "IRA").  The presence or absence of irregular error correction codes in the prior art is highly material to the patentability of the Asserted Patents.

120.   The Asserted Patents are unenforceable as a result of inequitable conduct arising from Caltech's, the named inventors', and others' intentional choice to withhold from the U.S. Patent and Trademark Office ("Patent Office") prior art references disclosing irregular error correction codes that the inventors knew to be

16

material, leaving the Patent Office with no prior art reference that disclosed irregular codes at all, so that Caltech could present the misleading and deceptive argument that irregularity made its claims patentable.

121.   Caltech, the named inventors, and others associated with prosecution of the patents-in-suit intentionally chose not to disclose at least:

- "Practical Loss-Resilient Codes" by Michael G. Luby et al. (1997) ("Luby97");

- "Analysis of Low Density Codes and Improved Designs Using Irregular Graphs" by Michael G. Luby et al. (1998) ("Luby98"); and

- "Design of Provably Good Low-Density Parity Check Codes" by Tom Richardson et al. (1999) ("Richardson99")

to the Patent Office during the prosecution of the Asserted Patents.  Caltech, the named inventors, and others associated with the patents' prosecution knew that these references were material to the patentability of the Asserted Patents, and still chose not to disclose them with the intent to deceive the Patent Office.

122.   Caltech and the named inventors of the Asserted Patents knew about the Luby97 and Luby98 references at the time they filed their patent application, and knew that these references were material to the prosecution of the Asserted Patents.  In his thesis submitted to Caltech in 2002, for example, Dr. Khandekar characterized Luby's work as a "major breakthrough," and explained how the alleged invention of the Asserted Patents was derived from Luby.  Dr. Khandekar wrote that "Luby et al. … introduced the concept of irregularity," and that "irregular repeat-accumulate (IRA) codes" merely "apply the concept of irregularity to the ensemble of RA codes" known in the prior art (*e.g.*, Divsalar et al., "Coding Theorems for 'Turbo-Like' Codes," Proceeding of the 36th Annual Allerton Conference on Communication, Control, and Computing, Sept. 23-25, 1998, pp. 201-210 (1998)).

123. Despite this knowledge, Caltech, the named inventors, and others associated with the prosecution of the patents-in-suit chose not to disclose either Luby97 or Luby98 to the Patent Office.

124. Upon information and belief, in addition, from at least April 1999 onward, the inventors and Caltech had an advance copy of a paper by Tom Richardson and Rudiger Urbanke, entitled "Design of Provably Good Low-Density Parity Check Codes", dated April 6, 1999. This paper, Richardson99, discusses irregular error correction codes. It begins, for example: "In this paper, we present *irregular* low-density parity check codes …." (emphasis in original). The inventors and Caltech failed to disclose Richardson99 to the Patent Office during prosecution.

125. Instead, Caltech, the named inventors, and others involved in prosecution chose to disclose a 2001 version of the Richardson and Urbanke article ("Richardson01"). Substantively, the disclosure in Richardson99 and the disclosure in Richardson01 is largely the same. Both describe irregular error correction codes. The only material difference between the two versions of this paper is that one (Richardson99) is prior art, and the other (Richardson01) is not. The disclosure of Richardson01 is thus an admission by Caltech, the named inventors, and those involved in prosecution that the content of Richardson99 is material. Caltech, the named inventors, and others involved in prosecution chose to disclose Richardson01 to the Patent Office, and withhold Richardson99, for a reason. Had they disclosed Richardson99, the Patent Office would have been informed that irregular error correction codes were known in the prior art. By choosing not to disclose Richardson99, Caltech, the named inventors, and those involved in prosecution were able to keep this prior art hidden from the Patent Office.

