UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 16-3714-GW(AGRx)** | Date | July 12, 2017 |
|---|---|---|---|

| Title | ***The California Institute of Technology v. Broadcom Limited, et al.*** | Page | 1 of 1 |
|---|---|---|---|

Present: The Honorable   **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | None Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS – FINAL RULING ON CLAIM CONSTRUCTION
(*MARKMAN* HEARING HELD ON JUNE 29, 2017)**


On June 29, 2017, the Court issued a tentative ruling and held a *Markman* hearing in this patent infringement action.  *See* Tentative Ruling on Claim Construction ("Tentative Ruling"), Docket No. 207.  During the hearing, the Court asked the parties to submit a joint supplemental brief after Defendants raised certain requests for clarification.  The parties have now done so. *See* Joint Supplemental Brief Regarding Claim Construction ("Supp. Br."), Docket No. 212. Defendants essentially seek an order clarifying whether the Court's construction of "repeat" is consistent with Judge Mariana R. Pfaelzer's construction of the same term in an earlier case involving the same patents asserted here, specifically whether "repeat": (1) means "duplicate"; and (2) does not mean "re-use."  *See* Supp. Br. at 1.  The Court has already addressed the related contentions by the parties in its tentative ruling to the extent necessary for construction. *See* Tentative Ruling at 8-11 (adopting the plain and ordinary meaning of "repeat," explaining further that the term encompasses: (1) "generation of additional bits by means of duplicating the original bits" "without limiting how specifically the duplicate bits are created or stored in the memory"; and (2) choosing or "selecting the [message] bits for use without necessarily storing them at a specific location in computer memory").  Indeed, the Court emphatically added that "the claims do not articulate a specific limitation as to the exact implementation technique" (*id.* at 9) – as such, while the term "repeat" may encompass duplication and reuse, it surely is not limited to those specific implementation techniques.  No more clarity is warranted at this stage. Accordingly, the Court adopts its tentative ruling as its final decision on the claim construction for the reasons stated in the tentative ruling.

*__The California Institute of Technology v. Broadcom Limited et al.__*; Case No. 2:16-cv-03714-GW-AGR; Tentative Rulings on Claim Construction (*Markman* Hearing set for June 29, 2017)

## I.      Introduction

Plaintiff The California Institute of Technology sues Defendants Broadcom Limited, Broadcom Corporation, Avago Technologies Limited, Apple Inc., and Cypress Semiconductor for patent infringement in this action. *See generally* First Amended Complaint, Docket No. 36.

Plaintiff claims that Defendants infringe the following patents issued by the U.S. Patent and Trademark Office ("USPTO" or "PTO") and owned by Plaintiff: (1) U.S. Patent No. 7,116,710 ("the '710 Patent"); (2) U.S. Patent No. 7,421,032 ("the '032 Patent"); (3) U.S. Patent No. 7,916,781 ("the '781 Patent"); and (4) U.S. Patent No. 8,284,833 ("the '833 Patent") (collectively, the "Asserted Patents" or the "patents-in-suit"). *See id.* ¶¶ 2-4.

Plaintiff alleges the following facts related to infringement:

The Institute of Electrical and Electronics Engineers ("IEEE") developed Wi-Fi, the industry standard for wireless communications over local area networks. *See id.* ¶ 30. Wi-Fi usage is widespread in modern electronic products such as smartphones. *Id.* The IEEE Wi-Fi standards are set forth in IEEE 802.11 specifications. *See id.* ¶ 31.

Some of the key improvements to the Wi-Fi standard – specifically: (1) the 802.11n version, which includes a high throughput mode that is implemented using a specific type of Low-Density Parity Check ("LDPC"); and (2) the 802.11ac version, which includes a very high throughput mode – include irregular repeat and accumulate operations, and therefore implemented Plaintiff's patented irregular repeat and accumulate ("IRA") error correction code technology. *See id.* ¶¶ 32-33.

Defendants manufacture, use, import, offer for sale, and/or sell Wi-Fi products (such as semiconductor chips) that incorporate IRA/LDPC encoders and/or decoders, and therefore infringe the Asserted Patents. *Id.* ¶¶ 36, 41-42, 47.

In response to the foregoing allegations, Defendants raise several defenses, including the invalidity and non-infringement of the Asserted Patents. *See generally* Answer, Docket No. 47.

The parties now move for construction of numerous claim terms in the Asserted Patents. *See* Pl.'s Opening Claim Constr. Br. ("Pl.'s Motion"), Docket No. 128; Decl. of Matthew Shoemake ("Shoemake Decl."), Docket No. 128-1; Decl. of Todd M. Briggs ("Briggs Decl."), Docket No. 128-2; Defs.' Opening Claim Constr. Br. ("Defs.' Motion"), Docket No. 127; Pl.'s Responsive Claim Constr. Br. ("Pl.'s Opposition"), Docket No. 167; Suppl. Decl. of Todd M. Briggs ("Briggs Suppl. Decl."), Docket No. 167-2; Defs.' Responsive Claim Constr. Br. ("Defs.' Opposition"), Docket No. 168; Pl.'s Suppl. Claim Constr. Br. ("Pl.'s Suppl. Motion"), Docket No. 194; Defs.' Suppl. Claim Constr. Br. ("Defs.' Suppl. Motion"), Docket No. 193; Pl.'s Responsive Suppl. Claim Constr. Br. ("Pl.'s Suppl. Opposition"), Docket No. 199; Defs.' Responsive Suppl. Claim Constr. Br. ("Defs.' Suppl. Opposition"), Docket No. 200.

## II.      Technical Background

The Asserted Patents trace their priority to U.S. Provisional Application Serial No. 60/205,095, filed May 18, 2000, and U.S. Application Serial No. 09/922,852, filed August 18, 2000 (now U.S. Patent No. 7,089,477).  *See* '710 Patent at 1:8-10; '032 Patent at 1:8-13; '781 Patent at 1:8-15; '833 Patent at 1:8-17.  Expectedly, the Asserted Patents utilize a common specification.

The specification purports to disclose a technology for reliable yet efficient data signal transmission over a communication channel, which protects the data from loss due to transmission errors.  *See generally* '781 Patent at 1:29-2:16.  Reliability is assured by repeating information bits (that is, binary digits "0" and "1," the building blocks for any data signal) in the manner disclosed in the Asserted Patents to generate error correction codes, which are then transmitted along with the original information bits; efficiency is secured by minimizing the repetitions.  *See generally id.*; *see also id.* at 2:41-46; *id.*, Abstract (summarizing that the invention is directed at "[a] serial concatenated coder include[ing] an outer coder and an inner coder," where the inner coder receives scrambled, repeated bits from the outer coder and maintains "a rate substantially close to one" as it operates).  As Judge Mariana R. Pfaelzer explained generally about the error correction codes in another case involving the Asserted Patents:

> In modern electronic systems, data are stored in the form of bits having the value "1" or "0."  During data transmission, a random or irregular fluctuation (known as noise) can occur in the signal and corrupt data.  For example, a transmitter may send a bit with the value "1," but noise may corrupt this bit and cause the receiver to read the value as "0."  To mitigate this problem, electronic systems use error correction.  Error correction depends on redundancy, which refers to "extra" bits that may be duplicates of original information bits and are transmitted along with the original bits.  These extra bits are not necessary, in the sense that the original information exists without them, but they serve an important purpose.  Using these extra bits, the receiver can ensure that the original information bits were not corrupted during transmission.

*Cal. Institute of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 977-78 (C.D. Cal. 2014) (footnote omitted).

At their core, a mechanism that balances the two (*i.e.* increased reliability by repeating bits versus efficiency by minimizing repetitions) by generating "irregular repeat and accumulate" error correction codes is the claimed novelty in the Asserted Patents, which enables a transmission rate close to the theoretical limit of the amount of data that a channel can carry.  *See* '781 Patent at 1:29-43; *see also id.* at 3:36-37 ("An IRA code is a linear code, and as such, may be represented as a set of parity checks.");  Transcript of the June 15, 2017 Technology Tutorial ("Tutorial Tr.") at 8-9 ("Caltech's patents are directed to . . . dealing with noise during the transmission process, and they are directed to this field of error correction coding.  The point of error correction coding is to try to, despite the fact that there is noise that has to be dealt with in communication, the point is to try to create reliable communication nonetheless.").  The Patent

Trial and Appeal Board at the USPTO explained the '781 Patent against this relevant backdrop:

> Error correcting codes are used to communicate information across a noisy communication channel. They enable recovery of a transmitted message that may have become distorted by noise on the communication channel. To error correction encode a message for transmission, its bits are parsed into groups of message bits that are "encoded" into "codewords" that include additional redundant information. (For example, message bits "10011" may be encoded into a codeword "100111" by adding a "parity" bit "1" to the original message.) Thus, the encoded codewords have more information than the original message had prior to encoding. The codewords are transmitted over the communication channel and are received at another location, where the codewords are "decoded" into the original message. No single coding scheme is optimal for all communication channels. There are design tradeoffs between the use of complex codes, which permit better error correction, and less complex codes, which are easier to decode. This has led to the development of many different encoding/decoding schemes. The '781 Patent describes one such scheme.

*Hughes Network Sys., LLC v. Cal. Institute of Tech.*, IPR2015-00059, 2016 WL 3598282, at *1 (Patent Tr. & App. Bd. Apr. 21, 2016) (footnote imported into the text as parenthetical).

The specification discloses an embodiment of the IRA coding system that includes an outer coder – "202," an interleaver – "204," and an inner coder – "206." *See* '781 Patent at Fig. 2.[1]



**FIG. 2**

---

[1] The specification also appears to indicate that the outer coder may encompass the interleaver, the component that scrambles bits. *Compare id.* at 2:3-5 ("The coding system includes an outer coder, which repeats and *scrambles* bits in the data block. The data block is apportioned into two or more sub-blocks, and bits in different sub-blocks are repeated a different number of times according to a selected degree profile. The outer coder may include a repeater with a variable rate and an *interleaver*.") (emphases added), *with id.* at 2:40-41 ("The coder 200 may include an outer coder 202, an interleaver 204, and inner coder 206."), and 2:56-58 ("In an embodiment, the outer coder 202 is a repeater that repeats the k bits in a block a number of times q to produce a block with n bits, where n=qk.").

