UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 16-3714-GW(AGRx)** | | Date | June 17, 2019 |
|---|---|---|---|---|

| Title | ***The California Institute of Technology v. Broadcom Limited, et al.*** | Page | 1 of 2 |
|---|---|---|---|

Present: The Honorable   **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | Katie E. Thibodeaux |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| James R. Asperger | Mark D. Selwyn |
| Todd M. Briggs | James M. Dowd |
| | Jason F. Choy |

**Proceedings:**   CALTECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF VALIDITY ON CLAIMS 20 AND 22 OF THE '710 PATENT UNDER 35 U.S.C. § 103 BASED ON IPR ESTOPPEL UNDER 35 U.S.C. § 315(e)(2) [844];

PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT OF VALIDITY UNDER 35 U.S.C. § 103 BASED ON IPR ESTOPPEL UNDER 35 U.S.C. § 315(E)(2) FOR U.S. PATENT NO. 7,916,781 [845];

DEFENDANT'S MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b) [887];

DEFENDANTS' MOTION SEEKING PARTIAL RECONSIDERATION OF THE COURT'S DECEMBER 28, 2018 ORDER REGARDING IPR ESTOPPEL OF CERTAIN CLAIMS OF U.S. PATENT NOS. 7,916,781 AND 7,421,032 [888];

CALTECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT [942];

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NO JOINT INFRINGEMENT [959];

DEFENDANTS' MOTION TO EXCLUDE INFRINGEMENT OPINIONS OF DR. MICHAEL TANNER [964];

CALTECH'S MOTION TO EXCLUDE IMPROPER CLAIM CONSTRUCTION OPINIONS OF DR. STARK AND DR. BLANKSBY [968];

CALTECH'S MOTION TO STRIKE DEFENDANTS' EVIDENCE AND EXPERT TESTIMONY CONCERNING LATE-DISCLOSED NON-INFRINGING ALTERNATIVE [971]

CALTECH'S MOTION TO STRIKE CERTAIN OPINIONS OF DEFENDANTS' EXPERTS BRENDAN FREY AND WAYNE STARK [974];

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 16-3714-GW(AGRx)** | Date | June 17, 2019 |
|---|---|---|---|

| Title | *The California Institute of Technology v. Broadcom Limited, et al.* | Page | 2 of 2 |
|---|---|---|---|

**CALTECH'S MOTION TO EXCLUDE DEFENDANTS' LATE-PRODUCED DOCUMENTS AND DR. HENRY PFISTER'S UNTIMELY EXPERT DEPOSITION TESTIMONY [1024]**

The Court's Tentative Rulings are circulated and attached hereto, as additions to the Tentative Rulings provided by the Court on June 6, 2019. Court hears oral argument. The Court's June 17, 2019 Tentative Ruling Regarding Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby is adopted as the Court's "Very Tentative Final Ruling" at this time. The Court's June 17, 2019 Tentative Ruling Regarding (1) Defendants' Motion for Summary Judgment as to No Joint Infringement, (2) Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner, (3) Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative is adopted as the Court's Final Ruling. The Court rules that:

- Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby (Docket No. 968) is **DENIED** without prejudice to Plaintiff renewing its objections to certain expert testimony at the appropriate time.
- Defendants' Motion for Summary Judgment as to No Joint Infringement (Docket No. 959) would be **GRANTED**.
- The Court would **GRANT-IN-PART** and **DENY-IN-PART** Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner (Docket No. 964) as stated herein.
- Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No. 971) would be **DENIED**.

The Court takes all other above-captioned Motions under submission.

The Court will issue new page limits regarding the upcoming set of motions to be filed.

A five-page brief re severance of Defendants Broadcom and Apple and a three-page offer of proof as to matters not previously identified as potential motions, but which Defendants believe warrant a summary judgment determination based on the Court's rulings on matters in the first "round" of motions, will be filed on the same date that opening briefs for the second "round" of motions are due. No response to the offer of proof is permitted. Plaintiff will be permitted a five-page opposition to Defendants' motion re severance and Defendants will be permitted a 3-page reply.

3 : 00

JG

*__The California Institute of Technology v. Broadcom Limited et al.__*; Case No. 2:16-cv-03714-GW-(AGRx) Tentative Final Rulings on: (1) Defendants' Motion for Summary Judgment as to No Joint Infringement, (2) Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner, (3) Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative

## I.        Introduction

Plaintiff California Institute of Technology currently alleges patent infringement against Defendants Broadcom Limited, Broadcom Corporation, Avago Technologies Limited, and Apple Inc.  *See* First Amended Complaint ("FAC"), Docket No. 36; *see also* Docket No. 1.  Plaintiff asserts that Defendants infringe fifteen claims from three of its patents: (1) U.S. Patent No. 7,116,710 ("the '710 Patent"); (2) U.S. Patent No. 7,421,032 ("the '032 Patent"); and (3) U.S. Patent No. 7,916,781 ("the '781 Patent") (collectively, the "Asserted Patents").[1]  *See* Docket No. 409 (Plaintiff's Amended Notice of Withdrawal of Certain Asserted Claims of Asserted Patents); *see also* Docket No. 953 (Joint Report Regarding Pending Disputed Issues).

The parties have filed this first "round" of motions for summary judgment and motions to exclude.  Those motions have been fully briefed.  A hearing was held on all pending matters in this case on June 6, 2019.[2]  All disputes were taken under submission, with a follow up hearing as to certain matters scheduled for a future date.

This Order addresses three of the parties' pending motions.[3]  The Court would rule as

---

[1] The fifteen remaining claims in this case are: Claims 20, 22, and 23 of the '710 Patent; Claims 3, 11, 13, 17, and 18 of the '032 Patent; and Claims 5, 6, 9, 10, 13, 19, and 22 of the '781 Patent.  Docket No. 409.  Of those claims, eleven were selected as representative claims for purposes of adjudication in this lawsuit: Claims 20, 22, and 23 of the '710 Patent; Claims 3, 11, 17, and 18 of the '032 Patent; and Claims 6, 9, 13, and 22 of the '781 Patent.  *See id.*; *see also* Docket No. 487, 488.  On March 22, 2019, in a joint report filed by the parties, Plaintiff stated that it intended to file a "formal notice of withdrawal" on the basis that it has "withdrawn its infringement allegations with respect to claims 5, 6, 9, and 10 of the '781 patent and claim 13 of the '032 patent."  Docket No. 953 at 2; *see also* Docket No. 998 at 2 (Plaintiff's memorandum in support of motion to exclude improper claim construction opinions, stating that it alleges that Defendants infringe Claims 20, 22, and 23 of the '710 Patent, Claims 3, 11, 17, and 18 of the '032 Patent, and Claims 9, 13 and 22 of the '781 Patent).  Plaintiff has not yet filed such a notice, which, once filed, will be understood to remove those five claims from the case entirely given that Plaintiff does not represent that any of the claims "[s]elected for adjudication" are representative of any of the withdrawn claims.

[2] At the June 6, 2019 hearing, tentative rulings were issued providing the Court's tentative views on the issues raised by the parties.  The tentative order has not been adopted as a final ruling of the Court and is not a final determination in this matter.

[3] Specifically, the following three motions are addressed herein: (1) Defendants' Motion for Summary Judgment as to No Joint Infringement (Docket No. 959); (2) Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner (Docket No. 964); and (3) Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No. 971).  The parties did not address the first or second of these motions at the June 6 hearing,

follows:

- Defendants' Motion for Summary Judgment as to No Joint Infringement (Docket No. 959) would be **GRANTED**.

- The Court would **GRANT-IN-PART** and **DENY-IN-PART** Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner (Docket No. 964) as stated herein.

- Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No. 971) would be **DENIED**.

## II.    <u>Legal Standard</u>

### A.    **Rule 37(c) and Timely Disclosure of Information**

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The burden is on the party facing the sanction to show that the failure to disclose is substantially justified or harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). "Among the factors that *may* properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. App'x. 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)) (emphasis added).

Generally, "the district court's discretion to issue sanctions under Rule 37(c)(1)" is given "particularly wide latitude." *Yeti by Molly*, 259 F.3d at 1107. However, discretion may be limited when the sanction amounts to dismissal of a claim. *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). In such a case, the district court is "required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, and also to consider the availability of lesser sanctions." *Id.*

---

nor did they express an interest in presenting argument regarding them at the next-scheduled hearing. As described *infra*, the Court directed the parties to begin additional discovery exchanges relating to the dispute reflected in the third motion.

