# Exhibit B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE GEORGE WU

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

California Institute of Technology,)
                    PLAINTIFF,    )
                                  )
VS.                               )  NO. CV 16-3714 GW
                                  )
Broadcom Limited, et al.,         )
                    DEFENDANT,    )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MARCH 25, 2019

_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:

QUINN EMANUEL URQUHART AND SULLIVAN LLP
BY:  JAMES R. ASPERGER
865 South Figueroa Street
Tenth Floor
Los Angeles, CA 90017-2543

FOR DEFENDANT:

WILMER CUTLER PICKERING HALE AND DORR LLP
BY:  MARK SELWYN
-and- JIM DOWD
-and- JASON CHOY
350 South Grand Avenue
Suite 2100
Los Angeles, CA 90071

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES, CALIFORNIA; MONDAY, MARCH 25, 2019

9:37 A.M.

- - - -

THE COURT:  Let me call the matter of CalTech versus Broadcom.

Let me have appearances starting with plaintiff's counsel first.

MR. ASPERGER:  Good morning, your Honor.  James Asperger on behalf of CalTech, and, with me, in a minute, will be Chantal D'Appuzzo from CalTech and John Yen from Quinn Emanuel.

THE COURT:  All right.  For the defense.

MR. SELWYN:  Good morning, your Honor.  Mark Selwyn.  With me today from Wilmer Hale is Jim Dowd, Jason Choy, and from Apple is Mark Braverman.

THE COURT:  All right.  Good morning.

We are here on two things.  First is the motion for -- well, to strike portions of Dr. Shoemake's second supplemental report, and, also, there is the further discussion in regards to scheduling, et cetera.

Let's take the second one first.  I issued some more thoughts in regards to the scheduling and the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

parties' March 2nd joint report.

I presume both sides have seen that?

MR. ASPERGER:  Yes, your Honor.

THE COURT:  Somebody want to comment on this stuff?  Anything?  Or is everybody agreeable to it?

MR. ASPERGER:  I think it is self-explanatory, your Honor, on some of the stipulations and the outstanding issues.  We still have some further discussions to engage in.

I think on some of them we are not as close to agreement as either side would like, but I think there is more discussion to be had.  But I think everything else is pretty self-explanatory.

MR. SELWYN:  I can offer a few further comments, your Honor.

On the issue of accused products, we did send back to CalTech a revised proposal and a revised stipulation in which we explained why what they wanted us to stipulate to is incorrect.  We are, of course, willing to and will meet and confer further about that to see if we can reach agreement to avoid motion practice, but that is the status of that issue.

With respect to Bellinger, I can report that defendants have decided not to bring that Daubert motion. We will instead proceed by way of cross-examination of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Mr. Bellinger should he testify at trial.

THE COURT: Now, as to the accused product, when do you think you are going to know whether or not there is going to be a resolution between the parties themselves?

MR. ASPERGER: Pretty quickly, your Honor. I think we are pretty far apart. I think it is going to likely require motions practice, but we should give it at least one more round.

THE COURT: All right. So, in other words, if it is necessary to file a motion, that motion will be filed within the next two weeks?

MR. ASPERGER: My recollection is the court set out a schedule, but I am not certain of that. I think that schedule made sense, but, yes, within the next two weeks.

THE COURT: I actually said that would actually be by Thursday of this week.

MR. ASPERGER: A little more time would be helpful because I think one more round of further discussion to see if we can resolve it would be useful.

THE COURT: Why don't I just add one week to the schedule that I have on here.

So, in other words, instead of being on March the 29th, a motion, if necessary, would be filed on April

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

the 4th, and that will be simultaneous briefs not to exceed 10 pages, and, then, by -- I had April the 12th. Why don't we put it for April the 18th, a seven-page brief simultaneous response and then the hearing on that issue would be on the -- we will leave it on the 25th. Okay.

MR. SELWYN:  Very good.

THE COURT:  All right.  And aside from those changes, everything else on there seems to be fine?

MR. ASPERGER:  Yes, your Honor.