126. A district court judge has rejected Caltech's past arguments that it did disclose these references to the Patent Office. In *California Institute of Technology v. Hughes Communications*, No. 2:12-cv-07245-MRP-JEM, 2015 WL 111089495 (C.D. Cal. May 5, 2015), the Court denied summary judgment to Caltech as to no

18

inequitable conduct.  Although Caltech cited to Luby97 and Richardson in presentation slides submitted as a provisional application, and disclosed a paper which cited these references, the Court found that neither action "necessarily fulfilled Caltech's duty to disclose this prior art to the [Patent Office]."  *Id.* at *7. The Court noted that if it adopted Caltech's rule, "brief citations to prior art *somewhere* in a patentee's submission would satisfy the patentee's duty", creating a "perverse incentive for patentees to bury harmful prior art in their filings".  *Id.* (emphasis in original).

127.   The Court further found it significant that Caltech did not disclose the references in accordance with 37 C.F.R. § 1.56, which states that:

> [t]he duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98.

*Id.*  The Court stated Caltech "cannot dispute" that it failed to disclose these references in accordance with §§ 1.97 and 1.98, and found there was "at least a question of fact as to whether Caltech omitted these prior art references or misrepresented their relevance."  *Id.*

128.   As a result, the Patent Office was never provided, and did not consider, any prior art reference disclosing irregular error correcting codes – despite the fact that the named inventors had at least three such references in their possession (Luby97, Luby98, and Richardson99) and had merely "appl[ied] the concept of irregularity" disclosed in each of these three references "to the ensemble of RA codes" also known in the prior art to allegedly conceive of IRA codes.

129.   In 2004, during the prosecution leading to the '710 Patent, the earliest Asserted Patent from which the later Asserted Patents depend, the Patent Office issued a first office action rejecting the claims as invalid under §§ 102 and 103 in

19

view of a prior art reference called Wang.  In response, Caltech argued that Wang disclosed an error correction code in which "all bits are repeated the same number of times" (*i.e.*, "regularly"). Caltech argued that its claims were patentable, by contrast, because they claim an "irregular" error correction code.

130.   At the time that Caltech made this argument to the Patent Office, the named inventors had in their possession at least the Luby97, Luby98, and Richardson99 references that disclosed "irregular" error correction codes.

131.   Luby97 disclosed "irregular" error correction codes generally, and teaches that irregular codes produce better performance than regular codes.  Luby97 discusses these concepts in terms of irregular Tanner graphs versus regular Tanner graphs, the same basis upon which the Caltech inventors performed their work.

132.   Luby98 notes that Luby97 demonstrated "that using irregular graphs yields codes with much better performance than regular graphs."

133.   Luby98 then explains "why irregular graphs prove useful," explaining that "[f]rom the point of view of a message node, it is best to have high degree, since the more information it gets from its check nodes the more accurately it can judge what its correct value should be," while conversely "from the point of view of a check node, it is best to have low degree, since the higher the degree of a check node, the more likely it is to transmit incorrect guesses to the message nodes." Luby98 explains:

> If one allows irregular graphs, there is more flexibility in balancing these competing requirements. In fact, for the decoding algorithm we describe below, the improved performance arises from varying the degrees of the message nodes. Message nodes with high degree tend to their correct value quickly. These nodes then provide good information to the check nodes, which subsequently provide better information to lower degree message nodes. Irregular graph constructions thus lead to a wave effect, where high degree message nodes tend to get corrected first, and then message nodes with slightly smaller degree, and so on down the line.

134.   Luby98 then provides examples and test results for "graphs where the nodes on the left side [*i.e.*, variable nodes] may have varying degrees and the nodes

20

on the right side [*i.e.*, check nodes] all have the same degree."  As Luby98 explains, "this suffices to find codes with significantly better performance than that given by codes determined by regular graphs."  Luby98's test results show "irregular codes" that "are far superior to any regular code."

135.   Richardson99 provides a similar disclosure.  Richardson99 begins: "In this paper we present *irregular* low-density parity check codes (LDPCCs) . . ." (emphasis in original).  Richardson99 explains that in "an *irregular* low-density parity-check code the degrees of each set of nodes are chosen according to some distribution.  Thus, an irregular low-density parity-check code might have a graphical representation in which half the variable nodes have degree 5 and half have degree 3, while half the constraint nodes have degrees 6 and half have degree 8." (emphasis in original).  Richardson99 "present[s] results indicating the remarkable performance that can be achieved by properly chosen *irregular* codes" (emphasis in original).