In that embodiment, reproduced above, the outer coder 202 receives an un-encoded data block containing a fixed number of original information bits, which it then repeats, acting as a repeater. *See id.* at 1:65-67, 2:50-51. The outer coder has an irregular output, which means that different bits in the data block may be repeated a different number of times. *See id.* at 2:58-60; *see also id.* at 2:60-64 ("For example, a fraction of the bits in the block may be repeated two times, a fraction of bits may be repeated three times, and the remainder of bits may be repeated four times. These fractions define a degree sequence, or degree profile, of the code."). The interleaver 204 then scrambles (or rearranges) the bits. *See id.* at 3:29-33. Finally, the inner coder 206 recursively performs exclusive-OR (also known as "XOR") or modulo-two logical operations on the bits it receives from the interleaver, generating the "accumulate code." *Id.* at 3:3-24; *see also id.* at 2:7-10 ("The repeated and scrambled bits are input to an inner coder that has a rate substantially close to one. The inner coder may include one or more accumulators that perform recursive modulo two addition operations on the input bit stream."). It is the "serial concatenation" of the interleaved irregular repeat code and the accumulate code that produces the IRA code, which is transmitted over the communication channel along with the original information bits. *See id.* at 3:34-36; *see also id.* at 2:11-13 ("The encoded data output from the inner coder may be transmitted on a channel and decoded in linear time at a destination using iterative decoding techniques.").

The specification also discloses an alternate embodiment, reproduced below, where the outer coder may be a low-density generator matrix ("LDGM") coder. *See id.* at Fig. 4. The IRA code in that case is produced by a serial concatenation of the LDGM code and the accumulator code, and the interleaver may be excluded as unnecessary. *See id.* at 3:65-4:1-3.



**FIG. 4**

The specification finally discloses yet another embodiment, reproduced below, where the IRA code is represented as a set of parity checks, that set in turn represented in a bipartite graph called the Tanner graph of the IRA code. *See id.* at Fig. 3; *see also id.* at 3:36-61. The Tanner graph includes variable nodes (information nodes $u_1 \ldots u_k$ on the left side of the graph and parity nodes $x_1 \ldots x_r$ on the right side of the graph) and check nodes (filed circles $v_1 \ldots v_r$ on the right side of the graph). *See id.* at 3:42-46. Relatedly, Figs. 5A and 5B, also reproduced below, illustrate, at a more granular level, a message from a variable node going to a check node on the Tanner graph of Fig. 3. *See id.* at 2:28-31; *see also id.* at 5:21-25 (using Figs. 5A and 5B, but only in the context of decoding the IRA codes, to explain that "[t]he outgoing message from a variable node u to a check node v represents information about u, and a message from a check node u to a variable node v represents information about u, as shown in FIGS. 5A and 5B,

4

respectively"). Also using the Tanner graph in Fig. 3 and related illustrations in Figs. 5A and 5B, the specification then discusses an embodiment on how to decode the IRA codes, wherein probabilities associated with encoded bits are used to iteratively decode the information bits:

> "Belief propagation" on the Tanner Graph realization maybe used to decode IRA codes. Roughly speaking, the belief propagation decoding technique allows the messages passed on an edge to represent posterior densities on the bit associated with the variable node. A probability density on a bit is a pair of non-negative real numbers $p(0)$, $p(1)$ satisfying $p(0)+p(1)=1$, where $p(0)$ denotes the probability of the bit being 0, $p(1)$ the probability of it being 1. Such a pair can be represented by its log likelihood ratio, $m=\log(p(0)/p(1))$. The outgoing message from a variable node u to a check node v represents information about u, and a message from a check node u to a variable node v represents information about u, as shown in FIGS. 5A and 5B, respectively.

*See generally id.* at 5:13-25; *see also id.* at 5:48-62 (explaining an initialization step followed by multiple iterations of the decoding process).



**FIG. 3**



FIG. 5A          FIG. 5B

The Asserted Patents generally claim methods and apparatuses of encoding and/or decoding bits in accordance with some form of the IRA code. *See, e.g.*, '710 Patent at 7:14-25 (claiming a method of encoding a signal); *id.* at 8:32-41 (claiming a "coding system"); '032 Patent at 8:62-67 (claiming an encoding device); '833 Patent at 7:21-35 (claiming an apparatus for performing encoding operations); '781 Patent at 8:35-39 (claiming a method of encoding a signal).

## III.    Legal Standard

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). It is "a question of law in the way that we treat document construction as a question of law," with subsidiary fact-finding reviewed for clear error pursuant to Fed. R. Civ. P. 52(a)(6). *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-40 (2015) (citing *Markman*, 517 U.S. at 388-91).

Claim construction begins with an analysis of the claim language itself. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). That is because the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). But "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Id.* at 1315 (internal quotations omitted). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

Although claims are read in light of the specification, limitations from the specification must not be imported into the claims. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The prosecution history is also part of the intrinsic evidence consulted during claim construction. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted). "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.* "Yet because the prosecution history represents an

ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13 (internal quotations and citations omitted). But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else. *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1334 (Fed. Cir. 2004); *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003). For the specification to provide a non-ordinary definition for a term, it must set out its definition in a manner sufficient to provide notice of the meaning to a person of ordinary skill in the art. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotations omitted). Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review." *Teva*, 135 S. Ct. at 841, 849. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

## IV.   Discussion

As an initial matter, the Court would make a general observation: The parties dispute less the terms in a claim (or the scope of a word or phrase in the claim) and more the scope of the invention claimed by the entirety of the claim language. To that end, for most part, the parties argue like ships passing in the night, only to ask the Court to paraphrase claim terms or rephrase them in terms of other words imported directly from the common specification, even when the claim terms are unambiguous or when no meaningful dispute about their meaning exists, discussed *infra*, in effect requesting the Court to rewrite claims. *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1303 (Fed. Cir. 2014) (affirming monetary sanctions under Rule 11(b)(2) of the Federal Rules of Civil Procedure against the patentee *and its counsel* for proposing a construction without support from the specification or the prosecution history). Tellingly, neither party cared to define a person of ordinary skill in the art before laying out arguments in their papers in support of their proposed constructions. Indeed, at times, the parties' positions appear strikingly similar to quibbles over infringement or invalidity of the claims, only cloaked in the garb of construction. But it is elementary that "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (citing *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (deciding that disputed issue was the proper application of a claim term to an accused process rather the scope of the term); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d

1554, 1568 (Fed. Cir. 1997) (declaring that claim construction "is not an obligatory exercise in redundancy")); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 798 (Fed. Cir. 2010) ("[The] term was not fundamentally in dispute, thus, it was proper for the district court not to construe it.") (quoting *O2 Micro*, 521 F.3d at 1362). Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro*, 521 F.3d at 1362 (citing *U.S. Surgical*, 103 F.3d at 1568). Because: (1) the parties have not presented a fundamental dispute regarding the scope of most of the claim terms; and, alternatively, (2) a person of ordinary skill in the art[2] would be presumed to know the plain or established meaning of the terms, the court need not construe them. *See Star Envirotech, Inc. v. Redline Detection, LLC*, No. SACV1201861JGBDFMX, 2015 WL 12743875, at *3 (C.D. Cal. Apr. 30, 2015) ("[W]hile it is the duty of this Court to resolve all disputes regarding the scope of claim terms, nothing in *O2 Micro* requires this Court to replace every disputed claim term with an explicit definition. In some instances, disputes as to the scope of claim terms can best be resolved simply by rejecting a proposed alternative definition in favor of the claim language itself."); Peter S. Menell et al., Fed. Judicial Ctr., *Patent Case Management Judicial Guide* ("*Menell*") § 5.1.4.3 (3d ed. 2016) ("There is no requirement that a court construe a claim term when there is no genuine dispute about its meaning.") (citing *O2 Micro*, 521 F.3d at 1362); *U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.") (citing *Phillips*, 415 F.3d at 1314).

In any event, the Court construes the terms as set forth below, discerning the arguments to the extent they address any relevant "dispute" over terms and in the process steering clear of paraphrasing claim language with less accurate terminology or altering the scope of the invention claimed in the claim language. Incidentally, the end result shows that, for most part, the "disputed" terms speak for themselves.

### A.     "repeat"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Creating a new bit that corresponds to the value of an original bit (i.e., a new copy) by storing the new copied bit in memory. A reuse of a bit is not a repeat of a bit." |

The relevant analysis starts with the claim language. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Claim construction begins and ends in all cases with the actual words of the claim.") (internal quotations and citations omitted);

---

[2] The Court defines a person of ordinary skill in the art to be someone knowledgeable about error correction codes generally and repeat-accumulate codes specifically, with education and training in information theory.

*see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."); *Menell* § 5.2.3.2.2.

The parties do not dispute that the term "repeat" appears in claims in the '710 Patent and the '032 Patent. *See* Pl.'s Motion at 11 n.3; Defs.' Motion at 13. Express language in each claim where "repeat" (as well as its variations) has been used, indicates generation of additional bits by means of duplicating the original bits "a different number of times," "irregularly," or "one or more times." *See, e.g.*, '710 Patent at 7:18-21 ("A method of enclosing a signal, comprising . . . first encoding the data block . . . said first encoding including repeating the data elements . . . a different number of times; interleaving the repeated data elements in the first encoded data block . . . "); *id.* at 7:49-55 ("A method of encoding a signal, comprising . . . first encoding the data block such that each bit in the data block is repeated and two or more of said plurality of bits are repeated a different number of times in order to form a first encoded data block . . ."); *id.* at 8:1-4 ("A coder comprising: . . . a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits . . ."); '032 Patent at 7:62-8:17 ("A method comprising: . . . generating a sequence of parity bits, wherein each parity bit . . . is the value of a sum of . . . randomly *chosen irregular repeats of the message bits* . . .") (emphasis added); *id.* at 8:30-38 ("The method of claim 1, wherein generating the sequence of parity bits comprises . . . generating a random sequence of bits that repeats each of the message bits one or more times with the repeats of the message bits being distributed in a random sequence, wherein different fractions of the message bits are each repeated a different number of times and the number of repeats for each message bit is irregular . . ."). The claim language, therefore, makes clear that "repeated bits" are a construct distinct from the original bits from which they are created, as Defendants contend repeatedly.