### B.    Experts and *Daubert*

*Daubert*'s "gatekeeping obligation" requires "that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).  In addition, expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  "The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

That being said, "far from requiring trial judges to mechanically apply the *Daubert* factors − or something like them − to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Exclusion of expert testimony is proper only when such testimony is irrelevant or unreliable because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

## III.    Analysis

### A.    Summary Judgment Motion Regarding Joint Infringement

Defendants move for a summary judgment determination that they have not jointly infringed the asserted patents on the basis that Plaintiff has "offered no evidence, opinions, or contentions" to support such a theory.[4]  Docket No. 959 at 1.

Plaintiff argues that it timely disclosed a joint infringement theory because its infringement contentions alleged that "**Defendants directly infringe** the Asserted Claims by **making** [and/or] **using** . . . the Accused Products" and "**Defendants** further directly infringe each method claim of the Asserted Claims because **Defendants** have performed each and ever step of the Asserted Claims at least through **testing** and/or **use** by their employees, among other ways."  Docket No. 1095 at 6 (quoting Docket No. 961-2 at 10) (emphasis in original).  Plaintiff also identifies a

---

[4] *See* Defendants' Motion for Summary Judgment as to No Joint Infringement, Docket No. 959 (public), Docket No. 1006 (sealed); Opposition, Docket No. 1055 (public), Docket No. 1095 (sealed); Reply, Docket No. 1137 (public), Docket No. 1183 (sealed).

sentence in its contentions where it stated Apple infringes "by requiring the LDPC coding functionality in the Broadcom Accused Products to be enabled." *Id.* (quoting Docket No. 961-2 at 11). Plaintiff argues that similar references to "***Defendants***" plural in some of its expert reports supports the conclusion that it timely disclosed a joint infringement theory. *Id.* at 7. Plaintiff also for the first time in this litigation suggests that it did not have an obligation to disclose all of its litigation theories in a timely fashion because "neither the scheduling order in this case nor any local rule required Caltech to present further details in its infringement contentions." *Id.* at 6-7.

Plaintiff's arguments are not persuasive. The parties have gone through multiple rounds of disputes in this case regarding the sufficiency of Plaintiff's infringement contentions. *See* Docket No. 673 at 2 (September 10, 2018 Order regarding motions, stating, "[t]he parties have been raising disputes about the adequacy of Plaintiff's infringement contentions for about a year now."). Arguing that using the word "Defendants" plural in infringement contentions supports a basis for understanding a joint infringement theory is both troubling and insufficient to put Defendants on notice of a specific joint infringement theory. As Defendants note, Plaintiff also takes other statements in its infringement contentions out of context. Docket No. 961-2 at 2 ("Apple incorporates Broadcom Accused Products into Apple Accused Products in an infringing manner by requiring the LDPC coding functionality in the Broadcom Accused Products to be enabled." (emphasis added).). Because Plaintiff failed to timely disclose any cognizable theory of joint infringement liability to support its affirmative case against Defendants, summary judgment is warranted. Defendants' Motion for Summary Judgment as to No Joint Infringement (Docket No. 959) would be **GRANTED**.

### B.    Motion to Exclude Infringement Opinions of Tanner

Defendants move to exclude the opinions of Dr. Michael Tanner.[5] Docket No. 964. As Plaintiff explains, "Dr. Tanner's renowned achievement is the development of the Tanner graph." Docket No. 1094 at 3.

In his expert report, Tanner provides various opinions, including opinions related to: (1) "the general concept of Tanner graphs and how they are used to graphically represent sparse parity-check matrix codes"; (2) an explanation of how the "claimed Tanner graphs" in the asserted claims

---

[5] *See* Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner, Docket No. 964 (public), Docket No. 1007 (sealed); Opposition, Docket No. 1057 (public), Docket No. 1094 (sealed); Reply, Docket No. 1133 (public), Docket No. 1182 (sealed).

of the '032 Patent relate to IRA encoders, and (3) "the relationship between the claimed Tanner graphs and the 802.11 IRA-LDPC codes." Docket No. 1094 at 3.

Defendants appear to be challenging all of Tanner's report,[6] but they focus their arguments on concern with the third category of Tanner's opinions. Docket No. 1182. Defendants argue that Tanner's opinions about the "relationship" between the "*claimed* Tanner Graphs" and the 802.11 standards is a stand-in for an infringement analysis between the claims and Defendants' accused products. *Id.* at 1-4. Defendants argue that such an analysis is not only improper in that it substitutes analysis of the standard for the analysis of the accused products, but is also likely to confuse or mislead the jury. *Id.* at 4-5. Plaintiff, for its part, argues that Tanner was not required to set forth opinions on the ultimate issue of infringement, but that his opinions comparing the claimed Tanner Graphs to the 802.11 standards are "relevant in educating the jury on Tanner graphs and how the 802.11 IRA-LDPC codes are in accordance with the claimed Tanner graphs." Docket No. 1094 at 8-9.

Plaintiff does not adequately explain what admissible purpose is served by Tanner's opinions comparing the claimed Tanner graphs to the codes contemplated by the 802.11 standards. The Court agrees with Defendants that in drawing this comparison, Tanner appears to be undertaking an analysis similar to an infringement analysis, but without the accused products. Doing so holds a high likelihood of confusing or misleading the jury. For instance, if the jury was persuaded by Tanner's opinions comparing the Tanner graphs to the 802.11 standards, and another expert simply opined that the accused products also satisfy the 802.11 standards, the jury might think it appropriate to find the accused products infringe the Tanner graph limitations of the asserted '032 Patent claims by simple, and improper, syllogism. Allowing the jury to connect the dots in such a way would be particularly unsupported because in providing his opinions, Tanner simply states he would "expect" encoders built according to the 802.11 standards to be "in accordance with" the claimed Tanner graphs. As Defendants observe, this open-ended opinion is speculative.

Because of the concerns with Tanner's opinions on this topic, permitting him to provide opinions to the jury on such issues would be improper under *Daubert*. Therefore, the Court would

---

[6] The title of Defendants' motion suggests that it relates only to some of Tanner's opinions. However, the conclusion of Defendants' opening brief appears to request exclusion of Tanner's entire expert report. *See, e.g.*, Docket No. 1007 at 8.

**GRANT-IN-PART** and **DENY-IN-PART** Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner. Docket No. 964. Paragraphs 2-3, 69-89 of the Tanner Report (*see* Docket No. 1094-1) would be **STRICKEN** to the extent they include opinions comparing the claimed Tanner graphs to the 802.11 standards. Defendants' motion would be otherwise **DENIED** as it relates to other portions of Tanner's testimony, as Defendants have not provided a sufficient basis for excluding it. Defendants do not dispute, for instance, that Tanner's opinions regarding and explaining the Tanner graphs generally would likely assist the jury.

### C.     Motion to Strike Late-Disclosed Non-Infringing Alternative

Plaintiff moves to exclude the testimony of Defendants' experts relating to a non-infringing alternative theory as not timely disclosed.[7, 8] Docket No. 971.

On the deadline for the parties to serve rebuttal expert reports, Defendants for the first time served a Disclosure and Declaration for Dr. Andrew Blanksby. Docket No. 1101 at 5. Blanksby is a long-time Broadcom employee. Thus, Defendants attempted to invoke Rule 26(a)(2)(C) when disclosing more limited opinions for him. The August 2018 Disclosure included the statement that Blanksby "expect[s] to testify about the design, development, and operation of the Broadcom accused products, and a Direct Encoder that [he] designed." Docket No. 699-2 ¶ 12. It further stated, "I expect to testify that the Broadcom accused products and the Direct Encoder that I designed do not implement several elements of the claims of the patents-in-suit." *Id.* ¶ 14. Plaintiff argues, and Defendants do not dispute, that the Blanksby Disclosure was the first instance where the Direct Encoder was disclosed as part of a non-infringing alternative theory. On the same day, Defendants also served rebuttal expert reports for Dr. Wayne Stark and Vincent Thomas that referred to the Direct Encoder and presented opinions about it that, according to Stark and Thomas, are based on undocumented discussions with Blanksby.[9]

---

[7] *See* Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative, Docket No. 971 (public), Docket No. 996 (sealed); Opposition, Docket No. 1052 (public), Docket No. 1101 (sealed); Reply, Docket No. 1144 (public), Docket No. 1176 (sealed).

[8] Unlike its other motions to exclude/strike, for this motion, Plaintiff does not provide a listing of the specific paragraphs of Defendants' expert reports that it seeks to have excluded.