MR. SELWYN:  Yes, your Honor.

THE COURT:  Okay.  All right.  Then, as to the issue of the motion to strike, I issued a tentative on this one.  I am kind of on the fence.  On the one hand, I do think that -- I do accept the plaintiff's explanation that the supplemental materials weren't available until the November 11th, but, between November 11th and January the 4th, why weren't those materials brought to the defense attention?

MR. ASPERGER:  Yes.  So I think there are a number of good reasons, your Honor, and let me sort of step back and explain the context.

First of all, as the court is aware from the briefing, this delay was entirely the result of the defendant's recategorizing Mr. Jacobsen as an expert

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

witness, then, not submitting an expert report.  And so the first chance we got to depose him was November 11th.

That actually harmed us, I think, much more than defendants because we weren't then able --

THE COURT:  As I said, I accept that is the reason why you didn't discover it prior to November 11th.

MR. ASPERGER:  So, then, your Honor, if you focus on first the provision of Rule 26(e) that the court called attention to the parties to in the order and which we agree the -- what we would say, your Honor, it is really the second part of Rule 26(e) that comes into play here.

Remember, fact discovery was closed.  So there really, normally, what happens in expert discovery is the disclosures are made in the expert reports and in the expert depositions, and there is no further supplementation.  And there really hasn't been.

THE COURT:  I understand that as well, and I agree with you on that.  But the question is that during this period there was expert discovery being conducted, and, so, I agree with the plaintiff that insofar as Dr. Shoemake himself is concerned, that that is not going to be a problem because, frankly, the defendants were allowed to cross-examine him or to examine him, et cetera.  And, so, again, I don't think that was a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

particularly weighty prejudice.

But they are making assertions that there was some other discovery, expert discovery that they were prejudiced by the late revelation.

MR. ASPERGER:  Okay.  So my first point on that would be to focus on Rule 26(e) and the language itself, and that is there are two prongs under Rule 26(e).  And that is, the first prong is if there is notice provided during the discovery process, that is sufficient.  And so they completely ignore that prong.  And when you focus on that prong, the facts that we want to get into evidence are all readily apparent and clear and put the defendants on notice of those facts of the deposition on November 11th.

So let me give the court some examples here, and I have got some slides.  We will hand them out.  I will just refer to the slide numbers rather than go through them, your Honor.  So you have them for later reference, but I think these points are pretty self-evident.

So, Mr. Yen, if you could please pass out the slides.

So, your Honor, there were a number of admissions that put the defendants on clear notice of the fact of copying which is the facts that we want to get

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

into evidence and the facts that Mr. Shoemake, Dr. Shoemake relied on in his expert report.

And so I think as a starting point because that clear notice was provided during the deposition, those facts really shouldn't be at issue.  They come into evidence no matter what.  And to the extent that Dr. Shoemake provided comments on those facts specifically, they should come into evidence as well because the parties had the expert report ten days before his deposition and could have cross-examined him if they had wanted to on anything relating to those facts.

But let me give you a few examples of the key facts that were admitted at the deposition itself and provided the defendants with clear notice.

Number one, Mr. Jacobsen admitted that he may have copied the encoder which was from CalTech.  As the court knows from the briefing, that was one of the big unknowns, was he going to say he came up with it himself, was he going to give some other explanation.  We didn't know the answer.  He admitted that he may have copied that from the University of Arizona papers, and those papers cite to the CalTech IRA code invention.

And that is our slide 13, your Honor.

He admitted that the structure of the encoder was the same.  It was functionally the same.  That is our

slide 12.  That is a key factor as well.

He admitted that he knew McEliece -- that is in our slide 14 -- and he admitted that he had accessed McEliece's website.  That is in our slide 15.  Why is that critical?  Because the web site had the RA codes paper and the IRA codes paper and the clear inference is that he had looked at the IRA codes paper before he wrote his IEEE slide presentation.

And, also, your Honor, very critically --

THE COURT:  Let me stop you.  I understand kind of your point, but you haven't answered my question.  I understand that Shoemake was entirely justified in not being aware of certain things which gave rise to his supplemental report being filed.