136.   As the Court in *California Institute of Technology v. Hughes Communications* explained:  ". . . during prosecution, the patentees distinguished their invention from the Wang prior art reference because Wang did not disclose irregular repetition of bits. While Wang does not disclose irregular repetition, the three references do disclose irregular repetition. Had the [Patent Office] considered these references, the [Patent Office] may have issued a rejection under § 103." 2015 WL 1108945, at *7.

137.   Caltech and the named inventors recognized that these teachings of Luby97, Luby98, and Ricahrdson99 were material to their then-pending patent claims, as demonstrated by Dr. Khandekar's explanation of these references and their relevance to IRA codes in his doctoral thesis.  By arguing to the Patent Office that their then-pending patent claims were patentable over the Wang prior art reference because in Wang "all bits are repeated the same number of times, *i.e.*, regularly," while at the same time keeping from the Patent Office three prior art

21

references (Luby97, Luby98, and Richardson99) that expressly teach the benefits of making regular codes irregular, Caltech and the named inventors made an affirmative misrepresentation to the Patent Office about the state of the prior art relevant to their then-pending patent claims.

138.   Caltech and the named inventors had a financial motive to do so.  On information and belief, Caltech was aware of the satellite industry at the time the patents-in-suit were being prosecuted.  Moreover, on information and belief, the named inventors stand to share in a percentage of any revenues earned on the patents-in-suit.

139.   Had Caltech, the named inventors, or anyone else participating in prosecution disclosed Luby97, Luby98, or Richardson99 to the Patent Office, they could not have made the representations in support of patentability that they made in order to overcome Wang.  Both the affirmative statements made to overcome Wang and the omission of all prior art references disclosing irregular codes (*e.g.*, Luby97, Luby98, and Richardson99) were material to the claims as issued.  The Asserted Patents' claims would not and could not have issued in their present form but for the affirmative representation that "irregular" made the claims novel, and Caltech's simultaneous omission of the references that contradict that representation.

140.   The Asserted Patents are invalid and unenforceable due to inequitable conduct.

## SEVENTH DEFENSE

### (Preclusion)

141.   On information and belief, Caltech's claims are barred in whole or in part by *res judicata*, collateral estoppel and/or other preclusion doctrines.

# EIGHTH DEFENSE

## (Failure to Mark)

142.   To the extent that Caltech, and their respective licensees, failed to properly mark any of the relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Defendants' actions allegedly infringed any of the Asserted Patents, Defendants are not liable to Caltech for the acts alleged to have been performed before they received actual notice that they were allegedly infringing the Asserted Patents.

## COUNTERCLAIMS

Counterclaim-Plaintiffs Broadcom Corporation ("Broadcom Corp.") and Apple Inc. ("Apple") (collectively, "Counterclaim-Plaintiffs"), on personal knowledge as to their own acts, and on information and belief as to all others based on their own and their attorneys' investigation, allege Counterclaims against Caltech as follows:

## PARTIES AND JURISDICTION

1. Broadcom Corp. is a California corporation with a principal place of business at 5300 California Avenue, Irvine, California 92617.

2. Apple is a corporation organized under the laws of the State of California, with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

3. On information and belief, and as represented in Caltech's Complaint, Caltech is a non-profit private university organized under the laws of the State of California, with its principal place of business at 1200 East California Boulevard, Pasadena, California 91125.

4. This Court has jurisdiction over these Counterclaims under 28 U.S.C. §§ 1331, 1338, and 2201-02.

5. This is an action for declaratory judgment of non-infringement, invalidity, and unenforceability arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et. seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. Thus, this Court has subject matter jurisdiction over these Counterclaims under 28 U.S.C. §§ 1331 and 1338(a), in combination with 28 U.S.C. §§ 2201-02.