But nowhere in the claims is the term "repeat" defined or used in a manner that specifies how the repeated bits are stored in their transitional state – in particular, that the repeated bits are generated only by "storing the new copied bit in memory," as Defendants would like this Court to construe the term. No person of ordinary skill in the relevant art would interpret the claim language so. Defendants' proposed construction rewrites the claims in a manner that impermissibly narrows the scope of the claims. *See Phillips*, 415 F.3d at 1312; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."); *see also McCarty v. Lehigh Val. R.R. Co.*, 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop."). The claims simply require bits to be repeated, without limiting how specifically the duplicate bits are created or stored in the memory – in other words, the claims do not articulate a specific limitation as to the exact implementation technique. A person of ordinary skill in the art would be presumed to know that efficient algorithm often craft complex data structures with constituent data elements referenced expressly by their memory references, without copying them in new location in computer memory, using what is commonly referred to in computer science as memory "pointers." Indeed, the Asserted Patents provision for creation of parity bits by "choos[ing]" other bits, thereby repeatedly selecting the bits for use without necessarily storing them at a specific location in computer memory. *See* '032 Patent at 7:62-8:17 ("A method comprising: . . . generating a sequence of parity bits, wherein each parity bit . . . is the value of a sum of . . . randomly *chosen* irregular repeats of the message bits . . .") (emphasis added).

The Asserted Patents also set forth such an implementation in the LDGM coder, which performs the repeat of the message bits using matrix multiplication, the output of which is then fed to an inner coder, an accumulator that performs additional operations on the transitory (repeated and interleaved) bits to produce the final IRA codes. *See, e.g.*, '710 Patent at 3:51-57; *see also Phillips*, 415 F.3d at 1315 (declaring that claims "must be read in view of the specification"). The Asserted Patents set forth another embodiment in the form of a Tanner graph, which too discloses repetition without expressly creating new copies in memory locations. *See* Patent at 3:23-50. Defendants' proposed construction would improperly exclude the LDGM coder expressly set forth in the specification and the implementation model contemplated by the Tanner graph representation in the specification, both of which provision for repeated bits that are manipulated but not stored at specific memory locations. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004)) (quotation marks omitted); *accord Menell* § 5.2.3.2.3.1.1 (collecting cases). Stated differently, storage of redundant copies of bits in new memory locations is not a predicate to duplication or reuse of bits to create IRA codes or parity bits, especially not when the repeated bits are merely transitory to generation of parity bits. *See* '032 Patent at 7:62-8:17 (making clear that parity bits for message bits, the object of the invention, are created by recursively adding "randomly chosen irregular repeats of the message bits," which are created at an intermediate stage); *see also id.* at 1:57-2:5.

Defendants reference claim 15 of the '710 Patent (*see* Defs.' Motion at 13), which recites "a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits . . ." ('710 Patent at 8:1-4). Defendants then rely on a tautology to assert that "the act of 'repeat[ing]' bits produces 'repeated bits,' *i.e.*, new copies of the bits that did not exist before." Defs.' Motion at 13. On its face, the conclusion merely restates the premise. Defendants do not show, and the Court cannot find, any support in the claim language for their contention that a new bit is created specifically by "storing the new copied bit in memory." In other words, no special meaning is attached to "repeat" (especially one that requires storage), that can be ascertained from the Asserted Patents. Defendants also assert that Plaintiff's attempt to re-write the claim to cover mere "reuse" of bits would render limitations of the asserted claims superfluous. *See* Defs.' Motion at 14; Defs.' Opposition at 4. But Plaintiff is not asking this Court to construe the claims so. Rather, Plaintiff only proposes that the Court adopts the plain and ordinary meaning of the term.

The manner in which "repeat" has been used in the Asserted Patents, including to generally describe that the invention generates irregular *repeat* and accumulate (or IRA) codes, implies strongly that a plain and ordinary, not a specialized, meaning of the term is intended. *See Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."). Moreover, a person of ordinary skill in the art would not approach the term "repeat" with a blank slate. Indeed, such a person would be familiar with the use of the term in the context of error correction codes and would be able to determine its meaning with relative ease without any further help from the Court. In the absence of any showing by Defendants that "repeat" has been limited to generating additional bits by the express means of "storing the new copied bit in memory" – that is, the patentee redefined the term or disavowed its full scope to limit it so, or that the Asserted Patents provide a special definition for the term –

the Court construes the term "repeat" to have its plain and ordinary meaning. *See Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1364 (Fed. Cir. 2016) (reiterating the general rule that claim terms take on their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history subject only to two exceptions: "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution"); *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (same); *see also Cal. Institute of Tech. v. Hughes Commc'ns Inc.* ("*Hughes*"), 35 F. Supp. 3d 1176, 1184 (C.D. Cal. 2014) ("The Court adopts the plain meaning of 'repeat.'").

## B.    "accumulation" (and its variations)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a process in which (a) the first output bit equals the first input bit; and (b) for all subsequent bits, the current output bit equals the mod-2 sum of the prior output bit and the current input bit" |

Defendants propose a construction that essentially imports a specific, preferred embodiment described in the specification into the claims. *Compare* Defs.' Motion at 19 (explaining that their proposed construction represents a specific formula for accumulator set forth in the specification), *with* '032 Patent at 2:66-3:19 (disclosing a specific "embodiment," describing it as a "recursive convolutional coder," and setting forth the logical model or formula for the accumulator). This is plainly impermissible. *See Pentair Water Pool & Spa, Inc. v. Hayward Indus., Inc.*, No. CV 11-10280-GW(FMOX), 2012 WL 12887686, at *10 (C.D. Cal. Dec. 12, 2012) ("[I]t is generally improper to import a limitation from a preferred embodiment into the claims.") (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004)), *aff'd*, 636 F. App'x 802 (Fed. Cir. 2016).

In any event, the claim language is not so limited. Indeed, the claims are drafted to encompass a broader concept of an accumulator. For example, claim 13 of the '032 Patent makes clear that an accumulator could be "configured to XOR sum in linear sequential fashion a predecessor parity bit and 'a' bits of the random sequence of repeats of the message bits." '032 Patent at 9:43-45. This generic recitation is much more flexible in scope than the specific embodiment described in the specification that is cabined by a fixed formula (*see* '032 Patent at 2:66-3:19), on which Defendants base their proposed construction. Similarly, claim 14 (a claim that depends from claim 12, which in turn depends from claim 11, a claim that provides that parity bits are generated in accordance with a Tanner graph), in that patent sets forth the limitation that the accumulator comprises "*a* recursive convolutional coder" (*see id.* at 9:46-47) – claiming any and all recursive convolutional coders – not *the* recursive convolutional coder disclosed in the preferred embodiment (*see id.* at 2:66-3:19). Finally, claim 17 requires a second accumulator that "defines a second condition that constrains the random sequence of repeats of the message bits." *See id.* at 9:53-56. Defendants' proposed construction for "accumulator" would insert a specific condition (according to the formula in the preferred embodiment in the specification) when the language generally (and broadly) claims only "a second condition" that constrains the repeated bits, introducing a precision that impermissibly limits the scope of the claim. In any case, if the accumulators specified in claims 14 and 17 were limited as Defendants

propose, those two claims would be equivalent in scope, surely a consequence not intended by the named inventors. *See RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003) ("[E]ach claim in a patent is presumptively different in scope."); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) ("[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope."). Accordingly, Defendants' proposed construction is not supported by the language used in the claims. *See Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (citing *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)).

The Federal Circuit has also repeatedly cautioned that limitations from the specification generally must not be imported into the claims. *See Comark*, 156 F.3d at 1186-87; *Phillips*, 415 F.3d at 1323 ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.") (citing *Comark*, 156 F.3d at 1186-87). On the facts presented here, where the specification discloses a preferred embodiment for an accumulator and the language used in the claims encompass alternative formulations for accumulators, the mere fact that a particular embodiment has been taught (or even "preferred") in the common specification of the Asserted Patents is not sufficient to justify limiting an otherwise broad claim scope to the particular embodiment taught. *See, e.g., GE Lighting Solutions, LLC v. AgriLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) (reversing claim construction which limited scope of "ICD connector" to features of preferred embodiment); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1348 (Fed. Cir. 2014) (reversing claim construction that limited scope of "MAC address" to local address generated by a hub, as taught by embodiments); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015) (reversing construction limited to the disclosed "pictorial map" in view of broader claim language and the lack of disclaimer); *Laryngeal Mask Co. Ltd. v. Ambu S/A*, 618 F.3d 1367, 1371 (Fed. Cir. 2010) (addressing "a difficult case of claim construction," finding that the term "backplate" is not limited to requiring a tube joint described in the specification; court was "mindful that the specification is the single best guide to the meaning of a disputed term" and that the "specification is replete with discussion of a tube joint," but concluded that the term "backplate" was not so limited because only the preferred embodiment indicated that the tube joint "is part of the backplate"); *Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1376-77 (Fed. Cir. 2006) (finding that a claimed "stack" of printing plates was not limited to the particular horizontal stack shown in the specification); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306-07 (Fed. Cir. 2006) (finding that a claimed "geometry" of orthodontic teeth was not limited to the geometries of orthodontics shown in the specification); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007) (finding that a claimed "transverse" hole in a bone nail was not limited to the particular "perpendicular" orientation shown in the specification).

Finally, as with "repeat," the manner in which "accumulate" (and its variations) has been used in the Asserted Patents, including to generally describe that the invention generates irregular repeat and *accumulate* (or IRA) codes, implies strongly that a plain and ordinary, not a specialized, meaning of the term is intended. *See Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."). In any event, the Court cannot say that the claim language makes the term ambiguous or that a person of ordinary skill in the art may not ascertain the meaning of the term. *See Rexnord Corp. v. Laitrop Corp.*,

274 F.3d 1336, 1343 (Fed. Cir. 2001) ("[I]f the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained by one of ordinary skill in the art from the language used, a court must look to the specification and file history to define the ambiguous term in the first instance.") (internal marks omitted); *Comark*, 156 F.3d at 1187 (observing that interpreting claim language in light of the specification is proper when a term is "so amorphous that one of skill in the art can only reconcile the claim language with the inventor's disclosure by recourse to the specification."); *cf. Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1380 (Fed. Cir. 2005) (limiting claim terms to the preferred embodiments where there was no other way of grounding the ambiguous language). Finally, a person of ordinary skill, reading the term and its usage in light of the specification, would not have trouble deducing its meaning.   The Court, therefore, construes the term "accumulate" (and its variations) to have its plain and ordinary meaning.  *See Thorner*, 669 F.3d at 1365 (holding that ordinary meaning should apply unless there is an explicit definition or disavowal); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) ("When narrowing claim scope, [the Federal Circuit] has recognized that a 'clear and unmistakable' disavowal during prosecution overcomes the 'heavy presumption' that claim terms carry their full ordinary and customary meaning.") (citations omitted).