[9] Although Plaintiff makes some passing comments about the sufficiency of Defendants' experts' opinions (Docket No. 996 at 5 (referring to Stark's and Thomas's opinions related to the Direct Encoder as "incomplete")), because Plaintiff brings this motion as a Rule 37 motion, these comments are viewed through the lens of Rule 37(c), not *Daubert* or otherwise as a motion *in limine*.

Soon after Defendants served the Blanksby Disclosure, Plaintiff moved to strike it in full, arguing that it failed to meet the applicable requirements of Rule 26(a)(2). Docket No. 699. In its motion, Plaintiff referred to the Direct Encoder and speculated that it was created for this litigation. *Id.* at 2 ("For instance, he references: . . . a previously-undisclosed "Direct Encoder" he developed (also apparently for this litigation)."); 12-13 ("Dr. Blanksby's opinions regarding his 'Direct Encoder' . . . are also, by all indications, based on work Dr. Blanksby performed solely for purposes of this litigation."). Defendants did not rebut these suppositions in their opposition brief. *See* Docket No. 720 at 12 (referring to Direct Encoder but not rebutting Plaintiff's assertions about its origins).

On October 22, 2018, the Court issued an order striking the Blanksby Disclosure, but permitting Blanksby to submit a more fulsome accounting of his expert opinions. Docket No. 746 at 3. The order further stated that "Defendants must . . . produce all materials related to and/or underlying Blanksby's expert opinions" within seven days. *Id.*

Blanksby served an amended disclosure on November 9, 2018. Docket No. 1101 at 6. Beyond the source code for the Direct Encoder,[10] Defendants do not dispute that they have not produced any other documents relating to the Direct Encoder. Plaintiff did not move to compel the production of additional documents relating to the Direct Encoder.

During his December 2018 expert deposition, Blanksby was asked questions about the Direct Encoder. *See generally* Excerpts of December 14, 2018 Blanksby Deposition Transcript, Docket No. 1101-2. In response to questions from Plaintiff's counsel, Blanksby testified that: (1) he developed the Direct Encoder (*id.* at 280:7-8); (2) he "start[ed] developing" the Direct Encoder "a few months" before his deposition (*id.* at 280:9-14); (3) no one asked him to create the Direct Encoder (*id.* at 281:15-22); and (4) he decided to develop it on his own (*id.* at 281:24-282:3). He testified "I don't know" when asked if "Broadcom's decision to develop the Direct Encoder[ ] was . . . impacted in any way by this lawsuit." *Id.* at 281:6-13.

Both before the Court issued its October 2018 order and after Blanksby's deposition, Plaintiff's expert, Shoemake, served expert reports with opinions relating to the Direct Encoder. *See* Docket No. 1103 at 5-6.

Plaintiff's arguments to support its current motion run the gambit. Plaintiff identifies

---

[10] Defendants produced the source code for the Direct Encoder before the Court issued its October 2018 order.

7

evidence to support an argument that development of the Direct Encoder happened long before June 2018. Docket No. 1176 at 1. Plaintiff argues Defendants have "concoct[ed]" a "carefully crafted" story regarding the timing of development on the one hand, but Plaintiff argues on the other hand that Defendants' claim that development of the Direct Encoder was not motivated by this litigation is "not plausible." Docket No. 1176 at 1, 3, 3-4 n.2. Plaintiff argues that it has been "wholly deprived of fact discovery" because of the late timing of disclosure of Defendants' Direct Encoder non-infringing alternative theory and thus Plaintiff could not test Defendants' experts' assertions about the Direct Encoder. *Id.* at 1-2. Plaintiff also argues that Defendants' experts were unable to answer "basic technical questions about the Direct Encoder," further compromising Plaintiff's ability to take expert discovery. *Id.* at 7.

The Court declines to make a factual determination at this time about the veracity of statements that the Direct Encoder was first developed in June 2018. The Court also declines to make a factual determination at this time about the motivations underlying development of the Direct Encoder. Plaintiff had a full opportunity in December 2018 to depose Blanksby - who testified under oath - regarding the Direct Encoder, including his development of it and his opinions relating to it. Plaintiff also had a full opportunity to explore the opinions of Defendants' other experts (and their purported shortcomings) during their depositions. Indeed, Plaintiff's expert prepared and served his own competing opinions relating to the Direct Encoder. The Court finds the October 2018 timing of Defendants' disclosure of the Direct Encoder non-infringing alternative theory effectively harmless given these efforts. To the extent Defendants did not produce the answers to Plaintiff's questions or the amount of discovery that Plaintiff would have wished, Defendants will similarly be precluded from relying on any of that allegedly missing information at trial.

Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No. 971) would be **DENIED**. However, in order to ameliorate any prejudice caused to Plaintiff by the timing of Defendants' disclosure of the Direct Encoder, at the hearing, the Court directed Plaintiff to serve by Monday, June 10, 2019 ten requests for production on Defendants. The Court further directed that a response to the requests, although not necessarily production of documents themselves, would be due within seven days of service. The Court indicated that it would consider further disputes relating to the requests after appropriate steps were taken, with the warning that the more outlandish the requests, the less likely Plaintiff will receive further relief from the Court.

8

**IV.    Conclusion**

For the reasons stated in this Order, the Court would rule as follows:

- Defendants' Motion for Summary Judgment as to No Joint Infringement (Docket No. 959) would be **GRANTED**.

- The Court would **GRANT-IN-PART** and **DENY-IN-PART** Defendants' Motion to Exclude Infringement Opinions of Dr. Michael Tanner (Docket No. 964) as stated herein.

- Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No. 971) would be **DENIED**.

***The California Institute of Technology v. Broadcom Limited et al.***; Case No. 2:16-cv-03714-GW-(AGRx)
Very Tentative Final Ruling on Plaintiff's Motion to Exclude Improper Claim Construction
Opinions of Dr. Stark and Dr. Blanksby

I.      **Introduction**

Plaintiff California Institute of Technology currently alleges patent infringement against
Defendants Broadcom Limited, Broadcom Corporation, Avago Technologies Limited, and Apple
Inc.  *See* First Amended Complaint ("FAC"), Docket No. 36; *see also* Docket No. 1.  Plaintiff
asserts that Defendants infringe fifteen claims from three of its patents: (1) U.S. Patent No.
7,116,710 ("the '710 Patent"); (2) U.S. Patent No. 7,421,032 ("the '032 Patent"); and (3) U.S.
Patent No. 7,916,781 ("the '781 Patent") (collectively, the "Asserted Patents").[1]  *See* Docket No.
409 (Plaintiff's Amended Notice of Withdrawal of Certain Asserted Claims of Asserted Patents);
*see also* Docket No. 953 (Joint Report Regarding Pending Disputed Issues).

The parties have filed this first "round" of motions for summary judgment and motions to
exclude.[2]  Those motions have been fully briefed.  A hearing was held on all pending matters in
this case on June 6, 2019.[3]  All disputes were taken under submission, with a follow up hearing as

---

[1] The fifteen remaining claims in this case are: Claims 20, 22, and 23 of the '710 Patent; Claims 3, 11, 13,
17, and 18 of the '032 Patent; and Claims 5, 6, 9, 10, 13, 19, and 22 of the '781 Patent.  Docket No. 409.  Of those
claims, eleven were selected as representative claims for purposes of adjudication in this lawsuit: Claims 20, 22, and
23 of the '710 Patent; Claims 3, 11, 17, and 18 of the '032 Patent; and Claims 6, 9, 13, and 22 of the '781 Patent.  *See
id.*; *see also* Docket No. 487, 488.  On March 22, 2019, in a joint report filed by the parties, Plaintiff stated that it
intended to file a "formal notice of withdrawal" on the basis that it has "withdrawn its infringement allegations with
respect to claims 5, 6, 9, and 10 of the '781 patent and claim 13 of the '032 patent."  Docket No. 953 at 2; *see also*
Docket No. 998 at 2 (Plaintiff's memorandum in support of motion to exclude improper claim construction opinions,
stating that it alleges that Defendants infringe Claims 20, 22, and 23 of the '710 Patent, Claims 3, 11, 17, and 18 of
the '032 Patent, and Claims 9, 13 and 22 of the '781 Patent).  Plaintiff has not yet filed such a notice, which, once
filed, will be understood to remove those five claims from the case entirely given that Plaintiff does not represent that
any of the claims "[s]elected for adjudication" are representative of any of the withdrawn claims.