But the question is between the time of November 11th and January 4th, if those are the correct dates, why wasn't that report filed earlier?

MR. ASPERGER:  Yes.  So that was actually my next point, your Honor, because all of those facts including the connection to the University of Arizona researchers, Ryan, Yang and Li, those come out in the deposition.  So those facts all come into the trial, and we can use them to make the copying inference.

So this allegation that the Shoemake theory is new and first disclosed in his expert report is really

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

off the mark and somewhat of a red herring because the copying facts are disclosed. That we can use. They have notice during discovery. We have satisfied Rule 26(e).

Now, why was there the delay? Well, first of all, as the court will recall, there were a couple of moving parts in play related to Shoemake. One was marking, and the defendants incorrectly say that his supplemental report was limited to marking. In fact, on October 22nd, there was a discussion about what else could be included in Shoemake's supplemental report. And, as the court may recall, Dr. Blanksby had submitted a supplemental report. And one of the things that he alleged in his supplemental report was the IRA codes are completely different from 802.11n.

So we asked, your Honor, can we also respond to Dr. Blanksby's supplemental report in the Shoemake report which a date had not been set for that yet. And your Honor said, sure, of course you can. Then, there was also no restriction as to any new evidence that could be addressed by Shoemake. Now, why did Shoemake not do his report until January 4th? What happened during -- there was some expert discovery going on after November 11th. It was almost done, but there were three CalTech witnesses as I recall who were going to be deposed. They don't say anything about the copying

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

theory.  So there really wasn't anything to ask them.

So I think that is a red herring as well, but, more importantly, your Honor, we offered to provide, to make Shoemake available in December, and that would have meant his supplemental report was provided in advance of that.  We ultimately agreed to 10 days in advance of his deposition, and the defendants declined.  They said, no, let's do it in January because those dates aren't convenient for us.  So, then, the parties agreed themselves that we would do, provide to the defendants the supplemental report on January 4th.

And so that supplemental report was, by agreement of the parties and with CalTech's understanding with the approval of the court, going to address those issues.

THE COURT:  So what you are saying is that had Shoemake's deposition gone in December, he would have produced the report 10 days prior to that deposition which would have been in December which is not so far away from the November -- your colleague is shaking his head a lot.

MR. ASPERGER:  He is, your Honor.  But I think the point is, I think you are right your Honor.  The whole premise was that Shoemake's report, his supplemental report would be provided to the defendant sufficiently

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

far in advance of his deposition which we had agreed

would be almost two full days so that they could fully

cross-examine him on the contents of his report.

THE COURT:  All right.  Let me hear a response from defense.

MR. SELWYN:  Your Honor, your December 21st, 2018, order, docket No. 829, gave CalTech the right to supplement on one thing and one thing only.  And that was to respond to Dr. Stark on the issue of patent marking. There was never a request sought to address anything else, nor did your Honor give them leave to do so.

There are two aspects here to CalTech's --

THE COURT:  That is fine and dandy, I suppose, but if, in fact, Jacobsen had proffered something new in his deposition which the plaintiff wanted to supplement on, they could still supplement.

MR. SELWYN:  Well, they would have to, at least, ask for the right to supplement.

THE COURT:  Let me stop you.  They are under an obligation to supplement.

MR. SELWYN:  No.  Your Honor, Rule 26(e) is not supposed to be an end run around the court's orders on deadlines for expert reports.

THE COURT:  It is not a -- in other words, if it is on something -- if it is on some point that they were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

unaware of, then, that is within the scope of their expert.  They will have to file a supplemental in order to get the stuff in.  In other words, if they find out something just before trial, they can make a request at that point in time to supplement.

MR. SELWYN:  Well, they can make a request.  There are two aspects to this, your Honor.

THE COURT:  Let me put it this way, if I find that what Jacobsen said was something that was unbeknownst to the plaintiff, I wouldn't allow them to supplement.