6. An actual controversy exists between the parties under the Declaratory Judgment Act because Caltech alleges in its Complaint that U.S. Patent No. 7,116,710 ("the '710 Patent"), U.S. Patent No. 7,421,032 ("the '032 Patent"), U.S. Patent No. 7,916,781 ("the '781 Patent"), and U.S. Patent No. 8,284,833 ("the '833 Patent") (collectively, "the Asserted Patents") are valid, enforceable, and infringed

24

by Counterclaim-Plaintiffs and Counterclaim-Plaintiffs deny those allegations.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400.

## COUNT I

## NON-INFRINGEMENT OF THE '710 PATENT

8.      Counterclaim-Plaintiffs repeat and re-allege the allegations contained in the immediately preceding paragraphs 1 through 7 as if fully set forth herein.

9.      Caltech avers in its Complaint that it is the assignee of the '710 Patent, the owner of all rights, title and interest in and to the '710 Patent, and that Counterclaim-Plaintiffs infringe the '710 Patent.

10.      Counterclaim-Plaintiffs do not now and never have infringed a valid and enforceable claim of the '710 Patent.

11.      Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

12.      Counterclaim-Plaintiffs are entitled to a declaratory judgment that they have not infringed and are not infringing any valid and enforceable claim of the '710 Patent.

## COUNT II

## INVALIDITY OF THE '710 PATENT

13.      Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 as if fully set forth herein.

14.      On information and belief, the claims of the '710 Patent are invalid for failure to comply with the conditions for patentability under the patent laws of the United States, 35 U.S.C. §§1 *et seq*., including 35 U.S.C. §§ 101, 102, 103, and/or 112.

25

15. Caltech contends that the '710 Patent is valid and enforceable.

16. Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs. Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein. Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

17. Counterclaim-Plaintiffs are entitled to a declaratory judgment that the claims of the '710 Patent are invalid.

## COUNT III

## NON-INFRINGEMENT OF THE '032 PATENT

18. Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 as if fully set forth herein.

19. Caltech avers in its Complaint that it is the assignee of the '032 Patent, the owner of all rights, title and interest in and to the '032 Patent, and that Counterclaim-Plaintiffs infringe the '032 Patent.

20. Counterclaim-Plaintiffs do not now and never have infringed a valid and enforceable claim of the '032 Patent.

21. Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs. Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein. Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

22. Counterclaim-Plaintiffs are entitled to a declaratory judgment that they have not infringed and are not infringing any valid and enforceable claim of the '032 Patent.

## COUNT IV

## INVALIDITY OF THE '032 PATENT

23.     Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 as if fully set forth herein.

24.     On information and belief, the claims of the '032 Patent are invalid for failure to comply with the conditions for patentability under the patent laws of the United States, 35 U.S.C. §§1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

25.     Caltech contends that the '032 Patent is valid and enforceable.

26.     Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

27.     Counterclaim-Plaintiffs are entitled to a declaratory judgment that the claims of the '032 Patent are invalid.

## COUNT V

## NON-INFRINGEMENT OF THE '781 PATENT

28.     Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 as if fully set forth herein.

29.     Caltech avers in its Complaint that it is the assignee of the '781 Patent, the owner of all rights, title and interest in and to the '781 Patent, and that Counterclaim-Plaintiffs infringe the '781 Patent.

30.     Counterclaim-Plaintiffs do not now and never have infringed a valid and enforceable claim of the '781 Patent.

31.     Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the

27

1    parties herein.  Such a determination and declaration is necessary and appropriate at

2    this time so that the parties may ascertain their respective rights and duties.

3        32.    Counterclaim-Plaintiffs are entitled to a declaratory judgment that they

4    have not infringed and are not infringing any valid and enforceable claim of the

5    '781 Patent.

6                            **COUNT VI**

7                    **INVALIDITY OF THE '781 PATENT**

8        33.    Counterclaim-Plaintiffs repeat and re-allege the allegations contained

9    in paragraphs 1 through 7 as if fully set forth herein.

10       34.    On information and belief, the claims of the '710 Patent are invalid for

11   failure to comply with the conditions for patentability under the patent laws of the

12   United States, 35 U.S.C. §§1 *et seq*., including 35 U.S.C. §§ 101, 102, 103, and/or

13   112.