### C.   "generator matrix"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a matrix that, when multiplied by a block of input bits, produces a number of output bits that is greater than or equal to the number of input bits" |

The analysis starts with the claim language.  *Becton*, 616 F.3d at 1254.  The parties do not dispute that the term "generator matrix" appears in claims 7, 13, 20, and 28 of the '710 Patent; and claims 6 and 13 of the '032 Patent.  *See* Pl.'s Motion at 19 n.12; Defs.' Motion at 32.

Claim 20 of the '710 Patent depends from claim 15.  *See* '710 Patent at 8:21-22. Both claims recite the following limitations:

> 15.  A coder comprising:
> a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits; and
> a second coder operative to further encode bits output from the first coder at a rate within 10% of one.
> 20.  The coder of claim 15, wherein the first coder comprises a low-density generator matrix coder.

'710 Patent at 8:1-6, 8:21-22.  Similarly, claim 13 of the '032 Patent recites the following about the generator matrix:

> a low-density generator matrix (LDGM) coder configured to perform an irregular repeat on message bits having a first sequence in a source data stream to output a random sequence of repeats of the message bits . . .

13

'032 Patent at 9:39-42.

Defendants contend that their proposed construction is supported by the claim language, specifically the language in claim 13 of the '032 Patent. *See* Defs.' Motion at 33-34. To demonstrate the support in the claims, however, Defendants expressly resort to a general purpose dictionary. *See id.* at 33:12-16. That is extrinsic evidence, the use of which must give way to the claim language, the written description, and the prosecution history. *Phillips*, 415 F.3d at 1318-19; *Menell* § 5.2.2; *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1372-73 (Fed. Cir. 2002) ("Only if a disputed claim term remains ambiguous after analysis of the intrinsic evidence should the court rely on extrinsic evidence.") (citing *Vitronics*, 90 F.3d at 1583).

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. [H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Phillips*, 415 F.3d at 1321; *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004) (making clear that the meaning of a claim term is not necessarily what the general public would understand from reading the language of the claim but instead that of ordinarily skilled artisans, for "what the claim terms would mean to laymen is irrelevant"). Moreover, by resorting to a general purpose dictionary, Defendants appear to agree with Plaintiff that the term "generator matrix" is susceptible to a plain and ordinary meaning. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful.") (internal citation omitted). In any event, Defendants trace "generator" to its root "generate," which they claim means to "create" or "produce." *See* Defs.' Motion at 33. From merely that support in the general purpose dictionary, Defendants leap to the conclusion that the term "generator matrix" must mean creating "new/duplicate" bits to support their proposed construction that the matrix "produces a number of output bits that is greater than or equal to the number of input bits," even though the dictionary definition only supports the notion that the generator matrix creates or produces bits without shedding any light on the numerical relationship between the input fed into the matrix and the output generated.

Continuing their examination of the claim language, Defendants next assert that "generator matrix" is recited as performing an "irregular repeat on message bits" to "output a random sequence of *repeats* of the message bit," emphasizing that the word "repeats," as a plural, indicates that the number of output bits must "at least equal the number of original message bits input to the matrix." *See* Defs.' Motion at 33 (emphasis added). Defendants are correct that term "repeats" indicates generation of additional bits, as the Court itself construed the term under its plain and ordinary meaning. *See generally supra* § IV.A; *see also id.* ("Express language in each claim where 'repeat' (as well as its variations) has been used, indicates generation of additional bits by means of duplicating the original bits[.]") (citations omitted). But Defendants do not appreciate the fact that if, as they claim, "repeats" can also be equated to the proposed limitation that the number of output bits from the generator matrix "must at least equal the

number of original message bits input to the matrix," then because the term "repeats" is expressly and separately set forth in the claim language, reading the proposed limitation ("must at least equal the number of original message bits input to the matrix") into the term "generator matrix" is unnecessary and, more critically, makes the "repeat" related limitation in the same claim ("output a random sequence of repeats of the message bits") redundant. *See LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 973 (Fed. Cir. 2008) ("Because that limitation appears elsewhere in the claims . . . it should not be engrafted onto the . . . term itself."); Edward D. Manzo, *Patent Claim Constr. in the Fed. Cir.* ("*Manzo*") § 2:27 (2017) ("[O]ne goal in claim construction is to give effect to each term in a claim."). The named inventors only claim, as a part of their invention, a low-density generator matrix that is further limited by the requirement that it output "a random sequence of repeats of the message bits"; they do not claim any and all forms of low-density generator matrix. *See, e.g.*, '032 Patent at 9:39-42. Moreover, the "repeats" limitation referenced by Defendants is not consistently and uniformly used with the term "generation matrix," which indicates that the former is not definitional. *See, e.g.*, '032 Patent at 2:1-3 (disclosing that "the outer coder may be a low-density generator matrix (LDGM) coder" without adding the qualification that the LDGM coder must "output a random sequence of repeats of the message bits"); *id.* at 3:55-58 ("In an alternate embodiment, the outer coder 202 may be a low-density generator matrix (LDGM) coder that performs *an* irregular *repeat* of the k bits in the block") (emphases added); *id.* at 8:41-44 ("The method of claim 5, wherein generating the random sequence of bits comprises coding the collection of message bits using a low-density generator matrix (LDGM) coder.").

Defendants next turn to the specification, attributing mathematical relationship described in one embodiment (which does not refer to or discuss a "generator matrix") to another (which describes a low-density generator matrix) simply because both embodiments have been described in the specification as "outer coders." *See* Defs.' Motion at 34-35. But the specification expressly sets forth that the second example of the outer coder is "an *alternate embodiment*" (*see* '032 Patent at 3:55 (emphases added)), not merely additional description of the first embodiment described earlier in the specification. More critically, if the two embodiments for the outer coder could be represented by the same underlying mathematical relationship, and were that relationship imported into the claim language, certain dependent claims that recite a low-density generator matrix as the sole additional limitation would not be distinct from the independent claim from which they depend, making the dependent claims superfluous. *Compare* Claim 11 of the '710 Patent, *with* Claim 13 of the '710 Patent; *compare* Claim 15 of the '710 Patent, *with* Claim 20 of the '710 Patent; *compare* Claim 25 of the '710 Patent, *with* Claim 28 of the '710 Patent; *compare* Claim 5 of the '032 Patent, *with* Claim 6 of the '032 Patent. This is plainly improper under the doctrine of "pure" claim differentiation. *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.") (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991); *Liebel-Flarsheim*, 358 F.3d at 910); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[A]ll claim terms are presumed to have meaning in a claim."); *Andersen*, 474 F.3d at 1369 ("[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope."); *Menell* § 5.2.3.2.4 ("'Pure' claim differentiation refers to the situation where there is no meaningful difference between an independent claim and its dependent claim, except for

the presence of an added limitation in the dependent claim."). Moreover, doing so would impermissibly limit the claims using the term "generator matrix" to a mathematical relationship described in the first embodiment, when there are no facts supporting the fact that the claims should be so limited. *See Pentair*, 2012 WL 12887686, at *10 ("[I]t is generally improper to import a limitation from a preferred embodiment into the claims."); *Liebel-Flarsheim*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citations omitted); *GE Lighting Solutions*, 750 F.3d at 1310.

The Court is not persuaded that the term "generator matrix" should be given a meaning that deviates from its "ordinary and customary meaning" to a person of ordinary skill in the art, the objective baseline for claim construction. *See Phillips*, 415 F.3d at 1312-13; *Menell* § 5.2.3.2.2. The Court, therefore, construes the term "generator matrix" to have its plain and ordinary meaning. *See Thorner*, 669 F.3d at 1365 (holding that ordinary meaning should apply unless there is an explicit definition or disavowal); *Plantronics*, 724 F.3d at 1350 ("When narrowing claim scope, [the Federal Circuit] has recognized that a 'clear and unmistakable' disavowal during prosecution overcomes the 'heavy presumption' that claim terms carry their full ordinary and customary meaning.") (citations omitted).

**D.    Tanner Graph (Diagram Used in Claims 11 and 18 of the '032 patent)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits. | A graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits, and all parity bits are determined as shown by the configuration of nodes and edges in the Tanner graph (*i.e.*, a first parity bit ($x_1$) is determined as a function of information bits alone, and all subsequent parity bits ($x_2$-$x_r$) are determined as a function of both information bits and prior parity bits). |

For most part, the parties agree with respect to the construction of the term "Tanner graph" used expressly in claims 11 and 18 of the '032 Patent. Defendants assert, however, that there is a dispute, in the context where a Tanner graph is used, with respect to whether "*all* parity bits" are generated using the configuration set forth in the Tanner graph. *See* Defs.' Motion at 21 (emphasis added). Defendants propose that the Court qualify further the common construction agreed upon by both parties by adding the following limitation: "all parity bits are determined as shown by the configuration of nodes and edges in the Tanner graph (*i.e.*, a first parity bit ($x_1$) is determined as a function of information bits alone, and all subsequent parity bits ($x_2$-$x_r$) are determined as a function of both information bits and prior parity bits)." *See generally id.* at 20-23. But this proposed qualifying language is contrary to the express language used in the representative claim, claim 11 of the '032 Patent, which recites:

> 11. A device comprising:
> an encoder configured to receive a collection of message bits and
> encode the message bits to generate *a collection of parity bits* in
> accordance with the following Tanner graph:
> [reproducing a Tanner graph]

'032 Patent at 8:62-9:34 (emphasis added). The claim expressly contemplates generating "*a collection* of parity bits," not "all parity bits," according to the Tanner graph set forth in the claim. *See id.* at 8:62-67 (emphasis added); *see also id.* at 9:53-56 (setting forth claim 17, a claim that depends from claim 11 and thus necessarily incorporates a Tanner graph, which expressly recites "a second sequence of parity bits," making clear, given the doctrine of claim differentiation, that Tanner graph cannot, by definition, generate *all* parity bits but only a subset). The claim language, therefore, ensures that an encoder configured to generate *some* parity bits in accordance with that particular Tanner graph would infringe the claim, even if that encoder generated additional parity bits according to a different encoding algorithm. Under Defendants' proposed construction, an encoder must generate *all* parity bits in accordance with the Tanner graph to infringe, which is clearly not what the claim language supports. Because the parenthetical in Defendants' proposed construction rests on all (not just a collection of) parity bits being generated according to the Tanner graph, that part of the proposed construction too is not supported by the claim language. In particular, the Court cannot demarcate the boundaries of the claim with the precision added by "*first* parity bit" and "*all subsequent* parity bits" in that parenthetical, when the claim language limits only a subset of parity bits by the limitations in the Tanner graph. *See also Hughes*, 35 F. Supp. 3d at 1192 ("In reality, the Tanner graph term as a whole is exemplary. It informs a person of ordinary skill of the structure of the code, but it does not define specific parameters. . . . A person of ordinary skill would be more than reasonably certain regarding the scope of the term, especially given the detailed explanation in the specification."). The part of the proposed constructions over which the parties agree – that "check nodes . . . enforce constraints that determine the parity bits" – sufficiently describes the edges that connect check nodes with parity nodes, especially in light of the embodiment and related description provided in the specification, and accurately conveys the scope of the claimed invention. *See* '032 Patent at 4:4-18 (disclosing an embodiment of the Tanner graph and explaining the relationship between check nodes and the variable nodes); *see also Hughes*, 35 F. Supp. 3d at 1193 ("[A] person of ordinary skill would be more than reasonably certain of the meaning of the Tanner graph term[.]").