[2] Specifically, the following seven motions have been filed: (1) Plaintiff's Motion for Summary Judgment as
to No Inequitable Conduct (Partial) (Docket No. 942); (2) Defendants' Motion for Summary Judgment as to No Joint
Infringement (Docket No. 959); (3) Plaintiff's Motion to Strike Certain Opinions of Defendants' Experts Brendan
Frey and Wayne Stark (Docket No. 974); (4) Defendants' Motion to Exclude Infringement Opinions of Dr. Michael
Tanner (Docket No. 964); (5) Plaintiff's Motion to Strike Late-Disclosed Non-Infringing Alternative (Docket No.
971); (6) Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby (Docket
No. 968); (7) Broadcom's Motion for Summary Judgment as to Non-Infringement as to Extraterritorial Sales (Docket
No. 975).

[3] At the June 6, 2019 hearing, tentative rulings were issued providing the Court's tentative views on the issues
raised by the parties.  The tentative order has not been adopted as a final ruling of the Court and is not a final
determination in this matter.

to certain matters scheduled for a future date.  This Order addresses Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby.[4]  Docket No. 968.

For the reasons stated in this Order, the Court would **DENY** Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby (Docket No. 968) as to all disputes, without prejudice to Plaintiff renewing its objections to certain expert testimony at the appropriate time.

## II.    Background

The asserted claims of the '710 Patent (and any claims that they depend from[5]) state:

15. A coder comprising:
>    a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits; and
>    a second coder operative to further encode bits output from the first coder at a rate within 10% of one.

*20. The coder of claim 15, wherein the first coder comprises a low-density generator matrix coder.*

21. The coder of claim 15, wherein the second coder comprises a rate 1 linear encoder.

*22. The coder of claim 21, wherein the second coder comprises an accumulator.*

*23. The coder of claim 22, wherein the second coder further comprises a second accumulator.*

The asserted claims of the '032 Patent (and any claims that they depend from) state:

1. A method comprising:
>    receiving a collection of message bits having a first sequence in a source data stream;
>    generating a sequence of parity bits, wherein each parity bit "$x_j$" in the sequence is in accordance with the formula

---

[4] *See* Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby, Docket No. 968 (public), Docket No. 998 (sealed); Opposition, Docket No. 1064 (public), Docket No. 1103 (sealed); Reply, Docket No. 1149 (public), Docket No. 1174 (sealed).

[5] To differentiate, asserted claims have emphasis added.

$$x_j = x_{j-1} + \sum_{i=1}^{\lambda} v_{(j-1)\lambda+i},$$

where
"$x_{j-1}$" is the value of a parity bit "j−1," and

$$"\sum_{i=1}^{a} v_{(j-1)a+1}"$$

is the value of a sum of "a" randomly chosen irregular repeats of the message bits; and
making the sequence of parity bits available for transmission in a transmission data stream.

*3. The method of claim 1, wherein the sequence of parity bits is generated is in accordance with "a" varying for different parity bits.*

*11. A device comprising:*
*an encoder configured to receive a collection of message bits and encode the message bits to generate a collection of parity bits in accordance with the following Tanner graph:*



*See also* Certificate of Correction for '032 Patent, Sept. 2, 2008 (replacing "V₁" and "U₁" in the

3

lower portion of the Tanner Graph with "Vr" and "Uk," respectively).

> ***17. The device of claim 12, further comprising a second accumulator configured to determine a second sequence of parity bits that defines a second condition that constrains the random sequence of repeats of the message bits.***

> ***18. A device comprising:***
>> ***a message passing decoder configured to decode a received data stream that includes a collection of parity bits, the message passing decoder comprising two or more check/variable nodes operating in parallel to receive messages from neighboring check/variable nodes and send updated messages to the neighboring variable/check nodes, wherein the message passing decoder is configured to decode the received data stream that has been encoded in accordance with the following Tanner graph:***



*See also* Certificate of Correction for '032 Patent, Sept. 2, 2008 (replacing "V₁" and "U₁" in the lower portion of the Tanner Graph with "Vr" and "Uk," respectively).

The asserted claims of the '781 Patent (and any claims that they depend from) state:

> 1. A method of encoding a signal, comprising:
>> receiving a block of data in the signal to be encoded, the block of data including information bits;

performing a first encoding operation on at least some of the information bits, the first encoding operation being a linear transform operation that generates L transformed bits; and

performing a second encoding operation using the L transformed bits as an input, the second encoding operation including an accumulation operation in which the L transformed bits generated by the first encoding operation are accumulated, said second encoding operation producing at least a portion of a codeword, wherein L is two or more.

2. The method of claim 1, further comprising:

outputting the codeword, wherein the codeword comprises parity bits.

5. The method of claim 2, wherein performing the first encoding operation comprises transforming the at least some of the information bits via a low density generator matrix transformation.

6. The method of claim 5, wherein generating each of the L transformed bits comprises mod-2 or exclusive-OR summing of bits in a subset of the information bits.

*9. The method of claim 6, wherein the information bits appear in a variable number of subsets.*

*13. A method of encoding a signal, comprising:*

*receiving a block of data in the signal to be encoded, the block of data including information bits; and*

*performing an encoding operation using the information bits as an input, the encoding operation including an accumulation of mod-2 or exclusive-OR sums of bits in subsets of the information bits, the encoding operation generating at least a portion of a codeword,*

*wherein the information bits appear in a variable number of subsets.*

21. A method comprising:

receiving a collection of information bits;

mod-2 or exclusive-OR adding a first subset of information bits in the collection to yield a first parity bit;

mod-2 or exclusive-OR adding a second subset of information bits in the collection and the first parity bit to yield a second parity bit; and

outputting a codeword that includes the first parity bit and the second parity bit.

*22. The method of claim 21, wherein:*

5

> *the method further comprises mod-2 or exclusive-OR adding additional subsets of information bits in the collection and parity bits to yield additional parity bits; and*
> *the information bits in the collection appear in a variable number of subsets.*

## III.     Legal Standard

*Daubert*'s "gatekeeping obligation" requires "that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).  In addition, expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs."  *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  "The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology."  *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

That being said, "far from requiring trial judges to mechanically apply the *Daubert* factors - or something like them - to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).  Exclusion of expert testimony is proper only when such testimony is irrelevant or unreliable because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

## IV.     Analysis

Plaintiff moves to exclude certain opinions of Dr. Wayne Stark and Dr. Andrew Blanksby on the basis that they rely on improper claim construction interpretations.  Docket No. 968.  Before turning to the nine separate disputes that Plaintiff raises in its motion, the Court notes that the brief snippets of technologically-complex argument that are directed to each of these disputes appear likely interrelated with much larger, possibly dispositive issues in this case.  The Court provides some determinations on the limited record before it, but will have the parties' disputes on these issues in mind when it is reviewing the parties' second "round" of summary judgment motions relating to dispositive issues in the case.

6

### 1.    "Repeat" (all asserted claims)

During claim construction, Defendants argued that the term "repeat" should be construed as "[c]reating a new bit that corresponds to the value of an original bit (*i.e.*, a new copy) by storing the new copied bit in memory.  A reuse of a bit is not a repeat of a bit."  *See* Docket No. 213 at 8.  The Court found that the claim language itself "makes clear that 'repeated bits' are a construct distinct from the original bits from which they are created, as Defendants contend repeatedly."  *Id.* at 9; *see also id.* at Cover, 14.  The Court went on to state, "nowhere in the claims is the term 'repeat' defined or used in a manner that specifies how the repeated bits are stored in their transitional state," and rejected Defendants' proposal that the term "repeat" be construed to require "storing the new copied bit in memory."  *Id.*  The Court referred to certain examples, including the low-density generator matrix ("LDGM") in the specification, before explaining, "storage of redundant copies of bits in new memory locations is not a predicate to duplication or reuse of bits to create IRA codes or parity bits, especially not when the repeated bits are merely transitory to generation of parity bits."[6]  *Id.*

Plaintiff argues that Defendants' experts improperly submit opinions that would limit the meaning of "repeat" to require "storing new copied bit[s] in memory."[7]  *See, e.g.* Docket No. 1174 at 1-2.  Plaintiff states:

> [i]nstead of explicitly stating that "repeating" requires "storing the new copied bit in memory," Defendants' experts claim that an information bit cannot be repeated by distributing it to multiple components connected to a wire because (in that context) the value of the original information bit cannot be changed without resulting in a corresponding change to the repeated bit. However, the only way the original bit can change its value without resulting changing the repeated bit is if the repeated bit is stored in memory (*e.g.*, registers, RAM, cache, latches, CD-ROMs, capacitors, etc.).  Indeed, even

---

[6] The claim construction order later stated:

> Defendants also assert that Plaintiff's attempt to re-write the claim to cover mere 'reuse' of bits would render limitations of the asserted claims superfluous.  *See* Defs.' Motion at 14; Defs.' Opposition at 4.  But Plaintiff is not asking this Court to construe the claims so.  Rather, Plaintiff only proposes that the Court adopts the plain and ordinary meaning of the term.