MR. SELWYN:  There are two aspects to this.  Let me address first your Honor's question in the tentative about what we would have done differently had we been put on notice in a timely way that Dr. Shoemake was going to offer this opinion because, between the time of Mr. Jacobsen's deposition and when we got the report on January 4th, there were six depositions taken of experts, and we would have asked them all questions that pertain to this theory.

So let me give you some examples.  We deposed three CalTech validity experts -- Divsalar, Hassibi and Mitzenmacher.  We would have asked them, for example, does Mr. Jacobsen's November, 2003, presentation to the IEEE show an irregular or a irregular code.  Mr. Jacobsen testified it shows a regular code, not an irregular code

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

which is one of the reasons that we say Mr. Jacobsen actually refuted the copying theory that they now want to advance, not supported it. So we would have asked all three of those experts that question.

We would have also asked them the question of how are eIRA codes, the codes that are in the University of Arizona researchers' papers, different from IRA codes. We would have also shown them the Google group post on which Dr. Shoemake now relies and asked all three of them where do you see any irregular codes in these documents. We were denied the opportunity to ask all three of the validity experts those questions.

Infringement experts, we would have asked Dr. Tanner whether the code in the November, 2003, Jacobsen presentation is the one in the standard. You will recall that Dr. Tanner is the one that studied the standard. So that would have been an opportunity to put in front of him the presentation and ask him the question, is that code in the standard.

Now, Mr. Jacobsen testified, no, it is not in the standard. That, too, refutes the copying theory. We would have asked Mr. Tanner how the code, Dr. Tanner, how the code in the November, 2003, presentation is different from what is in the standard. We were denied the opportunity to ask that question as well.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  You can ask all those questions now.

MR. SELWYN:  No, your Honor.  There are six validity experts, six experts that we deposed at length over a great amount of time.

THE COURT:  You can depose them on that limited topic.

MR. SELWYN:  Your Honor, we are not asking to go back and redo all the depositions.  That is not the cure here.  The proper cure here is to strike what they weren't given permission --

THE COURT:  The problem is the court has to balance it and decide what -- in other words, if I allow the supplement, I would allow you to reopen the discovery as to those experts, and the plaintiff will pay for them.

MR. SELWYN:  If we go down that path --

THE COURT:  Will be limited to one hour each.

MR. SELWYN:  If we go down that path, your Honor, what we will would also need to do is take depositions of the University of Arizona researchers as well.  As we explain in the briefs, there are questions we would have asked them had it been disclosed during discovery that CalTech was going to allege a copying theory starting with their papers, then, based on Mr. Jacobsen, then, based upon a IEEE working group.  We would have gone to those researchers and asked them questions about the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

differences between their eIRA codes and IRA codes, by way of example.

THE COURT:  Let me hear from defense.

MR. ASPERGER:  Three points, your Honor.  First, on the University of Arizona researchers, we were prejudiced severely by not being able to depose them either, and we would like that opportunity.

THE COURT:  I guess there won't be any objection to both sides deposing them.

MR. ASPERGER:  And, second, your Honor, on the Divselar, Hassibi, CalTech experts issue, Mr. Selwyn is again ignoring the critical distinction between the facts which came out at the Jacobsen deposition on November 11th where he said I may have copied it.  The encoder is the same structure.  He admits they are the same structure.  The copying theory is very clear from the deposition itself, and those facts are admissible.

So he could have asked all of those witnesses those questions, but, nonetheless, I think the court is on the right path.  Assuming even they could say otherwise, then they could have a limited deposition on those particular issues.

Lastly, Mr. Selwyn has his facts wrong on what we requested.  He is pointing to the wrong docket number. Docket No. 758, the October 22nd, 2018, hearing, we asked

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

is it permissible for our expert to respond to

Dr. Blanksby's new expert report.  The court said, sure,

not a problem.

MR. SELWYN:  Your Honor, we are not talking about

Dr. Blanksby.  We are talking about Mr. Jacobsen here,

and your Honor's order on December 21st only granted

leave to supplement with respect to the issue of patent

marking.