14       35.    Caltech contends that the '781 Patent is valid and enforceable.

15       36.    Accordingly, a valid and justiciable controversy has arisen and exists

16   between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a

17   judicial determination and declaration of the respective rights and duties of the

18   parties herein.  Such a determination and declaration is necessary and appropriate at

19   this time so that the parties may ascertain their respective rights and duties.

20       37.    Counterclaim-Plaintiffs are entitled to a declaratory judgment that the

21   claims of the '781 Patent are invalid.

22                            **COUNT VII**

23                **NON-INFRINGEMENT OF THE '833 PATENT**

24       38.    Counterclaim-Plaintiffs repeat and re-allege the allegations contained

25   in paragraphs 1 through 7 as if fully set forth herein.

26       39.    Caltech avers in its Complaint that it is the assignee of the '833 Patent,

27   the owner of all rights, title and interest in and to the '833 Patent, and that

28   Counterclaim-Plaintiffs infringe the '833 Patent.

                                    28

40.     Counterclaim-Plaintiffs do not now and never have infringed a valid and enforceable claim of the '833 Patent.

41.     Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

42.     Counterclaim-Plaintiffs are entitled to a declaratory judgment that they have not infringed and are not infringing any valid and enforceable claim of the '833 Patent.

## COUNT VIII
## INVALIDITY OF THE '833 PATENT

43.     Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 as if fully set forth herein.

44.     On information and belief, the claims of the '710 Patent are invalid for failure to comply with the conditions for patentability under the patent laws of the United States, 35 U.S.C. §§1 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, and/or 112.

45.     Caltech contends that the '833 Patent is valid and enforceable.

46.     Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

47.     Counterclaim-Plaintiffs are entitled to a declaratory judgment that the claims of the '833 Patent are invalid.

## COUNT IX

## UNENFORCEABILITY OF THE ASSERTED PATENTS DUE TO INEQUITABLE CONDUCT

48.     Counterclaim-Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 7 of the Counterclaims and paragraphs 119-140 of the Answer above as if fully set forth herein.

49.     The Asserted Patents are directed to Irregular Repeat-Accumulate codes ("IRA codes").  Repeat-Accumulate codes ("RA codes") were well known in prior art.  The purported novelty of the Asserted Patents is irregularity (switching from "RA" to "IRA").  The presence or absence of irregular error correction codes in the prior art is highly material to the patentability of the Asserted Patents.

50.     The Asserted Patents are unenforceable as a result of inequitable conduct arising from Caltech's, the named inventors', and others' intentional choice to withhold from the U.S. Patent and Trademark Office ("Patent Office") prior art references disclosing irregular error correction codes that the inventors knew to be material, leaving the Patent Office with no prior art reference that disclosed irregular codes at all, so that Caltech could present the misleading and deceptive argument that irregularity made its claims patentable.

51.     Caltech, the named inventors, and others associated with prosecution of the patents-in-suit intentionally chose not to disclose at least:

- "Practical Loss-Resilient Codes" by Michael Luby et al. (1997) ("Luby97");
- "Analysis of Low Density Codes and Improved Designs Using Irregular Graphs" by Michael Luby et al. (1998) ("Luby98"); and
- "Design of Provably Good Low-Density Parity Check Codes" by Tom Richardson et al. (1999) ("Richardson99")

to the Patent Office during the prosecution of the Asserted Patents.  Caltech, the named inventors, and others associated with the patents' prosecution knew that

30

these references were material to the patentability of the Asserted Patents, and still chose not to disclose them with the intent to deceive the Patent Office.

52.     Caltech and the named inventors of the Asserted Patents knew about the Luby97 and Luby98 references at the time they filed their patent application, and knew that these references were material to the prosecution of the Asserted Patents.  In his thesis submitted to Caltech in 2002, for example, Dr. Khandekar characterized Luby's work as a "major breakthrough," and explained how the alleged invention of the Asserted Patents was derived from Luby.  Dr. Khandekar wrote that "Luby et al. … introduced the concept of irregularity," and that "irregular repeat-accumulate (IRA) codes" merely "apply the concept of irregularity to the ensemble of RA codes" known in the prior art (*e.g.*, Divsalar et al., "Coding Theorems for 'Turbo-Like' Codes," Proceeding of the 36th Annual Allerton Conference on Communication, Control, and Computing, Sept. 23-25, 1998, pp. 201-210 (1998)).