As such, the Court adopts that part of the proposed constructions for the term "Tanner graph" with respect to which the parties concur, which accords with its plain and ordinary meaning. *See, e.g., Hughes*, 35 F. Supp. 3d at 1194 ("[A] person of ordinary skill would be able to decipher the Tanner graph term without difficulty or uncertainty.").

**E.   "receive messages from neighboring check/variable nodes and send updated messages to the neighboring variable/check nodes"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "each of the receiving nodes sends updated messages back to the same adjacent nodes from which they received the original messages" |

The analysis starts with the claim language. *Becton*, 616 F.3d at 1254; *Interactive Gift Express*, 256 F.3d at 1331. Claim 18 of the '032 Patent recites a decoder where "two or more check/variable nodes" "receive messages from neighboring check/variable nodes" and that these receiving nodes then "send updated messages to the neighboring variable/check nodes." '032 Patent at 9:57-10:5.   To illustrate, let's assume c1 and v1 are the "two or more check/variable nodes" that receive messages from c2 and v2, the only available "neighboring check/variable nodes." The claim language permits nodes c1 and v1 to receive messages from nodes c2 and v2; then allows node c1 to send updated messages to nodes c2 and v2, and v1 to send an updated message to c2, but not to v2 – collectively, *nodes* (plural) c1 and v1 still send updated messages to the neighboring *nodes* c2 and v2, consistent with the express language used in claim 18. In other words, the claim language is permissive in that it permits a receiving node to forego sending updated messages to its neighboring node from which it received the original message as long as collectively the receiving nodes respond to their neighboring nodes. The same is not true under the Defendants' proposed construction, according to which each receiving node is required to send an updated message back to the neighboring node from which it received the original message.   Under that proposed construction, c2 must send an updated message to v2 – individually, *node* (singular) c1 must send updated messages to *nodes* c2 and v2, and *node* (singular) v1 is then separately required to send updated messages to *nodes* c2 and v2. As such, a decoder where a receiving node receives a message from a neighboring node but does not send back an updated message to the neighboring node would infringe claim 18 under the express limitations set forth in the claim language. Not so under the Defendants' proposed construction, under which an additional limitation – that is, each receiving node must also send back an updated message to the neighboring nodes – is required for infringement to be found. This impermissible narrowing of the claim contravenes the express language in the claim, rendering Defendants' proposed construction inaccurate.

The Court turns next to the description in the specification, which provides an alternative basis for rejecting Defendants' proposed construction.   When construing claim language, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316. Defendants contend that the specification supports their proposed construction. *See* Defs.' Motion at 25 (citing '032 Patent at 6:4-6 ("In each iteration, every variable/ check node receives messages from its neighbors, and sends back updated messages.")).   But that reference in specification is preceded by additional disclosure that there is an "initialization" step in the decoding process (*see* '032 Patent at 6:2-4), in which "[t]he outgoing message from a node u to a node v depends on the incoming messages from all neighbors w of u *except v*" (*see id.* at 5:33-34) (emphasis added), making clear that some of the nodes that receive messages from neighboring nodes need not send updated messages back to the nodes from which they received the original messages.   That express disclosure in the specification is fatal to Defendants' proposed construction.   Besides, the specification speaks merely to an embodiment of the decoder process (*see* '032 Patent at 5:20-21), and such an embodiment cannot be read into the claim language to imply a limitation where the claim language does not support such an intent, as discussed above, particularly not when the specification does not reveal any special definition to the claim term. *See Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015) ("When claim language has a plain meaning on an issue . . . leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning.   The specification plays a more

limited role than in the common situation where claim terms are uncertain in meaning in relevant respects."); *Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."); *Liebel-Flarsheim*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citations omitted).

The specification discloses further, in the same context that Defendants reference, that "'[b]elief propagation' on the Tanner Graph realization may be used to decode IRA codes." *See* '032 Patent at 5:20-21.   Discussing the example further, the specification expressly references message exchanges between nodes and, in particular, Figs. 5A and 5B as illustrations relevant to the decoding process using "belief propagation," which allows the messages passed between nodes to represent "posterior densities" on the bit associated with the variable node. *See generally id.* at 5:20-32; *see also id.* at 5:28-32 (using Figs. 5A and 5B, but only in the context of decoding IRA codes, to explain that "[t]he outgoing message from a variable node u to a check node v represents information about u, and a message from a check node u to a variable node v represents information about u, as shown in FIGS. 5A and 5B, respectively"). As such, Defendants' assertion that the Tanner graph illustrations must be restricted to encoding process (*see* Defs.' Opposition at 23) is misplaced.  The illustrations Figs. 5A and 5B make it concrete, and clearly so, that nodes may receive messages from neighboring nodes but need not necessarily send updated messages back to each node from which they received the original messages.



**FIG. 5A**                                **FIG. 5B**

Based on the foregoing, the Court adopts the plain and ordinary meaning of the term, which accurately reflects the scope of the claim language when read in light of the disclosure in the specification.

F.   **"a first set of memory locations . . . a second set of memory locations . . . [and] a permutation module to read a bit from the first set of memory locations . . . a corresponding index of the first set of memory locations and a corresponding index of the second set of memory locations" (Subset of Claim 1 of the '833 Patent)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | • "a first set of memory locations to store |

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| | information bits" means "at least two addresses in an addressable memory array where information bits are stored"<br>• "a second set of memory locations to store parity bits" means "at least two addresses in an addressable memory array, different from the first set of addresses, where parity bits are stored"<br>• "index of the first set of memory locations" means "a list or table that contains the addresses where the information bits are stored"<br>• "index of the second set of memory locations" means "a list or table that contains the addresses where the parity bits are stored"<br>• "a corresponding" means "each index in the first set is associated with at least one index in the second set, and vice versa"<br>• "read a bit" / "reading a bit" means "provide an address to a memory and receiving back the bit that is stored at that address" |

The analysis starts with the claim language. *Becton*, 616 F.3d at 1254; *Interactive Gift Express*, 256 F.3d at 1331. Here, the representative claim 1 in the '833 Patent recites:

> 1. An apparatus for performing encoding operations, the apparatus comprising:
> a first set of memory locations to store information bits;
> a second set of memory locations to store parity bits;
> a permutation module to read a bit from the first set of memory locations and combine the read bit to a bit in the second set of memory locations based on a corresponding index of the first set of memory locations and a corresponding index of the second set of memory locations; and
> an accumulator to perform accumulation operations on the bits stored in the second set of memory locations, wherein two or more memory locations of the first set of memory locations are read by the permutation module different times from one another.

'833 Patent at 8:21-35.  Defendants contend that the principal dispute here centers around whether "memory locations" limitation necessarily require that those memory locations be addressable.  *See* Defs.' Motion at 28:12-16.  Interestingly, Defendants concede that the term "'memory locations' had a plain meaning that was well known to those ordinary skill," but ask that the term be construed so that the claim expressly encompasses the possibility that the memory "can be addressed."  *See* Defs.' Motion at 26-27 (citing IEEE Dictionary at 685).

As an initial matter, in the guise of claim construction for one term, Defendants propose an elaborate construction, requesting that three express limitations (and the language used therein) be rephrased.  *See* Defs.' Motion at 25-26 (asking, for example, that "a first set" be paraphrased to "at least two addresses"; "a second set" be similarly paraphrased to "at least two addresses"; "index" be rewritten as "a list or table" of addresses; and rewriting "a corresponding" and "read a bit" / "reading a bit").  This is an improper attempt at rewriting a substantial portion of the claim, not merely claim construction for one term, and, relatedly, an improper circumvention of the limit on the number of claim construction terms imposed by this Court.  *See* Docket No. 192.  Because Defendants emphatically assert that their dispute with Plaintiff centers on "whether the '833 Patent claims require use of addressable memory" (*see* Defs.' Motion at 28), the Court would only construe that term.

Defendants' proposed construction limits the scope of claim 1 to encoders with "addressable memory arrays" implements, but improperly excludes any implementation that could be achieved by means of alternative circuit implements such as registers, which are smaller, faster memory structures directly accessed by the central processing units ("CPUs") and typically not organized as addressable arrays.  *See* Pl.'s Motion; Shoemake Decl. ¶ 104; Briggs Suppl. Decl., Ex. S (entitled "Modern Dictionary of Electronics") at 636 (defining register as "[a] short-term, fast-access circuit used to store bits or words *in* a CPU" and, alternatively, "[o]ne word of memory . . . *directly accessible* to a processor") (emphases added), Briggs Decl., Ex. L ("Concise Encyclopedia of Computer Science").

> Different levels of memory (or *storage*) are employed in a computer system.  At one extreme are very fast and relatively small storage units used as fast access *registers* by the central processing unit (CPU . . .).  At the other extreme are relatively slow, large-capacity units of auxiliary storage. . . . The characteristics of *main memory* lie between these two extremes.

Concise Encyclopedia of Computer Science at 495 (emphases in original); *cf. id.* at 504 ("Main memory consists of a collection of consecutively numbered locations, each of which stores exactly one binary value.  Each of the numbered locations corresponds to a specific stored byte.  The unique number that identifies each byte is referred to as its address[.]"); *Advanced Micro Devices, Inc. v. Samsung Elecs. Co.*, No. C 08-986 SI, 2009 WL 3007916, at *6 n.4 (N.D. Cal. Sept. 17, 2009) ("'Memory locations' are cells that store data.").  Neither the claim language nor the specification supports exclusion of non-addressable but directly accessible memory locations such as registers.  Indeed, if the term "memory locations" had a plain meaning well known to persons of ordinary skills in the art at the time the '833 Patent was drafted and that meaning included the possibility that memory "can be addressed," as Defendants contend, then the express exclusion of that well known plain meaning by the named inventors in the '833 Patent further evidences an intent to encompass (and claim) a broader concept of memory locations in the claim limitations without excluding any specific form of implementation.