Docket No. 213 at 10.  However, in adopting the claim construction ruling as the final ruling of the Court, the cover page included the statement that "while 'repeat' may encompass duplication **and reuse**, it surely is not limited to . . . specific implementation techniques."  *Id.* at Cover (emphasis added); *see also id.* (stating term encompasses "generation of additional bits by means of duplicating the original bits.").

[7] Plaintiff specifically requests that paragraphs 414-415, 432, 437, 449, 532-556, 558-562, and 566-569 of the Stark Report and paragraphs 159-170 and 172-179 of the Blanksby Report be excluded.  Docket No. 998 at 7.

> though Defendants claim that bits can be "repeat[ed]" without storing new bits in memory, ***they yet have to identify a single scenario*** that meets Defendants' interpretation of "repeat" and does ***not*** use memory.

*Id.* (citations omitted) (emphasis added).

The Court agrees with Plaintiff that Defendants appear to hang on the word "distinct" in a sentence of the claim construction order in a way that leads to an interpretation of the word "repeat" that is narrower than its plain and ordinary meaning. Docket No. 213 at 9 ("'repeated bits' are a construct ***distinct*** from the original bits from which they are created, as Defendants contend repeatedly."). As the Court explained elsewhere in the claim construction order, "'repeats' indicates generation of additional bits." *Id.* at 14. A relationship between the generated repeat bits and the original bit (for instance, in the context of memory "pointers," *see id.* at 9) is not precluded by the claim construction order. In other words, to the extent Defendants would argue, for instance, that by saying repeated bits are "distinct" from the original bits, the Court somehow required difference or independence between the repeated and original bits, Defendants have not provided a basis for that position.

The Court agrees with Defendants, however, that on the current record, whether a branched wire meets the limitation of the claims, including a requirement for repeated bits, presents a question of fact. Whether the different points on the wire constitute the "exact same single bit" because "a wire, no matter the number of branches, settles to the exact same voltage at all points," (Docket No. 1103 at 3) or whether the different points on the wire represent repeat bits consistent with the "connections" shown in Figure 3 of the asserted patents because "[a] wire is just a connection from A to B" (Docket No. 1174 at 2-3) presents fact questions that cannot be resolved at this time.

### 2. "Low-Density Generator Matrix" ('710 Patent, Claim 20; '781 Patent, Claim 5) and "First Coder" ('710 Patent, all asserted claims; '781 Patent, Claim 9)[8]

Claim 15 of the '710 Patent requires, *inter alia*, a "first coder operative to repeat said stream of bits regularly." Claim 20 of the '710 Patent requires that "the first coder comprises a low-

---

[8] In its opening brief, Plaintiff argued that Defendants' experts' opinions regarding the "first coder" recited in Claim 15 of the '710 Patent are improper because Defendants' experts interpret the term to require that it must output parity bits. Docket No. 998 at 12. Defendants respond by stating, "Drs. Stark and Blanksby do not contend the claimed 'first coder' must output 'parity bits.'" Docket No. 1103 at 19. In reply, Plaintiff argues that the parties' dispute regarding "first coder" is the same as their dispute regarding "low-density generator matrix." *See, e.g.* Docket No. 1174 at 6. Thus, the two disputes are considered together.

density generator matrix coder."   During claim construction, Defendants argued that the term "generator matrix" should be construed as "a matrix that, when multiplied by a block of input bits, produced a number of output bits that is greater than or equal to the number of input bits."  Docket No. 213 at 13.  The Court found that the term should be understood by its plain and ordinary meaning.  *Id.* at 16.  The term "first coder" was not briefed during claim construction.

Plaintiff argues that Defendants' experts have impermissibly required that the first coder *must* output more bits than were input, because, Plaintiff argues, this: (1) fails to take into account that the first coder could be creating parity bits and (2) is contrary to the Court's claim construction order. [9]  Docket No. 1174 at 4.

At the hearing, Defendants suggested through their argument that their theory regarding the low density generator matrix is intertwined with their theory regarding the application of the "repeat" limitations in the claims, as well as the meaning and purpose of a "coder" in "encoding information bits" to introduce redundancy.  Defendants premised this argument on the fact that Claim 15 of the '710 Patent states, "a first coder having an input configured to receive a stream of bits, said first coder *operative to repeat said stream of bits* irregularly and scramble the repeated bits."  '710 Patent, Claim 15 (emphasis added).  Plaintiff, meanwhile, argued that Defendants' position assumes that the first coder is limited to certain tasks and cannot perform the additional step of summing the irregularly repeated bits before data proceeds to the claimed second coder.

The claim construction order states:

> Defendants do not appreciate the fact that if, as they claim, "repeats" can also be equated to the proposed limitation that the number of output bits from the generator matrix "must at least equal the number of original message bits input to the matrix," then because the term "repeats" is expressly and separately set forth in the claim language, reading the proposed limitation ("must at least equal the number of original message bits input to the matrix") into the term "generator matrix" is unnecessary and, more critically, makes the "repeat" related limitation in the same claim ("output a random sequence of repeats of the message bits") redundant. . . . The named inventors only claim, as a part of their invention, a low-density generator matrix that is further limited by the requirement that it output "a random sequence of repeats of the message bits"; they do not claim any and all forms of low-density generator matrix.  *See, e.g.,* '032 Patent at 9:39-42 [(Claim 13)].  Moreover,

---

[9] Plaintiff requests that paragraphs 414-415, 432, 437, 449, 532-556, 558-562, and 566-569 of the Stark Report and paragraphs 159-170 and 172-179 of the Blanksby Report be excluded with respect to the "low-density generator matrix" term and that paragraphs 566-569 of the Stark Report and paragraphs 172-179 of the Blanksby Report be excluded with respect to the "first coder" term.  *See* Docket No. 998 at 7, 13.

the "repeats" limitation referenced by Defendants is not consistently and uniformly used with the term "generat[or] matrix," which indicates that the former is not definitional.

Docket No. 213 at 14-15.  Importantly, the claim construction order refers to Claim 13 of the '032 Patent in its analysis, which recites: "[t]he device of claim 11, wherein the encoder comprises: a low-density generator matrix (LDGM) coder configured to perform an irregular repeat on message bits having a first sequence in a source data stream *and to output a random sequence of repeats of the message bits*."  '032 Patent, Claim 13 (emphasis added).  This requirement is not included in all of the asserted claims.  Specifically, it is not included in Claim 15 of the '710 Patent.

In general, the Court agrees with Plaintiff that the use of the term "repeat" in the claims cannot necessarily serve as a basis to require a LDGM coder where the outputted bits must be greater than or equal to the inputted bits.  Claims 15 and 20 of the '710 Patent use the transitional phrase "comprising."  Defendants have not provided a sufficient basis to support that the LDGM coder could not additionally perform other functions beyond repeating, such that the combination of the first coder's functions would lead to a lower output of bits.  As to Defendants' argument regarding the scope of the plain meaning of the term "coder," this issue was not raised during claim construction, and is raised now on a limited record.  That scanty record suggests that the parties' dispute regarding the meaning of the term "coder" in applying the claims to the accused products is factual, including by relating to the purpose of the purported first coder in the accused products at issue in this case.  Although the Court declines to exclude Defendants' expert's opinions at this time, Plaintiff may reserve an objection regarding this issue for later consideration.

### 3.  "Random" ('032 Patent, all asserted claims)

During claim construction, Defendants proposed the terms "random" / "randomly" should mean "non-deterministic."  Docket No. 213 at 23.  In Defendants' opening claim construction brief, for instance, they stated:

> [i]n computer science, much like in ordinary usage, the terms "random" and "deterministic" are antonyms. The outcome of a "random" choice depends upon chance and thus cannot be predicted in advance. To the contrary, in a "random" choice, all potential outcomes are equally likely . . . . A "deterministic" choice is the opposite of a "random" choice. In particular, a deterministic choice is made based upon a desired set of criteria to yield a predictable outcome that does not depend on chance . . . . By requiring "a sum of 'a' *randomly chosen* irregular repeats of the message bits," the plain claim language is explicit that the choice of which specific repeats to sum must be

10

made using a non-deterministic process (*i.e.*, one that depends on chance).