On the issue of what Mr. Jacobsen testified,

he did not testify that he copied.  To the contrary, he

testified that the code that he presented to the IEEE

802.11 working group was different than the code that was

in the 802.11n standard.  He testified that the code that

he presented was a regular code not an irregular code

like that in the IEEE 802.11 standard.

If we go to the last slide.  This is

Mr. Jacobsen's testimony when he was asked the question

about whether the presentation he made in 2003 was the

code that is in the standard, and he said, no, it is not,

it is a different code.  And he explained the ways that

it was different.

So the idea that Mr. Jacobsen's deposition

gave some new information, much less new information to

justify a copying theory is incorrect.  All of the

information on which this purported copying theory is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

based is available in the public documents that are ten or more years old.  There is nothing new presented in Mr. Jacobsen's deposition.

To the contrary, his testimony undermines the copying theory that was advanced.  We served interrogatories in 2016 asking CalTech to provide its evidence and its contentions on secondary considerations of non-obviousness, and it provided over time some theories but not a word about any purported copying by the 802.11 working group.

There was nothing new presented in Mr. Jacobsen's deposition to suggest copying.  If they had wanted to pursue such a theory, it could have been advanced at the outset.  But, at any rate, we were denied the opportunity to ask questions of the expert witnesses of the fact witnesses during fact discovery.  And it is now time to move on to summary judgment motions, to Daubert motions and, ultimately, to trial.

MR. ASPERGER:  So, your Honor, I think Mr. Selwyn selectively chooses the testimony that he is calling to the attention of the court, and I can walk you through some of the examples of where these admissions were absolutely clear.

First of all, if you look at our slide 4, you can see the encoder implementation that is in the IEEE

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

slide presentation that we are talking about at slide 30.

Importantly, in that, in citing, in preparing that diagram and including it in his presentation, he did not say where it came from.  He did not cite to CalTech, and so that is the issue that we had to address.

There was no connection prior to the deposition between that encoder in his slides and CalTech.

Go to the next slide, please.

MR. SELWYN:  And Mr. Jacobsen testified that they were different.  We quote this in our opening brief.

MR. ASPERGER:  Your Honor, if I could proceed.  I didn't interrupt him.  If I could proceed through this and then he can respond.

THE COURT:  Sure.

MR. ASPERGER:  So slide 5 shows the types of things that we had no idea -- we were unable, where we were unable to make a connection, and we had no idea the origins of the basis for his presentation on 802.11n to the working group.  We were not aware of his connection to the University of Arizona researchers.  We were not aware of the link between the CalTech IRA encoders and his encoder, nor were we aware of the connection between the other Arizona researchers and the evidence that he was collaborating with them prior to his presentation on

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

LDPC codes.

All of that came out at the deposition, and all of it put defendants on notice of our theory notwithstanding the fact that he was an evasive and sometimes contradictory witness.  But let me show you the clear admissions he did make.

MR. SELWYN:  Your Honor, can I interrupt at that point?

THE COURT:  No.  Let him finish.

MR. ASPERGER:  So Mr. Jacobsen's testimony proved that he derived the encoder in his 802.11n working group presentation from the CalTech IRA encoder and in collaboration with the University of Arizona researchers in 2002 and 2003.

Now, I would note, as Mr. Selwyn properly said, there were University of Arizona papers out there that cited to CalTech.  What we didn't know was that those guys, Dr. Ryan, Dr. Li and Dr. Yang were working with Mr. Jacobsen in 2002 and 2003.

Go to slide 7, please.

So what did we learn?  These are just anecdotal, your Honor, but there are multiple examples throughout the deposition.  We learned for the first time that Mr. Jacobsen collaborated with these critical University of Arizona researchers on LDPC codes,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Professor Ryan, Yan Li, and possibly Michael Yang.

Next slide, please.

We learn for the first time that Mr. Jacobsen worked with Professor Ryan on Intel sponsored research relating to LDPC codes.

Next side, please.  We learned for the first time that he was possibly working with another student, Michael Yang, on LDPC codes.