53.     Despite this knowledge, Caltech, the named inventors, and others associated with the prosecution of the patents-in-suit chose not to disclose either Luby97 or Luby98 to the Patent Office.

54.     Upon information and belief, in addition, from at least April 1999 onward, the inventors and Caltech had an advance copy of a paper by Tom Richardson and Rudiger Urbanke, entitled "Design of Provably Good Low-Density Parity Check Codes", dated April 6, 1999.  This paper, Richardson99, discusses irregular error correction codes.  It begins, for example: "In this paper, we present *irregular* low-density parity check codes …." (emphasis in original). The inventors and Caltech failed to disclose Richardson99 to the Patent Office during prosecution.

55.     Instead, Caltech, the named inventors, and others involved in prosecution chose to disclose a 2001 version of the Richardson and Urbanke article ("Richardson01").  Substantively, the disclosure in Richardson99 and the disclosure in Richardson01 is largely the same.  Both describe irregular error correction codes.

31

The only material difference between the two versions of this paper is that one (Richardson99) is prior art, and the other (Richardson01) is not.  The disclosure of Richardson01 is thus an admission by Caltech, the named inventors, and those involved in prosecution that the content of Richardson99 is material.  Caltech, the named inventors, and others involved in prosecution chose to disclose Richardson01 to the Patent Office, and withhold Richardson99, for a reason.  Had they disclosed Richardson99, the Patent Office would have been informed that irregular error correction codes were known in the prior art.  By choosing not to disclose Richardson99, Caltech, the named inventors, and those involved in prosecution were able to keep this prior art hidden from the Patent Office.

56.     A district court judge has rejected Caltech's past arguments that it did disclose these references to the Patent Office.  In *California Institute of Technology v. Hughes Communications*, No. 2:12-cv-07245-MRP-JEM, 2015 WL 111089495 (C.D. Cal. May 5, 2015), the Court denied summary judgment to Caltech as to no inequitable conduct.  Although Caltech cited to Luby97 and Richardson in presentation slides submitted as a provisional application, and disclosed a paper which cited these references, the Court found that neither action "necessarily fulfilled Caltech's duty to disclose this prior art to the [Patent Office]." *Id.* at *7.  The Court noted that if it adopted Caltech's rule, "brief citations to prior art ***somewhere*** in a patentee's submission would satisfy the patentee's duty", creating a "perverse incentive for patentees to bury harmful prior art in their filings". *Id.* (emphasis in original).

57.     The Court further found it significant that Caltech did not disclose the references in accordance with 37 C.F.R. § 1.56, which states that:

> [t]he duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98.

*Id.*  The Court stated Caltech "cannot dispute" that it failed to disclose these references in accordance with §§ 1.97 and 1.98, and found there was "at least a question of fact as to whether Caltech omitted these prior art references or misrepresented their relevance."  *Id.*

58.   As a result, the Patent Office was never provided, and did not consider, any prior art reference disclosing irregular error correcting codes – despite the fact that the named inventors had at least three such references in their possession (Luby97, Luby98, and Richardson99) and had merely "appl[ied] the concept of irregularity" disclosed in each of these three references "to the ensemble of RA codes" also known in the prior art to allegedly conceive of IRA codes.

59.   In 2004, during the prosecution leading to the '710 Patent, the earliest Asserted Patent from which the later Asserted Patents depend, the Patent Office issued a first office action rejecting the claims as invalid under §§ 102 and 103 in view of a prior art reference called Wang.  In response, Caltech argued that Wang disclosed an error correction code in which "all bits are repeated the same number of times" (*i.e.*, "regularly"). Caltech argued that its claims were patentable, by contrast, because they claim an "irregular" error correction code.