Defendants respond that surrounding claim language confirms that the "memory locations" terms require addressable memory.  Defendants point to the language where claim 1 of the '833 Patent sets forth the limitation of reading a bit from memory locations.  *See* Defs.' Opposition at 26.  Defendants again exclude the possibility that CPUs in a computer system can read or write from registers directly connected to it through hardware circuitry, instead of resorting to using the main memory locations or addresses.  The claim language does not support

such a narrowing construction.

Finally, attempting to construe "memory locations" adds little in the way of clarity here. By requesting that the Court to construe "memory locations" as "addressable memory arrays," Defendants essentially ask the Court to substitute a more restrictive synonym for the claim term, where it is more appropriate to just allow the term to speak for itself, specifically that "memory locations" are just that without regard to complex underlying implementation details. There is no evidence here that a person having ordinary skill in the art would bring a more distinctive perspective. *See Menell* § 5.2.3.1.2 ("Where the intrinsic evidence and extrinsic evidence do not meaningfully add to the definition of a term, . . . it is appropriate (and often preferred) to allow straightforward claim language to stand as is."); *see also Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."); *O2 Micro*, 521 F.3d at 1362 (recognizing that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims" but only "[w]hen the parties present a fundamental dispute regarding the scope of a claim term"); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) ("[M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction.").

Because Plaintiff does not dispute Defendants' assertion that "the term 'memory locations' had a plain meaning that was well known to those of ordinary skill" when the term was incorporated in the '833 Patent, and the specification does not forth a special definition that differs from that ordinary and customary meaning, the Court finds that plain and ordinary meaning gives the full effect to the scope of relevant claims, and therefore adopts it.

### G.   "combine the read bit to a bit in the second set of memory locations"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | (a) combine (i) the bit read from the first set of memory locations and (ii) a particular bit stored in the second set of memory locations and (b) store the combined result in the second set of memory locations |

Defendants contend that the dispute for this term concerns "where the combining of bits takes place." Defs.' Motion at 29. To that end, Defendants propose that the Court must limit the claim to "store the combined result in the second set of memory locations." *Id.* The analysis starts with the claim language. *Becton*, 616 F.3d at 1254; *Interactive Gift Express*, 256 F.3d at 1331. Here, the relevant limitation of claim 1 in the '833 Patent recites merely: (1) reading of the first bit from "the first set of memory locations" "based on a corresponding index of the first set of memory locations"; then (2) reading of a second bit from "the second set of memory locations" also "based on a corresponding index of the second set of memory locations"; and then, finally, (3) combining the first bit *to* the second bit. *See* '833 Patent at 25-30. There is no ambiguity in these operations to a person of ordinary skill in the art: to combine bits plainly means that the first bit is added to the second bit; exactly where that combination takes place is not claimed by claim 1. Claim 3 (which depends indirectly from claim 1), by contrast, further

limits (and thus specifically claims) the combining operation by requiring that the result of the operation is specifically written to "the second set of memory locations based on a corresponding index." *See id.* at 39-42.

In other words, claim 3, not claim 1, is directed to store the combined result in "the second set of memory locations" "based on a corresponding index" of the second set of memory locations, the only memory locations that are the subject of claim 3. Tellingly, Defendants concede as much. *See* Defs.' Opposition at 28 ("Claim 1 recites *looking up* the memory locations of the first bit and second bit in order to determine *what bits to combine* . . . Claim 3, by contrast, defines a precise location where the combined bit must be written back to the second set of memory locations."). Under the doctrine of claim differentiation, claim 1, therefore, does not encompass "stor[ing] the combined result in the second set of memory locations," as Defendants propose, otherwise claim 3 would be superfluous. *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.") (citing *Laitram*, 939 F.2d at 1538; *Liebel-Flarsheim*, 358 F.3d at 910); *Innova/Pure Water*, 381 F.3d at 1119 ("[A]ll claim terms are presumed to have meaning in a claim."); *Andersen*, 474 F.3d at 1369 ("[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope."); *Menell* § 5.2.3.2.4 ("'Pure' claim differentiation refers to the situation where there is no meaningful difference between an independent claim and its dependent claim, except for the presence of an added limitation in the dependent claim."). Accordingly, the Court finds no dispute with respect to the claim term and gives the term its plain and ordinary meaning.

### H.      "random" / "randomly"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "non-deterministic" |

The analysis starts with the claim language. *Becton*, 616 F.3d at 1254; *Interactive Gift Express*, 256 F.3d at 1331. Defendants argue that the claim language supports their proposed construction. *See* Defs.' Motion at 30-31. But Defendants rely on extrinsic, not intrinsic evidence, in support of their proposed construction. *See id.* (relying on IEEE Dictionary, a declaration, and Microsoft Press Computer Dictionary to construe the claim term). Defendants' argument can be distilled to the position that because the relevant claim of the '032 Patent recites "randomly chosen" to describe the selection of "repeats of the message bits," that choice must be non-deterministic, and therefore "randomly" should be replaced by "non-deterministic." *Id.* at 31; *see also* Defs.' Opposition at 29; *id.* at 30 (arguing that attaching "plain meaning" to random or randomly "would encompass any number of non-random orders of bits."). As a tautology, the argument is frivolous on its face. In any event, there is no support in the claim language that the random or randomly has any specialized meaning or, for that matter, the term has any inherent ambiguity that requires construction.

Defendants next turn to the specification. *See Phillips*, 415 F.3d at 1316. Referencing to the usage of a phrase plucked out of its context, Defendants assert that because the specification discloses that the value of a parity bit is "determined uniquely" by a condition, the named inventors knew the difference between a "deterministic" choice and a choice made "randomly,"

23

and so random or randomly should be construed as "non-deterministic." Defs.' Motion at 31-32. That argument undermines Defendants' proposed construction: If the named inventors indeed appreciated the difference between a "deterministic" choice and a choice made "randomly," and yet opted for the latter in the claims, the Court can only conclude that the named inventors clearly expressed their intent to claim only what is encompassed by that express usage, not by "non-deterministic," a term known by them and the usage of which they chose to forego.

A holistic review of the claim language and the specification indicates that Defendants' proposed construction runs contrary to the intrinsic evidence. Claim 1 in the '032 Patent recites that each parity bit in a sequence of parity bits is generated by combining an earlier parity bit and "randomly chosen irregular repeats of the message bits." *See* '032 Patent at 7:66-8:17. Claim 4, which depends from claim 1, recites that generating the sequence of parity bits comprises performing recursive XOR operations on the "random sequence of bits." *See id.* at 8:26-28; *see also id.* at 8:30-41, 8:42-44. Claim 7 contemplates "randomly permuting" bits to generate the "random sequence of bits." *See id.* at 8:45-52; *see also id.* at 9:38-45 (reciting an output of a "random sequence of repeats of the message bits"). Turning to the specification, the background of the patent discloses that "[t]urbo codes have sufficient randomness to allow reliable communication[.]" '032 Patent at 34-35. The written description further discloses that "[t]he bits from the outer coder 202 are scrambled . . . this scrambling may be performed by the interleaver 204, which performs a pseudo-random permutation of an input block v" of data bits (*id.* at 3:24-27) and that "[t]he interleaver 204 in FIG. 2 may be excluded due to the randomness already present in the structure of the LDGM code" (*id.* at 3:62-64). By inconsistently using random depending on the context – for example, as an adjective to modify "sequence of bits" and "sequence of repeats of the message bits"; as an adverb to modify "choos[ing]" or selection of the "message bits" and "permuting" of repeats of message bits; and as a noun to describe property of turbo codes and the structure of the LDGM code – the intrinsic evidence supports the inference that the named inventors did not attach any specialized meaning to "random" (or its variations), specifically not "non-deterministic" as Defendants improperly suggest, and intended only its plain and ordinary meaning. Substituting "random" with "non-deterministic" hinders, not helps, the factor finder, given the more intricate definition of the latter. *Cf.* Defs.' Motion at 30-31 ("A 'deterministic' choice is the opposite of a 'random' choice. In particular, a deterministic choice is made based upon a desired set of criteria to yield a predictable outcome that does not depend on chance."). Moreover, there is no indication that a person having ordinary skill in the art would bring a distinctive perspective to the term "random" or "randomly" in the context in which the term is used in the claims. To the contrary, a person of ordinary skill would reasonably interpret the term according to its evident meaning.

Accordingly, the Court gives the term its plain and ordinary meaning. *See Menell* § 5.2.3.1.2 ("Where the intrinsic evidence and extrinsic evidence do not meaningfully add to the definition of a term, . . . it is appropriate (and often preferred) to allow straightforward claim language to stand as is."); *see also Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

I.      **"said second encoding operation producing at least a portion of a codeword"**
        **/ "the encoding operation generating at least a portion of a codeword"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "the encoding operation produces at least a portion of the bits transmitted on a channel" |

The dispute here specifically pertains to the term "codeword." *Compare* Pl.'s Suppl. Motion at 4 ("The parties' dispute centers on the meaning of the term 'codeword.' With the exception of the term 'codeword,' Defendants' proposed construction essentially repeats the language of the longer phrases they identified for construction. Defendants seek to limit the term 'codeword' to 'bits transmitted on a channel.'"), *with* Defs.' Suppl. Motion at 11 (proposing that both "said second encoding operation producing at least a portion of a codeword" and "the encoding operation generating at least a portion of a codeword" be construed as "the encoding operation produces at least a portion of the bits transmitted on a channel," indicating that words prefacing "codeword" are not material to the dispute over the claim term). Defendants propose that the term "codeword" be construed as "the bits transmitted on a channel." Defs.' Suppl. Motion at 11-16; *see also* Defs.' Suppl. Opposition at 11-21. Plaintiff, by contrast, proposes that the term be given its plain meaning, but then adds that the plain meaning refers to "data elements generated by electronic circuitry, computer hardware, and/or computer software." Pl.'s Suppl. Motion at 4-8. Neither construction is supported by the intrinsic evidence.