Docket No. 127 at 30-31.  In comparison, Plaintiff argued that:

> [i]n the field of error correction coding, "random" refers to a sequence where the order of the data elements has been changed . . . . It does not matter how the bits are rearranged (i.e., the rearrangement is random), but whatever manner is selected for a particular implementation must be fixed. If the bits are not rearranged according to a preselected permutation, then it would be impossible for the code to ever be de-coded.

Docket No. 128 at 33-34.  After considering the parties' arguments, the Court concluded that the term "random" was used in the asserted patents consistent with its plain meaning to a person of skill in the art and "the named inventors did not attach any specialized meaning to 'random' . . . , specifically not 'non-deterministic' as Defendants improperly suggest, and intended only its plain and ordinary meaning."  Docket No. 213 at 24.

Plaintiff argues that Stark, in deposition testimony, improperly equated the claim term "random" to "non-deterministic."  Docket No. 998 at 7 (citing Excerpt of Deposition Transcript of Wayne Stark, Docket No. 998-3 at 106:8-9, 107:10-17).  On this basis, Plaintiff argues that any of Stark's opinions relating to the term "random" should be excluded.[10]

Defendants argue that "Stark's report never says 'random' is limited to 'non-deterministic,' and instead expressly rejects this (baseless) criticism."  Docket No. 1103 (citing Declaration of Dr. Wayne Stark in support of Defendants' Opposition to Motion to Exclude, Docket No. 1103-2, Ex. S-2 ("Stark Report," ECF36-ECF222) ¶¶ 519-20).  Defendants similarly argue that at his deposition, Stark "rejected the suggestion that 'random' is limited to 'nondeterministic.'"  Docket No. 1103 at 10.

During his deposition, Stark and Defendants' counsel had the following colloquy:

> Q.   So in claim construction the defendants argued that "random" meant nondeterministic; right?
>
> A.   Right.  Right.
>
> Q.   And the Court didn't agree with the defendants' construction; right?
>
> A.   I'm not sure I would characterize it that way.

---

[10] Plaintiff specifically requests exclusion of paragraphs 252, 254, and 494-528 of the Stark Report.  Docket No. 998 at 8.  Plaintiff does not seek exclusion of Blanksby's opinions relating to this limitation.  *Id.* 8 n.4.

Q.   How would you characterize it?

A.   I -- the way I understood the Court's opinion was that 'nondeterministic' wasn't more helpful than "random" in terms of the term.

Q.   Okay.  So -- so what definition did you use for "random" in your report?

A.   Plain and ordinary meaning.

Q.   And what's the plain and ordinary meaning of "random"?

A.   Something that has some chance involved.

Q.   And does that mean that it has to be nondeterministic?

[objection omitted]

A.   I think "random" and "nondeterministic" are, kind of, equivalent in terms for the same thing.

So, I mean, you could use the word "nondeterministic," but I don't think it conveys any better meaning than "random"; and probably for ordinary people, they would understand more what random means than "nondeterministic."

Q.   So in forming your noninfringement opinions on the "random" limitation, you were essentially treating the term "random" as meaning nondeterministic; right?

[objection omitted]

A.   No, I was -- I was treating the term "random" to mean random.

Q.   And in your view "random" means nondeterministic; right?

A.   Well, that's one interpretation that you could apply to "random."  If it's not deterministic, that means there's some randomness in it.  But I think the -- as I said earlier, the Court basically said that the word "random" is most likely better understood by a person than "nondeterministic."   And my understanding -- I -- I would agree with that; that "random" is a better word to use for an ordinary person, than "nondeterministic."

Q.   Can something that's random be deterministic?

A.   No, I --

[objection omitted]

-- think if it's random it can't be deterministic.

Q.   Okay.  So in your view "random" cannot mean deterministic.  It must mean nondeterministic.

[objection omitted]

A. I think "random" means that there's some – some chance, some unstructruedness associated with something, something that can't be predicted.

That's, kind of, how "random" should be interpreted.

You can't predict something from another thing if it's random.

Docket No. 998-3 at 105:12-108:4.

Stark's testimony suggests that the claim construction order simply found that "random" was a "better word" than "nondeterministic."  In other words, Stark testifies that the claim construction order did not necessarily reject Defendants' claim construction proposal.  This interpretation of the claim construction order is not supported by the record.  *See, e.g.*, Docket No. 213 at 24 ("A holistic review of the claim language and the specification indicates that Defendants' proposed construction runs contrary to the intrinsic evidence.").

In the tentative ruling, the Court requested that the parties "explain their interpretations of the plain and ordinary meaning of 'random' consistent with the claim construction order (and, in comparison, their interpretations of both 'nondeterministic' and 'not deterministic')."  Instead, at the hearing, the parties largely repeated the same arguments in their briefs, picking and choosing their favored testimony from Stark's deposition to support their position that he is or is not applying the Court's construction for the term "random."  After returning to the parties' claim construction briefs, the Court tends to agree with Plaintiff that certain of Stark's deposition testimony includes concerning statements related to the meaning of the term "random."  Stark testifies, for instance, that "if it's random it can't be deterministic."  *See supra*.  Stark also testifies that "random" and "nondeterministic" can be considered "equivalent" terms.  However, these statements are somewhat offset by other statements in Stark's deposition testimony and the statements in Stark's expert report, where he explains, "[t]he Court did not adopt Defendants' proposed construction of 'non-deterministic' and I have not used that construction in forming my opinion."  Stark Report ¶ 520.  The Court does not find that exercising its gatekeeping function to exclude Stark's opinions regarding whether the accused products satisfy the randomness requirement of the asserted claims of the '032 Patent is warranted at this time.  However, Plaintiff should reserve its objection for trial.

          **4.**       **"Repeat . . . Irregularly" (all asserted claims)**

The asserted claims require irregular repetition of information bits.[11]  For instance, Claim 15 of the '710 Patent states, *inter alia,* "a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits."[12]   Plaintiff argues that Defendants' experts provide expert opinions that rely on an improperly narrow interpretation of this claim language.[13]

The parties appear to agree that assuming a system follows a method of first repeating "bits," then "puncturing" certain of the "bits" in a particular way, it could create a pattern of irregular repetition of "bits."[14]  *Compare* Docket No. 998 at 9 *with* Docket No. 1103 at 13.  Plaintiff argues that a person of skill in the art would understand an overall process of repeating and then puncturing bits would satisfy the "repeat . . . irregularly" claim language.  *See, e.g.*, Docket No. 1174 at 5-6 ("repetition followed by puncturing is just one way of irregular[ly] repeating bits.").  Defendants argue that a person of skill in the art would understand that the "repeat . . . irregularly" claim step only refers to the initial act of repeating bits, and does not encapsulate the subsequent puncturing of bits.  Docket No. 1103 at 13 ("[w]hereas 'repeating' bits generates additional bits by means of duplication (Dkt. 213 at 9), 'puncturing' bits destroys bits by removing them (and deleting the information they contain).").  In the context of the accused products, Defendants argue that even assuming bits are repeated,  that repetition does not lead to irregular repetition because irregularity only occurs after the puncturing step.  Defendants thus argue that the "repeat . . . irregularly" claim language cannot be satisfied by the process carried out by the accused products.  *Id.*; *see also id.* at 12.

The parties have presented a factual dispute regarding whether the accused products infringe the "repeat . . . irregularly" limitations of the asserted claims.  Whether to characterize the accused products' process as a single overall repetition "implementation" step or separate

---

[11] The asserted claims of the '710 and '032 Patents include an "irregular" limitation.  The asserted claims of the '781 Patent require that bits appear in a "variable number of subsets," supporting a requirement for irregular repetition of bits.  *See* Docket No. 849 at 22.

[12] Claim 15 of the '710 Patent is not itself an asserted claim, but asserted Claims 20, 22, and 23 depend from Claim 15.

[13] Plaintiff specifically requests that Defendants' expert opinions in paragraphs 410-413, 420-425, 430-431, and 436 of the Stark Report and paragraph 109 of the Blanksby Report be excluded.  *See* Docket No. 998 at 10.