Next slide, please.

These admissions provided a critical connection because the papers by those three University of Arizona researchers cited and relied on the IRA codes paper and Dr. Wei Jin's thesis.  They cited them expressly in multiple versions of them.

And just by way of further example on slide 11, you see that the 2002 and 2003 versions of the Yang paper which includes all three of those authors explicitly referenced the following figure as CalTech's LDPC IRA invention.

So the connection of that drawing compared to Mr. Jacobsen's now is clear.  They are virtually identical.  They are functionally the same, and, so, your Honor, that critical link was established.

Similarly, down below that, the 2002 version of Dr. Jin's thesis is cited, and it has a virtually

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

identical drawing with an LDGM, a low density generator matrix, and an accumulator.

Next slide, please.  Now, here is critical testimony that Mr. Selwyn ignored.  Number one, did he admit that they are functionally similar?  Yes, he did.

THE COURT:  Is that page 12 of your?

MR. ASPERGER:  Page 12, your Honor.

He did.  He said, you know, other than the font and the appearance, there is a notational difference.  The concatenation on the output is different, but he says the differences are -- he says, functionally, they appear to be similar.

Go to slide 13, please.  So, then, Mr. Briggs asked him, do you know if you cut and pasted or took a screen shot somehow of the H2 matrix in this University of Arizona paper from 2002 and put it into your presentation to the IEEE from November, 2003.
Mr. Thompson objects.  The witness, he doesn't say no, it is completely different.  He doesn't say, no, it has nothing do with the 802.11n.  He says it is possible.  I don't whether I did, but it is possible.  And if I did, I would have done it with permission because he was working with the University of Arizona researchers.

So the point, your Honor, is there may be disputed issues of fact over what all of this means, but

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

the theory, the admissions are absolutely clear.  If they were concerned about it and really wanted to ask the questions they are claiming they now want to ask of Divselar, Hassibi and any other CalTech expert, they have the tools and the information they needed to do so.

They didn't need Shoemake's report. Shoemake's report just takes and puts into what is a proper expert opinion his analysis based on the deposition testimony and a few of the articles.

THE COURT:  All right.  Your response.

MR. SELWYN:  Your Honor, the documents on which they are relying for this theory have been in the public domain for more than ten years.  The notion that they just learned the relationship between University of Arizona researchers and Mr. Jacobsen in the deposition does not make any sense, and the proof of that is Dr. Shoemake's report.

If you look at paragraphs 89, 90, 91, 92 and 93 of the supplemental report that we are seeking to strike, he purports to analyze public documents showing a connection between Mr. Jacobsen and the University of Arizona researchers.  He goes through them one by one and shows how on the face of those documents he says that there is a connection between the two.

That is how he draws the linkage.  Those

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

documents have been in the public domain for more than 10 years.  If that was a theory that CalTech wanted to advance, it should have disclosed it in response to our interrogatories served back in 2016.

THE COURT:  Let me just ask you, had they been allowed to engage in Mr. Jacobsen's deposition at an earlier point in time, they could have discovered it then I suppose?

MR. SELWYN:  They didn't need Mr. Jacobsen's deposition.  They had all of the documents.

THE COURT:  But he is the one who is drawing the connection.  There might be tons of documents out there, but he is potentially drawing the connection.

MR. SELWYN:  No, your Honor.  The documents on their face show work between Dr. Jacobsen and the University of Arizona researchers.  They are then taking that and suggesting that there was some work that carried over to the IEEE 802.11 working group.  Mr. Jacobsen testified to the opposite.  He testified that the code that he presented in November of 2003 did not make it in to the 802.11n standard, that it was a different code, that it was a regular code, not an irregular code.

So there was nothing in that deposition that supported a copying theory or that altered anything that the documents themselves CalTech could have used from the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

outset.

THE COURT:  All right.  Let me hear a response to the last point.