60.   At the time that Caltech made this argument to the Patent Office, the named inventors had in their possession at least the Luby97, Luby98, and Richardson99 references that disclosed "irregular" error correction codes.

61.   Luby97 disclosed "irregular" error correction codes generally, and teaches that irregular codes produce better performance than regular codes.  Luby97 discusses these concepts in terms of irregular Tanner graphs versus regular Tanner graphs, the same basis upon which the Caltech inventors performed their work.

62.   Luby98 notes that Luby97 demonstrated "that using irregular graphs yields codes with much better performance than regular graphs."

63.   Luby98 then explains "why irregular graphs prove useful," explaining that "[f]rom the point of view of a message node, it is best to have high degree,

33

since the more information it gets from its check nodes the more accurately it can judge what its correct value should be," while conversely "from the point of view of a check node, it is best to have low degree, since the higher the degree of a check node, the more likely it is to transmit incorrect guesses to the message nodes." Luby98 explains:

> If one allows irregular graphs, there is more flexibility in balancing these competing requirements. In fact, for the decoding algorithm we describe below, the improved performance arises from varying the degrees of the message nodes. Message nodes with high degree tend to their correct value quickly. These nodes then provide good information to the check nodes, which subsequently provide better information to lower degree message nodes. Irregular graph constructions thus lead to a wave effect, where high degree message nodes tend to get corrected first, and then message nodes with slightly smaller degree, and so on down the line.

64.    Luby98 then provides examples and test results for "graphs where the nodes on the left side [*i.e.*, variable nodes] may have varying degrees and the nodes on the right side [*i.e.*, check nodes] all have the same degree."  As Luby98 explains, "this suffices to find codes with significantly better performance than that given by codes determined by regular graphs."  Luby98's test results show "irregular codes" that "are far superior to any regular code."

65.    Richardson99 provides a similar disclosure.  Richardson99 begins: "In this paper we present *irregular* low-density parity check codes (LDPCCs) . . ." (emphasis in original).  Richardson99 explains that in "an *irregular* low-density parity-check code the degrees of each set of nodes are chosen according to some distribution.  Thus, an irregular low-density parity-check code might have a graphical representation in which half the variable nodes have degree 5 and half have degree 3, while half the constraint nodes have degrees 6 and half have degree 8." (emphasis in original).  Richardson99 "present[s] results indicating the remarkable performance that can be achieved by properly chosen *irregular* codes" (emphasis in original).

34

66.     As the Court in *California Institute of Technology v. Hughes Communications* explained:  ". . . during prosecution, the patentees distinguished their invention from the Wang prior art reference because Wang did not disclose irregular repetition of bits. While Wang does not disclose irregular repetition, the three references do disclose irregular repetition. Had the [Patent Office] considered these references, the [Patent Office] may have issued a rejection under § 103." 2015 WL 1108945, at *7.

67.     Caltech and the named inventors recognized that these teachings of Luby97, Luby98, and Ricahrdson99 were material to their then-pending patent claims, as demonstrated by Dr. Khandekar's explanation of these references and their relevance to IRA codes in his doctoral thesis.  By arguing to the Patent Office that their then-pending patent claims were patentable over the Wang prior art reference because in Wang "all bits are repeated the same number of times, *i.e.*, regularly," while at the same time keeping from the Patent Office three prior art references (Luby97, Luby98, and Richardson99) that expressly teach the benefits of making regular codes irregular, Caltech and the named inventors made an affirmative misrepresentation to the Patent Office about the state of the prior art relevant to their then-pending patent claims.

68.     Caltech and the named inventors had a financial motive to do so.  On information and belief, Caltech was aware of the satellite industry at the time the patents-in-suit were being prosecuted.  Moreover, on information and belief, the named inventors stand to share in a percentage of any revenues earned on the patents-in-suit.

69.     Had Caltech, the named inventors, or anyone else participating in prosecution disclosed Luby97, Luby98, or Richardson99 to the Patent Office, they could not have made the representations in support of patentability that they made in order to overcome Wang.  Both the affirmative statements made to overcome Wang and the omission of all prior art references disclosing irregular codes (*e.g.*,

35

Luby97, Luby98, and Richardson99) were material to the claims as issued.  The Asserted Patents' claims would not have and could not have issued in their present form but for the affirmative representation that "irregular" made the claims novel, and Caltech's simultaneous omission of the references that contradict that representation.

70.     The March 28, 2011 application for the '833 Patent is a continuation of the June 30, 2008 application for the '781 Patent, which is a continuation of the October 3, 2006 application for the '032 Patent, which is a continuation of the May 18, 2001 application for the '710 Patent, and a continuation-in-part of the August 18, 2000 application for U.S. Patent No. 7,089,477.

71.     All of the Asserted Patents share a common specification and relate to the same subject matter.  Therefore, these patents have an immediate and necessary relation to one another, and Caltech's actions rendering each one of them unenforceable likewise render the others unenforceable.

72.     For the foregoing reasons, the Asserted Patents are invalid and unenforceable due to inequitable conduct.

73.     Counterclaim-Plaintiffs are informed and believe, and on that basis allege, that Caltech contends that the Asserted Patents are valid and enforceable.

74.     Accordingly, a valid and justiciable controversy has arisen and exists between Caltech and Counterclaim-Plaintiffs.  Counterclaim-Plaintiffs desire a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

75.     Counterclaim-Plaintiffs are entitled to a declaratory judgment that the claims of the Asserted Patents are not enforceable.

## **DEMAND FOR JURY TRIAL**

Under Fed. R. Civ. P. 38(b), Counterclaim-Plaintiffs demand a trial by jury on all issues triable to a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiffs respectfully request entry of judgment in their favor and against Caltech as follows:

a)     Dismissing Caltech's Complaint in its entirety, with prejudice;

b)     Entering judgment on Caltech's claims in favor of Broadcom Ltd., Avago Ltd., Broadcom Corp., and Apple and against Caltech;

c)     Denying Caltech any and all relief on its claims, including, but not limited to, the relief in Caltech's Prayer for Relief (a)-(h);

d)     Declaring that Counterclaim-Plaintiffs do not now and never have infringed any claim of the '710 Patent;

e)     Declaring that the claims of the '710 Patent are invalid;

f)     Declaring that the claims of the '710 Patent are unenforceable due to inequitable conduct before the United States Patent and Trademark Office;

g)     Declaring that Counterclaim-Plaintiffs do not now and never have infringed any claim of the '032 Patent;

h)     Declaring that the claims of the '032 Patent are invalid;

i)     Declaring that the claims of the '032 Patent are unenforceable due to inequitable conduct before the United States Patent and Trademark Office;

j)     Declaring that Counterclaim-Plaintiffs do not now and never have infringed any claim of the '781 Patent;

k)     Declaring that the claims of the '781 Patent are invalid;

l)     Declaring that the claims of the '781 Patent are unenforceable due to inequitable conduct before the United States Patent and Trademark Office;

m)     Declaring that Counterclaim-Plaintiffs do not now and never have infringed any claim of the '833 Patent;

37

n)   Declaring that the claims of the '833 Patent are invalid;

o)   Declaring that the claims of the '833 Patent are unenforceable due to inequitable conduct before the United States Patent and Trademark Office;

p)   Declaring the case exceptional under 35 U.S.C. § 285 and awarding to Counterclaim-Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

q)   Granting Counterclaim-Plaintiffs such other and further relief as this Court deems just and proper.

Dated:  August 1, 2016

Respectfully submitted,

MAYER BROWN LLP

By: */s/ Cliff A. Maier*
        Cliff A. Maier

Duane-David Hough (*pro hac vice pending*)
dhough@mayerbrown.com
Brian W. Nolan (*pro hac vice pending*)
bnolan@mayerbrown.com
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

Cliff A. Maier
cmaier@mayerbrown.com
Elspeth V. Hansen
ehansen@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

Andrew S. DeCarlow
adecarlow@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

Attorneys for Defendants Broadcom Limited, Broadcom Corporation, Avago Technologies Limited, and Apple Inc.

38