The problem with Defendants' proposed construction is that it mandates that the bits be transmitted on a channel subsequent to the encoding operation, a construction belied by the express disclosure in the claim language and specification, which imposes no such constraint. Just because the bits resulting from an encoding operation *may* be transmitted following an encoding operation does not mean that the bits *must* be. *See* Defs.' Suppl. Opposition at 11-12 (arguing that the encoded bits must be transmitted given the purpose of the encoding operation). The idea of transmission of codewords is separate and distinct from encoding codewords: IRA codes, the thrust of the claimed invention in the '781 Patent, are generated or produced with the help of, for instance, outer and inner coders, even before such codes are transmitted. *See* '781 Patent at 1:65-2:14 ("The coding system includes an outer coder, which repeats and scrambles bits in the data block. . . . The repeated and scrambled bits are input to an inner coder that has a rate substantially close to one. . . . The encoded data output from the inner coder *may* be transmitted on a channel[.]") (emphasis added). Indeed, where an action is contemplated *after* the parity bits are generated, that action has been so specified and expressly claimed in the claim language. *See, e.g.,* '781 Patent at 7:39-41 (claiming "outputting" of the codeword). This undercuts the thrust of Defendants' proposed construction.

Evidently, Defendants concede that the '781 Patent contemplates an encoder that *permits,* not limits, that encoded data from the inner coder to be transmitted on a channel. *See* Defs.' Suppl. Motion at 13:8-11; *see also* '781 Patent at 2:11-12 ("The encoded data output from the inner coder *may be* transmitted on a channel[.]") (emphasis added); *Hughes,* 35 F. Supp. 3d at 1183 ("These examples show only that *it is possible to transmit* encoded or formatted data. They do not even weakly suggest that a codeword *must be transmitted.*") (emphases added). Defendants' argument that the distinction between the systematic and non-systematic version of IRA codes supports their construction (*see* Defs.' Suppl. Motion at 14-15) similarly misconstrues examples set forth in the specification. Those examples merely explain Fig. 3, an embodiment,

not limit the claimed encoding operation in any manner. *See generally* '781 Patent at 4:25-49. While an encoder maybe typecast as systematic or non-systematic, with a corresponding encoding rate, that characterization of the encoder does not limit the independent existence of a "codeword," which results from the encoding operation, a phenomenon preceding and distinct from the possibility of any subsequent transmission. *See id.* at 8:38-44 ("A method of encoding a signal, comprising: . . . performing an encoding operation using the information bits as an input . . . the encoding operation generating at least a portion of a codeword[.]").

Indeed, the disclosure surrounding codeword makes clear that term "codeword" more generally describes the bits resulting from the encoding operations, where such collection of generated bits are either systematic (where codeword includes information bits and parity bits) or nonsystematic (where codeword includes only parity bits), divorced from whether such bits are thereafter transmitted over any channel. *Compare id.* at 4:25-30 (describing the nonsystematic IRA code as is an (r,k) code, in which the *codeword* corresponding to information bits $(u_1, \ldots, u_k)$ is $(x_1, \ldots, x_r)$.") (emphases added), *with id.* at 4:6-7 (describing $(x_1, \ldots, x_r)$ as "r parity bits"); *see id.* at 7:40-41 (claiming a method of encoding a signal in claim 2, which depends from claim 1, where the codeword in claim 2 is more specifically limited to "parity bits," indicating that term "codeword" in claim 1 is a more generic limitation that encompasses "parity bits"). Finally, claim 8 in the '032 Patent, a related patent based on a common specification, expressly recites adding "transmitting" limitation to "the sequence of parity bits" (*see* '032 Patent at 8:53:54 ("The method of claim 1, further comprising transmitting the sequence of parity bits.")), which further compels the inference that the named inventors did not intend to limit the term "codeword," which includes parity bits under either systematic or non-systematic encoding, in the absence of such express usage of the "transmitting" limitation. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[U]nless otherwise compelled . . . the same claim term in the same patent or related patents carries the same construed meaning."); *In re Rambus Inc.*, 694 F.3d 42, 48 (Fed. Cir. 2012); *see also Unwired Planet*, 829 F.3d at 1358-59 (finding that the district court erred in construing "voice input" as "speech provided over a voice channel" because the plain language of the claims does not dictate the manner in which voice is to be transmitted from a mobile device to a server, and there was no clear and unmistakable disclaimer in the specification or file history); *Hughes*, 35 F. Supp. 3d at 1184 ("The Court declines Hughes' invitation to read a transmission limitation into 'codeword.'").

Despite labeling its construction as plain and ordinary meaning of the term, Plaintiff proposes a construction that too is not grounded in the intrinsic evidence. First, Plaintiff claims that by asking that "codeword" be limited to bits transmitted on a channel, Defendants have conceded that the encoding steps must be performed by a computer or by circuitry. *See* Pl.' Suppl. Motion at 4-5. Because the Court has rejected Defendants' proposed construction, any concession implied therein shall also be rejected. Second, Plaintiff claims that the intrinsic evidence demonstrates that the encoding operation that generates "at least a portion of a codeword" is performed by electronic circuitry, computer hardware, and/or computer software. *See* Pl.'s Suppl. Motion at 5 (citing '781 Patent at 2:39-3:36, 3:63-4:3, Figs. 2, 4). But the disclosure contained in these references to the specification show only that a "coder" *may* produce "encoded data." *See, e.g.,* '781 Patent at 2:39-46. There is no reference to a requirement that the encoded data must require "electronic circuitry, computer hardware, and/or computer software" in those portions of the specification. *See also* Tutorial Tr. at 11-12 (explaining that "[an] encoder actually . . . take[s] the information bits and convert[s] them into what we call coded bits or code words," indicating that the term "codewords" could simply be

understood as "coded bits," and without conditioning the generation of the codewords on any sort of "electronic circuitry, computer hardware, and/or computer software"); *id.* at 28:18-20 (equating codeword with the information or message bits, indicating that codeword has a plain and ordinary meaning of simply a "group of bits"); *id.* at 53 ("If you think about the Hamming code, we have four message bits, and we have to select one of 16 code words. We could do that very easily by just writing down a table. We could, in fact, I do that on the next slide. So this would tell us that encoding is easy, just *write down all the code words*, there is 16 of them, and, then, let's just associate each code word with a message.") (emphases added).

In fact, Plaintiff relies on extrinsic evidence, a declaration from its expert, not intrinsic evidence, to make that inference. *See* Pl.' Suppl. Motion at 5 (citing to Briggs Decl.). That inference too is facetious. The fact that a device may generate coded signal does not warrant the conclusion that the coded signal must only be generated through the device, precluding all other methods of generating a coded signal. Moreover, even if the specification were to imply so, the specification makes clear that it is merely illustrating coders using embodiments; there is simply no evidence that the claims must be so limited. *See Liebel-Flarsheim*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citations omitted); *Omega*, 334 F.3d at 1326 (holding that there was no clear and unmistakable disavowal of claim scope that would compel a result different than the claim language). Finally, the claims in which the term "codeword" is used are method claims setting forth methods of encoding to generate a codeword, but nothing in the claim language or the specification restricts those methods of encoding to be restricted to a specific device; and, in any case, no such device has separately been claimed in the '781 Patent, and is more likely to be claimed in apparatus claims, which is not the subject of the '781 Patent.

The meaning of the term "codeword," the result of an encoding operation, would be clear to a person of ordinary skill in the art, presumed to be familiar with encoding operations and the outputs of such operations, and there is no ambiguity or technical aspect to it that warrants a construction. This is especially true here where the level of a person of ordinary skill in the art is self-evidently higher than average. *See, e.g.*, Tutorial Tr. at 36 ("[T]he level of a person of ordinary skill in the art in this case is higher than average. It is just the nature of the Caltech patents. They are very advanced technology."). Accordingly, the Court gives the term its plain and ordinary meaning. *See Hughes*, 35 F. Supp. 3d at 1183 ("[T]he plain meaning of 'codeword' does not require data elements to be encoded for transmission, and the specification never clearly redefines or disavows the plain meaning of 'codeword.'"); *id.* ("The Court finds that 'codeword' means 'a discrete encoded sequence of data elements.' Once again, Hughes attempts to improperly inject a limitation into *a clear term*.") (emphasis added); *see also U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *Am. Piledriving Equip.*, 637 F.3d at 1331 ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.") (citing *Phillips*, 415 F.3d at 1314); *Menell* § 5.1.4.3 ("There is no requirement that a court construe a claim term when there is no genuine dispute about its meaning.") (citing *O2 Micro*, 521 F.3d at 1362).

27

### J.      "at least two of the information bits appear in three subsets"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "at least two, but not all, of the information bits appear in exactly three subsets." | Plain and ordinary meaning |

The analysis starts with the claim language. *Becton*, 616 F.3d at 1254; *Interactive Gift Express*, 256 F.3d at 1331; *Manzo* § 2:26 ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for that is the language that the patentee chose to particularly point out and distinctly claim the subject matter regarded as the invention. . . . [T]he claim language remains the focal point.") (internal citations omitted). Here, the representative claim, claim 19 of the '781 Patent, recites as follows:

> 19. A method of encoding a signal, comprising:
> receiving a block of data in the signal to be encoded, the block of data including information bits; and
> performing an encoding operation using the information bits as an input, the encoding operation including an accumulation of mod-2 or exclusive-OR sums of bits in subsets of the information bits, the encoding operation generating at least a portion of a codeword, wherein at least two of the information bits appear in three subsets of the information bits.

'781 Patent at 8:34-49. Under its plain language, claim 19 imposes a floor of two, but no ceiling, for the number of "information bits" in the "subsets of the information bits" to be encoded using exclusive-OR operations. *Id.*; *see also* Defs.' Supp. Motion at 3-4 (illustrating how all the information bits may appear in three subsets). There is no ambiguity in the limitations set forth in claim 19 and, therefore, no construction is warranted here. *See Am. Piledriving Equip.*, 637 F.3d at 1331 ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.") (citing *Phillips*, 415 F.3d at 1314). Indeed, Plaintiff does not identify a specific term to be construed but instead asks the Court to insert specific terms (*see generally* Pl.'s Suppl. Motion at 9-13) in an otherwise unambiguous limitation. *See also MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381-83 (Fed. Cir. 2012) (characterizing the claim term "change in the resistance by at least 10%" as an "open-ended" term because it set forth "a lower threshold, but not an upper limit" and that the relevant claims including that term "cover resistive changes from 10% up to infinity"); *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1292 (Fed. Cir. 2010) ("At least 3500 is the simplest way to express greater than or equal to 3500, an open-ended range."); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) ("[T]he term 'at least two' sets forth the *minimum number* of a particular element required.") (emphasis added); *see also York Prod., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996) (construing "plurality" according to its ordinary meaning, equating it with "at least two," but no other artificial limits); *id.* ("[T]his term requires *only* at least two ridge members on each sidewall to form a load lock.") (emphasis added).

In any case, Plaintiff's proposed construction relies on a stretched reading of a specific embodiment, the Tanner graph, specifically the variable nodes and edges emanating from the variable nodes. *See* Pl.'s Suppl. Motion at 10. But the Tanner graph does not evidence the specificity that Plaintiff wants to import into the plain language of the claim limitation. The graph makes clear that it is merely exemplary in its disclosure by using ellipses between the nodes as well as between the edges that Plaintiff references, and undermines Plaintiff's assertion that the relevant limitation should be read to claim "not all" information bits and "exactly" three subsets of information bits:



'781 Patent, Fig. 3; *see also Hughes*, 35 F. Supp. 3d at 1192 ("In reality, the Tanner graph term as a whole is exemplary. It informs a person of ordinary skill of the structure of the code, but it does not define specific parameters."); *id.* ("Throughout the specification, the Tanner graph is described in generic, exemplary terms. . . . This exemplary nature is reflected by the identical Tanner graph in the claims. . . . Th[e] exemplary nature is demonstrated by the ellipses between the subsets, which indicates that the number of subsets may exceed two. The exemplary nature is also demonstrated by the labels on the graph: $U_k$, $V_k$, and $X_k$."); *id.* at 1193 ("A person of ordinary skill would understand the exemplary nature of the Tanner graph[.]"); *id.* at 1194 ("[A] person of ordinary skill would understand the meaning of the ellipses, which indicate the exemplary nature of the Tanner graph."). Relatedly, there is also no evidence that the plain language of the claim is restricted to claiming only the Tanner graph embodiment at the exclusion of alternative embodiments disclosed in Figs. 2 and 4 and discussed in the written description. *See Pentair*, 2012 WL 12887686, at *10 ("[I]t is generally improper to import a limitation from a preferred embodiment into the claims."); *Liebel-Flarsheim*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citations omitted); *GE Lighting Solutions*, 750 F.3d at 1310. Indeed, if the named inventors had meant to claim "at least two, but not all" limitation in the claim language, it would have been simple to do so.

Plaintiff also contends that the fact that the very character of the invention centers on generating "irregular" codes warrants the conclusion that not all the information bits are encompassed, otherwise the resulting code may no longer be irregular. *See* Pl.'s Suppl. Opposition at 7-8. First, this undermines Plaintiff's proposed construction. If the code resulting from the use of an encoding process were not irregular, that encoding process would simply not infringe the '781 Patent. There is no reason why the claim limitation must be construed to

improperly broaden the scope of the claim to preserve infringement. Second, merely describing the advantages of the present invention does not necessarily limit the claim to methods or systems processing those advantages. *See i4i Limited Partnership v. Microsoft Corp.*, 589 F.3d 1246, 1259-60 (Fed. Cir. 2009). To the extent Plaintiff's proposed construction is an attempt to preserve the validity of the relevant claims of the '781 Patent, the unambiguous limitations do not warrant such a result. *See Generation II Orthotics Inc. v. Medical Technology Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) ("Claims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."); *see, e.g., Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("Elekta further argues that OSI's interpretation would render claim 1 invalid, because a gamma unit with radiation sources solely between 30°-45° would be inoperative. We do not reach the issue of invalidity, and we note that the record is unclear as to whether such a device would be inoperative. Moreover, having concluded that the amended claim is susceptible of only one reasonable construction, we cannot construe the claim differently from its plain meaning in order to preserve its validity (upon which we do not opine).") (citation omitted); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1434 (Fed. Cir. 1988) (rejecting argument that limitations should be added to claims to preserve the validity of the claims).

Plaintiff's proposed construction essentially asks the Court to synthesize language in the claims with the explanation in the specification and then substitute the combination for the claim term that Plaintiff considers disputed. That approach has the effect of impermissibly importing limitations from the specification into the claims. *Cf. Comark*, 156 F.3d at 1186-87. Accordingly, the Court gives the term its plain and ordinary meaning.

### K.   "information bits"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "binary digits (i.e., 1s and/or 0s) that represent information" |

Defendants' proposed construction self-evidently paraphrases the claim term. *See also* Defs.' Suppl. Motion at 17 ("The plain meaning of 'bits' to a person of ordinary skill in the art is 'binary digits (*i.e.*, 1s and/or 0s).'") (citation omitted).

Plaintiff's proposed construction, on the other hand, while labeled as "plain and ordinary meaning," improperly reads in "electronic circuitry, computer hardware, and/or computer software" limitations, limitations considered and rejected by the Court. *See* Pl.' Suppl. Motion at 13-14; *supra* § IV.I (rejecting the argument that encoding operation that generates "at least a portion of a codeword" is performed by electronic circuitry, computer hardware, and/or computer software); *see also Source*, 753 F.3d at 1299 ("Instead of looking to the words themselves, [the patentee] added language without support from the specification or prosecution history, altering otherwise unambiguous claim language, a practice this court has repeatedly rejected.") (citations omitted). Indeed, just because the claimed invention "can actually be implemented" in a computer chip (*see, e.g.*, Tutorial Tr. at 52:13-16), does not mean that the claims have no meaning beyond that specific implementation. Plaintiff also asserts that construing bits to 0 or 1 would exclude "soft-decision decoding techniques, such as belief propagation," which assign each bit a probability. *See* Pl.'s Suppl. Opposition at 17.

Assigning a probability to a bit does not, however, set the intrinsic value of the bit to a percentage between 0 and 100%, as Plaintiff misunderstands – that value remains set to either 0 or 1 – it is the probabilities attached to the bit that vary. Indeed, the specification expressly discloses so – that is, the probabilities associated with a bit under the belief propagation decoding technique is represented distinctly, and with the help of different notations, as p(0) or p(1), making clear that those *probabilities* of the bit being 0 or 1 are separate and distinct from the definitional value of the bit being 0 or 1. *See* '781 Patent at 5:17-20 ("A probability density on a bit is a pair of non-negative real numbers p(0), p(l) satisfying p(0)+p(1)=1, where p(0) denotes the probability of the bit being 0, p(l) the probability of it being 1."); *see also* Tutorial Tr. at 31-32 ("[L]et's say we wanted to transmit some *information.* We just wanted to *transmit a zero or a one*, and you can think about this zero-one as, I don't know, being a bit inside a movie we are trying to send or even just being a simple answer to a question, 'yes' or 'no.'") (indicating that the information bits exist only in binary states).

There is no showing that the term needs to be clarified, or that the specification defines or uses the term in a special, narrower manner that requires the Court to give the term that meaning. Indeed, the claim term is unambiguous to a person of ordinary skill in the art, who would be presumed to know that information bits refer to binary digits 0 and 1 in the message to be encoded, in light of the claim language and the specification, and would likely interpret the term according to that evident meaning. No construction is, therefore, necessary. *See Am. Piledriving Equip.*, 637 F.3d at 1331. Accordingly, the Court gives the term its plain and ordinary meaning.

## V.    Conclusion

Based on the foregoing, the Court adopts the constructions set forth below for the terms or limitations for which the parties offer differing constructions.

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| "repeat" | Plain and ordinary meaning | "Creating a new bit that corresponds to the value of an original bit (i.e., a new copy) by storing the new copied bit in memory. A reuse of a bit is not a repeat of a bit." | Plain and ordinary meaning |
| "accumulation" (and its variations) | Plain and ordinary meaning | "a process in which (a) the first output bit equals the first input bit; and (b) for all subsequent bits, the current output bit equals the mod-2 sum of the prior output bit and the current input bit" | Plain and ordinary meaning |

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|------|-----------------------------------|-----------------------------------|----------------------|
| "generator matrix" | Plain and ordinary meaning | "a matrix that, when multiplied by a block of input bits, produces a number of output bits that is greater than or equal to the number of input bits" | Plain and ordinary meaning |
| Tanner Graph (Diagram Used in Claims 11 and 18 of the '032 patent) | A graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits. | A graph representing an [irregular repeat accumulate] IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits, and all parity bits are determined as shown by the configuration of nodes and edges in the Tanner graph (*i.e.*, a first parity bit ($x_1$) is determined as a function of information bits alone, and all subsequent parity bits ($x_2$-$x_r$) are determined as a function of both information bits and prior parity bits). | A graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits. |
| "receive messages from neighboring check/variable | Plain and ordinary meaning | "each of the receiving nodes sends updated messages back to the | Plain and ordinary meaning |

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| nodes and send updated messages to the neighboring variable/check nodes" | | same adjacent nodes from which they received the original messages" | |
| "a first set of memory locations . . . a second set of memory locations . . . [and] a permutation module to read a bit from the first set of memory locations . . . a corresponding index of the first set of memory locations and a corresponding index of the second set of memory locations" (Subset of Claim 1 of the '833 Patent) | Plain and ordinary meaning | • "a first set of memory locations to store information bits" means "at least two addresses in an addressable memory array where information bits are stored"<br>• "a second set of memory locations to store parity bits" means "at least two addresses in an addressable memory array, different from the first set of addresses, where parity bits are stored"<br>• "index of the first set of memory locations" means "a list or table that contains the addresses where the information bits are stored"<br>• "index of the second set of memory locations" means "a list or table that contains the addresses where the parity bits are stored"<br>• "a corresponding" means "each index in the first set is associated with at least one index in the | Plain and ordinary meaning |

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| | | second set, and vice versa"<br>• "read a bit" / "reading a bit" means "provide an address to a memory and receiving back the bit that is stored at that address" | |
| "combine the read bit to a bit in the second set of memory locations" | Plain and ordinary meaning | (a) combine (i) the bit read from the first set of memory locations and (ii) a particular bit stored in the second set of memory locations and (b) store the combined result in the second set of memory locations | Plain and ordinary meaning |
| "random" / "randomly" | Plain and ordinary meaning | "non-deterministic" | Plain and ordinary meaning |
| "said second encoding operation producing at least a portion of a codeword" / "the encoding operation generating at least a portion of a codeword" | Plain and ordinary meaning | "the encoding operation produces at least a portion of the bits transmitted on a channel" | Plain and ordinary meaning – but not exactly Plaintiff's version |
| "at least two of the information bits appear in three subsets" | "at least two, but not all, of the information bits appear in exactly three subsets." | Plain and ordinary meaning | Plain and ordinary meaning |
| information bits | Plain and ordinary meaning | "binary digits (i.e., 1s and/or 0s) that represent information" | Plain and ordinary meaning – but not exactly Plaintiff's version |