[14] Defendants' preliminary noninfringement position is that the accused products rely on "branched wires" where bits are not repeated.  But Defendants argue that even if the bits are repeated, they are each repeated the same number of times such that repetition is not irregular.

repetition and puncturing steps will depend on how a person of ordinary skill in the art would apply the claim language to the accused products. Plaintiff's arguments relating to Defendants' experts' application of the term "repeat . . . irregularly" are rejected.

### 5.    "Sums" ('781 Patent, all asserted claims)

During claim construction, the parties agreed that "sums of bits in subsets of information bits" (and variations thereof) should be construed as "the result(s) of adding together two or more information bits from a subset of information bits." Dkt. 125 at 1-2. In essence, the parties now dispute whether summing bits by "accumulation" satisfies the parties' agreed construction. Plaintiff characterizes the parties' dispute in its opening brief:

> As shown in the table below, according to Defendants' experts, summing 0+i1+i2 to yield the result i1+i2 in a single operation would be a sum of subsets of information bits, but summing 0+i1 to yield the result i1 and then summing i1+12 to yield i1+i2 [*i.e.*, "accumulation"] would not be a sum of subsets of information bits[:]

| Admittedly a Sum of Information Bits | Allegedly Not a Sum of Information Bits |
|---|---|

Docket No. 998 at 13.

Plaintiff argues that Defendants' experts have taken an improperly narrow view of the term "sum."[15] Plaintiff argues that "accumulation is a form of summation," and thus the example in the chart on the right should be covered by the claim term "sums of bits." Among other arguments, Plaintiff also argues that Defendants' experts have themselves admitted that "the claimed 'sums' cover the result of accumulation." *Id.* at 15; *see also id.* at 16 ("Both experts subsequently tried to retract their admissions by submitting errata, but this should not detract from their prior admissions."). Defendants argue that the '781 Patent claims use both the terms "accumulation" and "sums," supporting a presumption that the two terms have different meanings. Docket No. 1103 at 14. Defendants note that in the *Hughes* case, Judge Pfaelzer found, in denying Plaintiff's motion for summary judgment of infringement, that adding a parity bit and an information bit in a similar recursive fashion does not satisfy the claim language "sums of bits." *Id.* at 15.

---

[15] Plaintiff asks that paragraphs 653-670 and 672-699 of the Stark Report and paragraphs 212-234 of the Blanksby Report be excluded. Docket No. 998 at 16.

In her summary judgment order, Judge Pfaelzer specifically stated:

> [t]he accumulator never adds together, for example, i1 and i2.  Instead, the accumulator sums i1 and p0 to generate p1.  The accumulator then sums p1 and i2.  But p1 is not an "information bit from the subset of information bits." Instead, p1 is a newly created bit that does not appear in the original subset of information bits (i1, i2, and i3).  Given these facts, the procedure performed by [the accused] technology does not "[accumulate] mod-2 or exclusive-OR sums of bits in subsets of the information bits."

*California Inst. of Tech. v. Hughes Commc'ns Inc.*, LACV13-07245-MRP-(JEMx), Docket No. 370 (C.D. Cal. May 5, 2015).[16]  Plaintiff argues that Judge Pfaelzer's interpretation of the "sums" limitation is "non-binding" and "does not compel a different outcome" because she was addressing whether products not at issue in this case infringe the asserted patents.  Docket No. 1174 at 7 n.8. Plaintiff alternatively argues, "to the extent that opinion addresses claim construction, it is contrary to the plain meaning of sums, the specification, and Defendants' experts' sworn statements."  *Id.*

Plaintiff agreed to the same construction of the phrase "sums of bits in subsets of information bits" in this case that the parties in the *Hughes* case had agreed to, despite the fact that, approximately two years earlier, Judge Pfaelzer had effectively interpreted the "sums of bits" term (and the parties' same agreed construction for that term) in her summary judgment order adverse to Plaintiff.  Having reviewed the parties' agreed construction, which requires "adding *together* two or more *information* bits," the Court agrees with Judge Pfaelzer that adding an outputted bit and an information bit would not satisfy this construction.  The Court has also reviewed Plaintiff's citations to the intrinsic and extrinsic record and is not persuaded that they warrant a different outcome.

At the hearing, Plaintiff reiterated that it "disagree[d] vehemently" with the analysis and conclusion reached by Judge Pfaelzer in *Hughes*.  Indeed, Plaintiff argued that the *Hughes* decision is "contrary to the most basic principles of math and science."  In framing the dispute, Plaintiff cosistently focused on the fact that no matter how information is added together (be it through a pure sum or a series of accumulation steps), the output value is the same.  The issue here, however, is not just the final output, but the steps used to arrive at that output and the inputs used for each of those steps.  Ultimately, the Court does not disagree with Plaintiff that accumulation is a form of summing.  But the parties' agreed construction of "sum," which the Court finds consistent with

---

[16] Judge Pfaelzer's summary judgment order is also available at Docket No. 127-7 in this case.

16

the intrinsic record and Judge Pfaelzer's analysis, requires adding together "*information bits*."  In making this determination, the Court is leaving open the possibility at this time that accumulation steps could exist that satisfy the claim language, *i.e.* where the accumulation step includes adding together information bits rather than solely an information bit and some newly-created bit.  That is just not the case in Plaintiff's example or the one Judge Pfaelzer references in *Hughes*.

Plaintiff's request to exclude Defendants' experts' opinions related to the "sums" claim terms is rejected.

### 6.    "Stream" ('710 Patent, all asserted claims; '032 Patent, Claim 3)

The parties dispute whether a "stream" of bits can be made up of "blocks" of bits.  Plaintiff argues that Defendants' experts take an improperly narrow view of the scope of the term "stream" because they treat "streams of bits" and "blocks" of data as mutually exclusive.[17]  Docket No. 1174 at 7.  Plaintiff argues, "[t]here is no support whatsoever for this false dichotomy in the intrinsic or extrinsic evidence."  *Id.*  Plaintiff cites to portions of the patent specification and argues that it discloses receiving a "stream of bits" "partitioned into blocks of fixed size."  *Id.* (citing '710 Patent at 2:35-38).   Defendants argue that language in the claims and statements that Plaintiff made in IPR proceedings "demonstrate that 'streams of bits' are different from 'blocks.'"  Docket No. 1103.  Defendants, however, do not directly explain why a person of ordinary skill in the art would find that a stream of bits - as that phrase is used in the asserted patents - cannot include bits that are streamed as part of a collection of data blocks.  By this, the Court means that bits are streamed block-by-block such that one 50-bit block follows another 50-bit block, and so on.

At the hearing, Defendants maintained the position that a stream requires that bits can only be transmitted one-by-one and proceeded to present arguments based on the intrinsic record's use of the term "stream" compared to "block."  But the Court's concern remains with this initial premise: would a person of skill in the art understand that a stream can include bits transmitted block-by-block as well as one-by-one?

Defendants' intrinsic evidence certainly supports the conclusion that a single block of data transmitted all at once would not satisfy the "stream" requirement.  But the intrinsic record otherwise appears ambiguous at best regarding whether data can be transmitted in a block-by-block stream.  As Plaintiff observes, in describing Figure 2, the '710 Patent states:

---

[17] Plaintiff specifically requests that the Court strike paragraphs 579-593 and 596-598 of the Stark Report and paragraphs 182-187 of the Blanksby Report.  Docket No. 998 at 17.

FIG. 2 illustrates a coder 200 according to an embodiment.  The coder 200 may include an outer coder 202, an interleaver 204, and inner coder 206.  The coder may be used to **format blocks of data for transmission**, introducing redundancy **into the stream of data** to protect the data from loss due to transmission errors.  The encoded data may then be decoded at a destination in linear time at rates that may approach the channel capacity.

'710 Patent at 2:33-40.

The term "stream" was not identified for construction.  The current record is also limited. There is not much beyond statements by both side's attorneys, regarding whether a block-by-block stream could satisfy the claim language in the context of the asserted patents.  Without more information regarding the understanding of persons of skill in the art, the Court would decline to adopt a narrowed interpretation of this term.

The Court also questions whether the parties have presented a purely claim construction dispute versus a dispute involving questions of fact.  It seems, for instance, that the parties could have a potential fact dispute regarding the timing of transmission of sequential data blocks and whether that timing is sufficient such that the sequential blocks can be considered a stream.

On the current record, the Court will not exclude Defendants' testimony.  However, Plaintiff may reserve an objection regarding this issue for later consideration.

### 7.      "Tanner Graph" ('032 Patent, Claims 11, 17, and 18)

The Court construed the term "Tanner Graph" as "a graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits."  Docket No. 213 at 32.  Both parties' proposed construction had included this language, and Defendants' proposed construction also included additional language.  The Court found that "[t]he part of the proposed constructions over which the parties agree . . . sufficiently describes the edges that connect check nodes with parity nodes, especially in light of the embodiment and related description provided in the specification, and accurately conveys the scope of the claimed invention." *Id.* at 17.

Plaintiff argues that Defendants' experts have taken an improperly narrow view of the claim term, opining that "claims 11, 17, and 18 of the '032 Patent literally require an accused

18

device to have 'check nodes.'"[18]  Docket No. 1174 at 8.  Plaintiff argues that the claims simply require an encoder configured "in accordance with" a Tanner graph, not that it physically include a Tanner graph.  *Id.*  Defendants argue that Plaintiff's reliance on the phrase "in accordance with" in the claims would "vitiate" the Tanner Graph claim requirement altogether.  Docket No. 1103 at 11.  Defendants focus on the claims' requirement of an encoder "configured to" encode.  *Id.* ("In construing the Tanner graph's requirements, the Court defined how an 'encoder' must be 'configured' in order to practice these claims - including that it must be 'configured to' use 'check nodes [that] enforce constraints that determine the parity bits.'").

As construed during claim construction, Claim 11 effectively reads:

11. A device comprising:
    an encoder configured to receive a collection of message bits and encode the message bits to generate a collection of parity bits in accordance with [a graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits.]

As construed during claim construction, Claim 18 effectively reads:

18. A device comprising:
    a message passing decoder configured to decode a received data stream that includes a collection of parity bits, the message passing decoder comprising two or more check/variable nodes operating in parallel to receive messages from neighboring check/variable nodes and send updated messages to the neighboring variable/check nodes, wherein the message passing decoder is configured to decode the received data stream that has been encoded in accordance with [a graph representing an IRA code as a set of parity checks where every message bit is repeated, at least two different subsets of message bits are repeated a different number of times, and check nodes, randomly connected to the repeated message bits, enforce constraints that determine the parity bits.]

Plaintiff has not shown that Defendants' experts' application of the claim term "Tanner Graph," based on the position that an accused encoder must employ check nodes in order to "enforce constraints that determine the parity bits," is inconsistent with how that term was construed by the

---

[18] Plaintiff requests that paragraphs 614-622 and 624 of the Stark Report and paragraphs 196-204 of the Blanksby Report be excluded.  Docket No. 998 at 18.

Court and how it is used in the context of the claim language, particularly when considering Claim 18.[19]  Plaintiff's argument is thus rejected.

At the hearing, Plaintiff reiterated the argument in its briefs that the phrase "in accordance with" in the claims means that an accused product that meets the claim limitations need not literally include check nodes.  As Plaintiff framed it, an accused product should not necessarily need to include a Tanner Graph itself.  Plaintiff referred to Shoemake's testimony for the assertion that a person of skill in the art would not differentiate between a graph and check nodes in the Court's construction of Tanner Graph.

The Court agrees with Defendants that Plaintiff's reading of the claims appears to effectively vitiate a requirement of the claimed devices.  At the least, Plaintiff's arguments appear to raise a factual question insofar as how applying the requirements of a Tanner Graph to an accused product can be done such that it satisfies the claim language, including "in accordance with" a graph that has check notes to "enforce constraints that determine the parity bits."  Plaintiff's argument that Defendants are somehow requiring that a device include a graph itself is not adequately explained, and appears to misconstrue Defendants' noninfringement position.  Plaintiff's request for exclusion of Defendants' experts' opinions relating to this limitation are rejected.

### 8.    "Scrambled" / "Permutation" ('710 Patent, all asserted claims; '032 Patent, Claims 11, 17, and 18)

Plaintiff argues that Defendants' experts rely on an impermissibly narrow meaning of the claim terms "scrambled" and "permutation" for separate reasons with respect to the '710 Patent asserted claims and '032 Patent asserted claims.[20]  *See* Docket No. 1174 at 8-9.  Plaintiff characterizes the issues in dispute as "(1) whether claims 11, 17, and 18 of the '032 patent require

---

[19] The parties have not requested, and the Court does not provide an opinion regarding, whether Plaintiff's expert applies the claim term "Tanner Graph" to the accused products consistent with how it is used in the asserted claims of the '032 Patent.  There is too little information in the parties' papers to make such a determination.  Although Plaintiff challenges Defendants' experts' application of the claim language and generally states, "[b]its can be encoded 'in accordance with' the Tanner graph even if an encoder does not include the specific circuitry shown in the graph," (Docket No. 1174 at 8) Plaintiff does not fully explain its position or its expert's position regarding this term and, for instance, how it and the requirement of "enforc[ing] constraints that determine the parity bits" can be satisfied by an accused product.  At the hearing, Plaintiff briefly responded to this comment but did not explain how the requirement of "enforc[ing] constraints that determine the parity bits" is allegedly satisfied by an accused product.

[20] Plaintiff requests that paragraphs 453-479 of the Stark Report and paragraphs 118 and 124-149 of the Blanksby Report be excluded.  Docket No. 998 at 20.

20

a two-step process of irregular repetition followed by scrambling; and (2) whether claim 15 of the '710 patent requires that same two-step process." *Id.* Plaintiff argues that repetition and scrambling can occur simultaneously, while Defendants argue that they must occur serially. *Id.* The parties did not present oral argument regarding this term at the hearing.

The parties appear to agree that although Claims 11, 17, and 18 of the '032 Patent do not use the words "scrambled" or "permutation," irregular repetition and permutation are depicted in the claimed Tanner Graph. The parties' dispute relates to whether, in reading a Tanner Graph, "events" like repeating bits and scrambling bits, which admittedly occur in different places in the visual Tanner Graph representation, must also occur at different times or in a particular sequence. The parties' arguments support the conclusion that in the context of these claims, the parties have presented factual disputes about the application of the asserted claims to the accused products, including factual disputes that may be similar to those for the term "repeat . . . irregularly."

Regarding Claim 15 of the '710 Patent,[21] the parties dispute whether the particular language of the claim supports the conclusion that repeating and scrambling are or are not performed simultaneously. Claim 15 states:

> 15. A coder comprising:
> a first coder having an input configured to receive a stream of bits, said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits; and
> a second coder operative to further encode bits output from the first coder at a rate within 10% of one.

Defendants emphasize that because Claim 15 refers to "said first coder operative to repeat said stream of bits irregularly and scramble the ***repeated*** bits," it requires that repeating the bits occur before scrambling the bits. Docket No. 1103 at 16-17 (citing *Tuna Processors, Inc. v. Hawaii Int'l Seafood, Inc.*, 327 F. App'x 204 (Fed. Cir. 2009)). Plaintiff argues that the '710 Patent specification does not support Defendants' interpretation, and moreover that the parties have a grammar dispute. Docket No. 1174 at 9-10. Plaintiff states, "[t]he parties dispute whether 'repeated bits' refers to 'bits' that *are* 'repeated' or 'bits' that *were* 'repeated.' The intrinsic evidence indicates that it is the former - the bits being 'repeated' are also 'scramble[d].'" *Id.* at 10 (emphasis in original) (citing '710 Patent at Fig. 4, Claim 20).

---

[21] All asserted claims of the '710 Patent depend from Claim 15 of the '710 Patent.

21

Plaintiff's interpretation of the phrase "said first coder operative to repeat said stream of bits irregularly and scramble the repeated bits" in Claim 15 is not persuasive insofar as Plaintiff would argue that bits can be repeated before they are scrambled.  To the extent Plaintiff's position is simply that the two actions on a large scale can occur simultaneously, this position would likely present fact questions requiring a determination of whether, on a small scale level, repetition of a particular bit has taken place before it is scrambled.  For similar reasons, to the extent Defendants would take the position that the large scale processes of repetition and scrambling must take place completely separately and sequentially, such a position is not necessarily supported by the claim language.  Beyond these comments, there is not enough information about the nuances of the parties' disputes to make any further determinations about the parties' positions, and any determination about whether certain expert opinions should be excluded based on their interpretations of these claim terms would be reserved for future objections.

## V.    **Conclusion**

As stated herein, the Court would **DENY** Plaintiff's Motion to Exclude Improper Claim Construction Opinions of Dr. Stark and Dr. Blanksby (Docket No. 968) as to all disputes, without prejudice to Plaintiff renewing its objections to certain expert testimony at the appropriate time.