MR. ASPERGER:  So just very briefly on the documents in Shoemake's report.  So there are -- Mr. Selwyn is talking at too high a level of abstraction, your Honor.  There are 2004 documents that would not be relevant to other -- Mr. Jacobsen knew about the copying theory when he did his IEEE presentation in 2003. Shoemake did look for some additional documents after he read the deposition and was offering his opinion.

Those are completely separate from the facts that were disclosed at the deposition and the critical fact that we could not make the link and did not make the link prior to the deposition.  So I think the point is anything in Mr. Shoemake's or Dr. Shoe make's declaration that focuses on the deposition itself and the articles that Mr. Jacobsen admitted were connected to the University of Arizona researchers, that was all disclosed as of November 11th, and he is just offering opinions on that.

To the extent there may be some different articles, we would have to go through them one by one for me to be able to give a specific response, but I know some of them were after the fact.  For example, there is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

an intern by the name of Mr. Xai, X-I-A -- I may be saying it wrong, but it is X-I-A -- that really wouldn't give a connection to us because he was the intern in 2004.  And I believe if my memory is correct, Dr. Shoemake then embarked himself on looking for some additional documents and I believe those may be the documents Mr. Selwyn is referring to.  But without specifically going through document by document, I can't answer that with precision.

I mean, the point is the disclosures, the theory was made on November 11th.  They may have arguments as to why there isn't copying, and there were some evasive answers and some contradictory answers, but the theory is absolutely clear.  And you saw good examples of the slides there, your Honor, that show there was copying in our view and should enable us to present this to the jury.

MR. SELWYN:  Your Honor, I want come back to the point that you asked in the tentative, why it took two months to serve this expert report.  There still has not been an answer to that.  We did not know of the --

THE COURT:  There has been an answer to that.  In other words, they would have produced it sooner, but there was -- in December, but the agreement was it would be produced 10 days prior to Dr. Shoemake's deposition

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

since it was originally scheduled for December, and then it was scheduled for January.  That is the reason why it was produced in January.

MR. SELWYN:  And we took all these depositions before that time anyhow.

THE COURT:  Well, I mean, that is -- again, what can one say.  I mean, they did not necessarily know that you would make these objections.

MR. SELWYN:  Well, he is making the suggestion that we were on notice that we could have asked these experts about this theory.

THE COURT:  I am not necessarily making that finding.  All I am saying is that if I do allow Shoemake's supplement in, I will have to allow you guys a chance to reopen as to certain depositions.

I don't know if I am going to allow you to reopen all six, but I will have to allow you to reopen some.  And, also, if there is going to have to be further discovery insofar as the people down at University of Arizona -- it is Arizona; right -- then I would perhaps allow that as well, but I haven't made a final determination as to how I am going to rule so I have to think about that.

Anything else from either side?

MR. SELWYN:  Just, your Honor, that there would

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

have been no reason for us to be asking questions about a theory that had never been articulated in response to any discovery.  Nor after the deposition itself.

          The parties send letters and correspondence back and forth -- I am sure this this will come as a shock to you -- every single day.

          THE COURT:  But there is so much in those letters anyway that sometimes you say, well, in terms of ranking their importance, you might say this is not quite as important as all the other things that we really need to talk about.

          MR. SELWYN:  But, your Honor, not once did they raise their hands and say, we are now going to pursue an 802.11 working group copying theory.  They didn't do it at the deposition.  They didn't do it after the deposition.  The first time that they put that forward was in Dr. Shoemake's report of January 4th, and that is the fact.

          THE COURT:  Let me just ask, what would bar them from at the trial calling Dr. Jacobsen in and eliciting the same testimony and then making the argument based on that.

          MR. SELWYN:  If he is within the subpoena power, they could.

          MR. ASPERGER:  He is outside the jurisdiction,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

your Honor, but the facts are admissible.

THE COURT:  All right.  I will take the matter under submission.

Anything else I need to do with you guys today?

MR. ASPERGER:  I don't think so.

THE COURT:  In that case, then, have a very nice day.

MR. ASPERGER:  Thank you.

(Proceedings concluded.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28,

United States Code, the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.

Date:  March 28, 2019


 /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA