**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
James R. Asperger (Bar No. 083188)
jimasperger@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Todd M. Briggs (Bar No. 209282)
toddbriggs@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Attorneys for Plaintiff the California
Institute of Technology

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The CALIFORNIA INSTITUTE OF TECHNOLOGY, a California Corporation,<br><br>                 Plaintiff,<br><br>        vs.<br><br>BROADCOM LIMITED, BROADCOM CORPORATION, AVAGO TECHNOLOGIES LIMITED, APPLE INC., AND CYPRESS SEMICONDUCTOR CORPORATION<br><br>                 Defendants. | CASE NO. 2:16-cv-3714-GW-AGRx<br><br>**CALTECH'S MOTION FOR SUPPLEMENTAL DAMAGES, INTEREST, ATTORNEYS' FEES, AND A PERMANENT INJUNCTION OR ON-GOING ROYALTIES**<br><br>**REDACTED**<br><br>Hon. George H. Wu<br>United States District Court Judge<br>Hearing Date: June 1, 2020<br>Time: 8:30 am<br>Place: Courtroom 9D |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# Table of Contents

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND ......................................................................................... 2

III.    MOTION FOR SUPPLEMENTAL DAMAGES AND INTEREST ............... 3

    A.    Caltech Should Be Awarded Supplemental Damages ........................... 3

    B.    Caltech Should Be Awarded Prejudgment Interest ............................... 5

    C.    Caltech Should Be Awarded Post-Judgment Interest ........................... 9

IV.     MOTION FOR PERMANENT INJUNCTION OR, IN THE ALTERNATIVE, AN ONGOING ROYALTY ........................................... 10

    A.    Caltech Is Entitled to Entry of an Injunction ...................................... 11

    B.    Alternatively, the Court Should Award an Ongoing Royalty ............... 12

        1.    Legal Standard for Ongoing Royalties ...................................... 12

        2.    Changed Circumstances Since The Time Of The Hypothetical Negotiation Relevant to Determination of the Ongoing Royalty Rates ................................................................ 15

        3.    Defendants' Willful Infringement Supports Enhancement of the Royalty Rates .................................................................... 18

        4.    The Ongoing Royalties Should Apply To The Adjudicated Products And Products That Are Not Colorably Different ........ 20

V.      MOTION FOR AN AWARD OF ATTORNEYS' FEES ............................ 21

    A.    Defendants' Unreasonable Conduct During Discovery ....................... 22

    B.    Defendants' Unreasonable Pursuit of Defenses Lost on Summary Judgment ........................................................................................... 27

    C.    Defendants' Unreasonable Conduct During Trial ............................... 30

VI.     CONCLUSION ........................................................................................ 34

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## TABLE OF AUTHORITIES

Page

### Cases

*ActiveVideo Networks v. Verizon Communications*,
694 F.3d 1312 (Fed. Cir. 2012) ..................................................... 14

*Air Separation, Inc. v. Underwriters at Lloyd's of London*,
45 F.3d 288 (9th Cir. 1995) ........................................................ 10

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
783 F. Supp. 2d 891 (E.D. Tex. 2011) ...................................... 14, 18

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008) ............................................... 14, 18

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
926 F. Supp. 2d 1100 (N.D. Cal. 2013) ................................... passim

*Arctic Cat, Inc. v. Bombardier Recreational Prods., Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ..................................................... 13

*Atmel Corp. v. Silicon Storage Tech., Inc.*,
202 F. Supp. 2d 1096 (N.D. Cal. 2002) ......................................... 7, 9

*Bard Peripheral Vascular Inc. v. W.L. Gore & Assocs.*,
670 F.3d 1171 (Fed. Cir. 2012) ..................................................... 13

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
No. CV-03-597,
2010 U.S. Dist. LEXIS 144259 (D. Ariz. Sept. 8, 2010) ........... 18, 20

*Barnard v. Theobald*,
721 F.3d 1069 (9th Cir. 2013) ......................................................... 9

*Bianco v. Globus Medical, Inc.*,
No. 2:12–CV–00147–WCB,
2014 U.S. Dist. LEXIS 89777 (E.D. Tex. July 1, 2014) .................. 21

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*,
807 F.2d 964 (Fed. Cir. 1986) ......................................................... 6

*Creative Internet Adver. Corp. v. Yahoo! Inc.*,
674 F. Supp. 2d 847 (E.D. Tex. 2009) ................................. 17, 18, 21

*eBay v. MercExchange, LLC*,
547 U.S. 388 (2006) ...................................................................... 11

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
340 F. Supp. 3d 1004 (C.D. Cal. 2018) ................................... passim

*Energy Transp. Group, Inc. v. William Demant Holding*,
697 F.3d 1342 (Fed. Cir. 2012) ....................................................... 5

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)......................................................................3, 4

*Fractus, S.A. v. Samsung Electronics Co.*,
No. 6:09-CV-203, 2012 WL 2505741 (E.D. Tex. June 28, 2012)..................15

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
No. C 03-1431 SBA, 2008 WL 928535 (N.D. Cal. Apr. 4, 2008),
*aff'd/rev'd on other grounds*, 582 F.3d 1288 (Fed. Cir. 2009)........................7

*Fresenius USA, Inc. v. Baxter Int'l., Inc.*,
582 F.3d 1288 (Fed. Cir. 2009)......................................................................13

*Fresenius USA, Inc. v. Baxter Int'l., Inc.*,
No. C 03-1431 PJH, 2012 WL 761712 (N.D. Cal. Mar. 8, 2012) .................20

*Fujifilm Corp. v. Motorola Mobility LLC*,
No. 12-cv-03587, 2016 WL 1622877 (N.D. Cal. Apr. 25, 2016)................8, 9

*Gen. Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983) ................................................................................5, 6, 8

*Georgia-Pacific v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)....................................................14, 15, 16

*Gyromat Corp. v. Champion Spark Plug Co.*,
735 F.2d 549 (Fed. Cir. 1984) ..........................................................................4

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S.Ct. 1923 (2016) .....................................................................................18

*Hynix Semiconductor Inc. v. Rambus Inc.*,
609 F. Supp. 2d 951 (N.D. Cal. 2009) .........................................................3, 4

*Hynix Semiconductor Inc. v. Rambus Inc.*,
No. 5:00-cv-20905-RMW, ECF No. 3911 (N.D. Cal. Mar. 10, 2009)..........21

*I/P Engine, Inc. v. AOL Inc.*,
No. 2:11-cv-512, 2014 U.S. Dist. LEXIS 7876
(E.D. Va. Jan. 21, 2014) .................................................................................21

*IMX, Inc. v. LendingTree, LLC*,
469 F. Supp. 2d 203 (D. Del. 2007) .................................................................7

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
831 F. Supp 1354 (N.D. Ill. 1993) ...................................................................8

*Informatica Corp. v. Bus. Objects Data Integration, Inc.*,
489 F. Supp. 2d. 1075 (N.D. Cal. 2007) ...........................................................8

*Internet Machines LLC v. Alienware Corp.*,
6:10-cv-23, 2013 WL 4056282 (E.D. Tex. Jun. 19, 2013) ................15, 19, 20

*Johnstech Int'l Corp. v. JF Micro. SDN BHD*,
14-cv-02864, 2018 WL 3036759 (N.D. Cal. June 19, 2018).........................11

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED
UNDER SEAL

*Lam, Inc. v. Johns-Manville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1983) ................................................................. 6

*Mobil Oil Corp. v. Amoco Chems. Corp.*,
   915 F. Supp. 1333 (D. Del. 1995) ............................................................. 8

*Mondis Tech. Ltd. v. Chimei InnoLux Corp.*,
   822 F. Supp. 2d 639 (E.D. Tex. 2011) ...................................................... 4

*Mondis Tech. Ltd. v. Chimei InnoLux Corp.*,
   No. 2:11-cv-378-JRG,
   2012 U.S. Dist. LEXIS 60004 (E.D. Tex. Apr. 30, 2012) ........................ 21

*Munchkin, Inc. v. Luv N' Care, Ltd.*,
   No. CV 13-06787 JEM,
   2018 WL 7504404 (C.D. Cal. Dec. 27, 2018) .................................... 22, 29

*Nickson Indus. Inc., v. Rol Mfg. Co., Ltd.*,
   847 F.2d 795 (Fed. Cir. 1988) ................................................................. 6

*O2 Micro Int'l Ltd. v. Monolithic Power Sys, Inc.*,
   420 F. Supp. 2d 1070 (N.D. Cal. 2006) .................................................... 8

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ................................................................................. 22

*Oplus Techs., Ltd. v. Vizio, Inc.*,
   782 F.3d 1371 (Fed. Cir. 2015) .............................................................. 30

*Opticurrent v. Power Integrations, Inc.*,
   17-cv-03597-EMC, 2019 WL 2389150 (N.D. Cal. June 5, 2019) ................ 13

*Paice LLC v. Toyota Motor Corp.*,
   504 F.3d 1293 (Fed. Cir. 2007) .............................................................. 10

*Paice LLC v. Toyota Motor Corp.*,
   609 F. Supp. 2d 620 (E.D. Tex. 2009) ........................................... passim

*Polara Eng'g, Inc. v. Campbell Co.*,
   237 F. Supp. 3d 956 (C.D. Cal. 2017),
   *aff'd/vacated in part on other grounds*,
   894 F.3d 1339 (Fed. Cir. 2018) ....................................................... 3, 7, 9

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
   No. 08-cv-335, 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010) ...................... 4

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) ................................................................ 19

*Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*,
   No. 5:11-cv-00774-PSG, 2014 WL 1008183 (N.D. Cal. Mar. 7, 2014)
   *aff'd/rev'd on other grounds*, 616 Fed. Appx. 987 (Fed. Cir. 2015) ........ 7, 8, 9

*Soverain Software v. J.C. Penny Corp., Inc.*,
   899 F. Supp. 2d 574 (E.D. Tex. 2012) ........................................ 13, 15, 19

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*SRI Int'l v. Cisco Systems,*
930 F.3d 1295 (Fed. Cir. 2019) ................................................. 22, 31

*Tannas v. Multichip Display, Inc.,*
No. SACV1500282AGJCGX, 2018 WL 1033219
(C.D. Cal. Feb. 21, 2018), *appeal dismissed,*
No. 18-55527, 2018 WL 5099246 (9th Cir. Aug. 22, 2018) ................... 22, 30

*Telcordia Tech. Inc. v. Cisco Sys., Inc.,*
No. 04-876-GMS, 2014 WL 1457797 (D. Del. Apr. 14, 2014) .......... 13, 18, 20

*Uniroyal, Inc. v. Rudkin-Wiley Corp.,*
939 F.2d 1540 (Fed. Cir. 1991) ..................................................... 6, 8

*VirnetX v. Apple Inc.,*
Case No. 13-CV-211, 2014 U.S. Dist. LEXIS 159013
(E.D. Tex. Mar. 6, 2014) ............................................. 15, 19, 20, 21

*Wisconsin Alumni Research Foundation v. Apple Inc.,*
Case No. 14-cv-00062 (W.D. Wis. Dec. 21, 2015) ........................... 14

*XY, LLC v. Trans Ova Genetics,*
890 F.3d 1282 (Fed. Cir. 2018) .................................................... 14

## <u>Statutes</u>

28 U.S.C. § 1961 ..................................................................... 9

28 U.S.C. § 1961(a) ................................................................. 9

35 U.S.C. § 283 ................................................................ 10, 13

35 U.S.C. § 284 ................................................................... 3, 5

35 U.S.C. § 285 ............................................................... passim

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Caltech respectfully moves for an award of supplemental damages, pre- and post-judgment interest, attorneys' fees, and a permanent injunction or on-going royalties.

## I.   INTRODUCTION

On January 29, 2020, after nearly four years of litigation culminating in a ten-day trial, the jury in this case awarded Caltech over $1.1 billion in running royalties for Apple's and Broadcom's past infringement of three Caltech patents.  The verdict translates to per unit royalty rates of $1.40 for Apple and $0.26 for Broadcom – the precise rates that Caltech's damages expert opined were appropriate.  These royalty rates were applied to Broadcom's sales of accused products from May 2010 through August 2019 and Apple's sales of accused products from May 2010 through September 2019.

Patentees are entitled to receive supplemental damages for infringing sales that were not considered by the jury that precede entry of final judgment.  At trial, the jury did not consider Broadcom's infringing sales made after August 2019 or Apple's infringing sales made after September 2019 because such sales data was not available from Defendants.  Accordingly, Caltech respectfully requests that the Court order Defendants to provide an accounting of sales made from August/September 2019 through the entry of judgment, and award Caltech supplemental damages on those sales at the royalty rates determined by the jury.  Caltech further requests that the Court award pre-judgment interest on the damages award at the prime rate compounded annually, and post-judgment interest at the statutory rate.  Supplemental damages and interest on the damages award are necessary to fully compensate Caltech for the substantial risk it took in pursing this litigation, and the loss in royalty payments over the past ten years.

Furthermore, despite Caltech's convincing win at trial, Defendants have shown no indication that they intend to cease their infringement of Caltech's patents.  To the contrary, Defendants' plan seems to be, as it has been over the past

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

four years, to simply continue to capitalize on Caltech's technology without regard to the consequences.  Accordingly, Caltech requests that the Court exercise its equitable power to permanently enjoin further infringement by Defendants or, alternatively, to order the payment of ongoing royalties for future sales of the accused products and any products that are not colorably different.

Finally, Caltech respectfully requests that the Court find this case was exceptional under 35 U.S.C. § 285 and award Caltech its attorneys' fees.  Defendants' misconduct in this litigation was sweeping in scope, including the inhibition of Caltech's discovery efforts, untimely disclosure of evidence and contentions, and generally overzealous pursuit of a substantively weak case.  For the reasons discussed more fully herein, those tactics justify a finding that this case was exceptional and an award of attorneys' fees.

## II.    BACKGROUND

Caltech filed this action on May 26, 2016 alleging, *inter alia*, that Apple and Broadcom infringe Caltech's U.S. Patent Nos. 7,116,710, 7,421,032, and 7,916,781 ("patents-in-suit").  Caltech alleged that Apple's Wi-Fi enabled products, such as the iPhone, iPad, and iMac, infringed the patents-in-suit and that certain Broadcom 802.11n and 802.11ac compliant chips infringed the patents-in-suit.

After the case was filed, Apple filed ten *inter partes* review petitions with the Patent Trademark and Appeal Board ("PTAB") seeking to invalidate the patents-in-suit.  The PTAB instituted seven of the petitions and eventually determined that all asserted claims of the patents-in-suit were patentable.  Thereafter, the Court granted Caltech's motions for summary judgment of IPR estoppel dismissing Defendants' prior art-based invalidity defense in the litigation.  Dkt. 1395.

On January 29, 2020, following a ten-day trial, the jury returned a verdict finding that Defendants infringed all of the asserted claims.  Dkt. 2114.  The jury awarded Caltech damages in the amounts of $837,801,178 for Apple's infringement and $270,241,171 for Broadcom's infringement.  *Id.*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## III.   MOTION FOR SUPPLEMENTAL DAMAGES AND INTEREST

Caltech respectfully requests that the Court award supplemental damages, prejudgment interest, and post-judgment interest.   The precise amount of supplemental damages and prejudgment interest will depend on the date the final judgment is entered.

### A.   Caltech Should Be Awarded Supplemental Damages

Caltech requests supplemental damages on the sales made by the Defendants up to the time of the entry of judgment, which were not included in the jury's verdict.

Supplemental damages are awarded where "an infringer provides sales data that does not cover all sales made before trial" and "where the jury did not consider certain periods of infringing activity post-verdict."   *Polara Eng'g, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 995 (C.D. Cal. 2017), *aff'd in part and vacated in part on other grounds*, 894 F.3d 1339 (Fed. Cir. 2018); *see also EcoServices, LLC v. Certified Aviation Servs., LLC*, 340 F. Supp. 3d 1004, 1034 (C.D. Cal. 2018) ("Patentees are entitled to supplemental damage awards for infringing sales that a jury does not consider."); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 960-61 (N.D. Cal. 2009) (awarding supplemental damages for infringement occurring between verdict and entry of judgment).   Supplemental damages may be assessed by the Court and are rooted in 35 U.S.C. § 284's requirement that patentees be awarded damages adequate to compensate for the infringement.   *See EcoServices*, 340 F. Supp. 3d at 1034; *see also Hynix*, 609 F. Supp. 2d at 961 ("Permitting recovery of such supplemental damages serves section 284's expressed interest in providing damages 'adequate to compensate for the infringement.'"); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212-13 (Fed. Cir. 2010) (ordering supplemental damages to compensate patentee for uncompensated sales).

In awarding supplemental damages, "the Court may apply the reasonable royalty rate found by the jury."   *Polara Eng'g*, 237 F. Supp. 3d at 995; *see also*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  *Finjan*, 626 F.3d at 1212 ("The district court granted Finjan additional damages by

2  multiplying the jury's royalty rates against previously uncalculated sales."); *Presidio*

3  *Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-cv-335, 2010 WL 3070370,

4  at *1-2 (S.D. Cal. Aug. 5, 2010) ("supplemental damages are calculated consistent

5  with the damages awarded in the jury verdict"), *aff'd in part and vacated in part on*

6  *other grounds*, 702 F.3d 1351 (Fed. Cir. 2012); *Hynix*, 609 F. Supp. 2d at 964-65

7  (applying jury's royalty determination to all infringement); *Mondis Tech. Ltd. v.*

8  *Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 642-43 (E.D. Tex. 2011) (awarding

9  supplemental damages at the same royalty rate determined by the jury for the period

10  of infringement not covered by the verdict).  The Court should apply the jury's

11  existing verdict without revisiting or reevaluating the jury's methods or conclusions,

12  and any uncertainty regarding that calculation should be resolved against the

13  infringer.  *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 926 F. Supp. 2d 1100, 1106

14  (N.D. Cal. 2013) ("In most . . . cases, a jury determined what the appropriate royalty

15  rate would be, allowing the court to simply apply the jury's stated methodology to

16  the proven or estimated post-verdict sales."), *vacated on other grounds* 786 F.3d

17  983 (Fed. Cir. 2015); *Hynix*, 609 F. Supp. 2d at 964-65 ("The Court does not believe

18  [it] is proper" to "reexamine the reasonable royalty rates found by the jury"); *see*

19  *also Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 554-55 (Fed. Cir.

20  1984) (doubts regarding amount of damages should be resolved against infringer).

21  Apple itself has sought and been awarded supplemental damages in precisely the

22  same scenario presented here.  *See Apple*, 926 F. Supp. 2d at 1106 (assessing

23  supplemental damages by dividing number of infringing sales by the lump sum

24  damages amounts awarded by the jury).

25      The jury awarded Caltech damages in the form of a running royalty in the

26  exact amounts determined by Caltech's damages expert, Dr. Teece. Dkt. 2114; Dkt.

27  2127, 1/23/2020 Trial Tr. (Teece) at 25:23-26:13.  To arrive at the damages

28  amounts, Dr. Teece applied a rate of $1.40 to Apple's U.S. sales, and a rate of $0.26

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1   to Broadcom's sales to Apple (not covered by Apple's U.S. sales) and Broadcom's

2   imports into the U.S.  *Id.*

3   　　　The jury's damages verdict was limited to sales made from May 2010 through

4   September 2019 for Apple and through August 2019 for Broadcom because this was

5   the sales data available from Defendants at the time of trial.  Dkt. 2155, 1/22/2020

6   Trial Tr. (Lawton) at 136:12-19, 142:3-11; PTX-1471; PTX-1476; PTX-1480.

7   Caltech is thus entitled to an accounting of and supplemental damages for

8   Defendants' sales of infringing products from the end-dates of the prior sales data

9   up to the date the Court enters final judgment.  *See EcoServices*, 340 F. Supp. 3d at

10   1034.   Moreover, supplemental damages for this time period should include

11   Defendants' sales of both the specifically accused products considered by the jury

12   and products that are not colorably different, including products that Defendants

13   have admitted "contain the same encoders and decoders" and "fall under the

14   Representative Product Stipulation."  Dkt. 2157, 12/30/2019 Pretrial Conf. at 67:6-

15   9.

16   　　　Accordingly, Caltech requests that supplemental damages be calculated based

17   on the jury's awarded royalty rates up until final judgment.  Caltech asks the Court

18   to order Defendants to produce a complete accounting of all infringing sales not

19   accounted for by the verdict through the entry of judgment.  Caltech will then

20   submit a declaration from its expert Catharine Lawton calculating the precise

21   amount of supplemental damages so that the judgment can be amended to include

22   the total amount of damages.

23   **B.    Caltech Should Be Awarded Prejudgment Interest**

24   　　　Under 35 U.S.C. § 284, a prevailing patent holder is entitled to prejudgment

25   interest on damages.  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983)

26   ("[P]rejudgment interest should be awarded under § 284 absent some justification

27   for withholding such an award.").  "The award of pre-judgment interest is 'the rule,

28   not the exception.'"  *Energy Transp. Group, Inc. v. William Demant Holding*, 697

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

F.3d 1342, 1358 (Fed. Cir. 2012) (citation omitted).  The purpose of prejudgment interest is to compensate the patent owner for the "use of [its] money between the time of infringement and the date of the judgment."  *Gen. Motors*, 461 U.S. at 656.  Such interest is awarded from the date infringement began – which, in this case, is May 26, 2010 – up to the date of entry of judgment.  *See Nickson Indus. Inc., v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 800 (Fed. Cir. 1988); *EcoServices*, 340 F. Supp. 3d at 1032.

The rate of prejudgment interest and whether it should be compounded are within the discretion of the Court.  *See Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986).  Courts "may award interest at or above the prime rate," including at the California statutory rate.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *see also EcoServices*, 340 F. Supp. 3d at 1033 (awarding state statutory rate).  In determining the rate, the Court "must be guided by the purpose of prejudgment interest, which is to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement."  *Bio-Rad Labs.*, 807 F.2d at 969 (internal quotation marks omitted); *EcoServices*, 340 F. Supp. 3d at 1032 (prejudgment interest is "necessary" "to ensure the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty rate").

Although courts have awarded prejudgment interest at higher rates, Caltech believes that the appropriate rate for calculating prejudgment interest in this case is the prime rate compounded annually.  The Federal Circuit has repeatedly endorsed, and courts in the Ninth Circuit (and other circuits as well) have routinely used, the prime rate to calculate prejudgment interest in patent cases.  *See Uniroyal*, 939 F.2d at 1545 (upholding award at the prime rate); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983) ("The district court may 'fix' the interest and select an award above the statutory rate, or select an award at the prime rate.");

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Polara Eng'g*, 237 F. Supp. 3d at 996 ("As the 'rate charged by banks to its most credit-worthy customers,' the prime rate is frequently found to be the appropriate rate for calculation of prejudgment interest in a patent case."); *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007) ("Courts have recognized that the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'"); *see also Sealant Sys. Int'l, Inc. v. TEK Global S.R.L.*, No. 5:11-cv-00774-PSG, 2014 WL 1008183, at *6, 35 (N.D. Cal. Mar. 7, 2014) (awarding prime rate), *aff'd in part and rev'd in part on other grounds*, 616 Fed. Appx. 987 (Fed. Cir. 2015); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2008 WL 928535, at *3 (N.D. Cal. Apr. 4, 2008) ("Numerous other courts have also held that the prime rate is appropriate for calculating prejudgment interest a patent case."); *Atmel Corp. v. Silicon Storage Tech., Inc.*, 202 F. Supp. 2d 1096, 1101 (N.D. Cal. 2002) (awarding prime rate).  In fact, Apple itself has advocated for use of the prime rate to calculate prejudgment interest in patent cases.  *See Apple Inc. v. Samsung Elec. Co., Ltd.*, No. 5:12-cv-00630, Dkt. 1897-3 at 30 (N.D. Cal. May 23, 2014); *Apple*, No. 5:11-cv-1846, Dkt. 2002 at 29-30 (N.D. Cal. Sept. 25, 2012).  In doing so, Apple noted that the prime rate, "which reflects private borrowing rates for businesses," "is a far better indicator of the actual economic value of the delay in payment for [] infringement than the T-Bill rate."  *Apple*, No. 5:12-cv-00630, Dkt. 1897-3 at 30.  Apple continued that "[t]here is no reason that [the infringer] should reap the advantage of what is effectively a loan from [the patentee] with minimal interest for [] years."  *Id.*

In this case, Caltech was forced to engage in years of costly and highly contentious litigation against Defendants.  During that time, Caltech effectively made what amounted to "a large, involuntary, unsecured loan to a debtor of uncertain credit-worthiness that is doing its utmost to avoid paying."  *In re*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  *Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp 1354,

2  1394 (N.D. Ill. 1993) ("Winners in litigation are not called 'judgment creditors' for

3  nothing."). In view of the fact that the damages period in this case spans

4  approximately ten years, the prime rate, which is typically used for short term loans,

5  is particularly reasonable. *See Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F.

6  Supp. 1333, 1371 (D. Del. 1995) ("The prime rate is an interest rate on short term

7  debt…. [which is] generally recognized as debt that is for less than a year"); *see also*

8  *Gen. Motors*, 461 U.S. at 655 n. 10 (a prejudgment interest award should not

9  "undercompensates the patent owner", thereby creating a "windfall to the infringer

10  and . . . an incentive to prolong litigation").

11  The prime rate is also warranted because during the damages period the prime

12  rate averaged 3.8%, which is historically low and well below the interest rates courts

13  have found appropriate in a variety of intellectual property cases. *See, e.g.*,

14  *EcoServices*, *LLC*, 340 F. Supp. 3d at 1033 (7% rate); *O2 Micro Int'l Ltd. v.*

15  *Monolithic Power Sys, Inc.*, 420 F. Supp. 2d 1070, 1076-77 & n. 1 (N.D. Cal. 2006)

16  (same); *see also Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 489 F.

17  Supp. 2d. 1075, 1087 (N.D. Cal. 2007) (4.78% rate). In fact, the prime rate is lower

18  than the interest rate on Caltech's taxable bonds obtained during the damages

19  period. Lawton Decl. ¶14. For example, in 2010 through 2012, Caltech borrowed

20  money at interest rates ranging from approximately 4.25% to 5.0%, slightly higher

21  than the prime rate at the time. Lawton Decl. ¶13.[1] Caltech also earned interest on

22  its endowment over the damages period at an average annual rate of return of 6.9%,

23  which is also much higher than the prime rate. Lawton Decl. ¶12.

24  _____

25  [1] In any event, it is "not necessary" for Caltech to "demonstrate that it borrowed

26  at the prime rate in order to be entitled to prejudgment interest at that rate."

27  *Uniroyal*, 939 F.2d at 1545; *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-

28  03587, 2016 WL 1622877, *21-22 (N.D. Cal. Apr. 25, 2016) (quoting *Uniroyal*);

*Sealant Sys.*, 2014 WL 1008183, at *6 (same).

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    Caltech further requests that the prejudgment interest be compounded
2  annually, which is consistent with the many cases in which Ninth Circuit courts
3  have awarded interest at the prime rate. *See, e.g.*, *Polara Eng'g*, 237 F. Supp. 3d at
4  997 ("annual compounding is warranted" for prime rate); *Fujifilm Corp.*, 2016 WL
5  1622877, *21-22 (quarterly compounding for prime rate); *Atmel*, 202 F. Supp. 2d at
6  1101 (compounding interest quarterly and monthly).  Courts "have recognized that
7  compounding is necessary to fully compensate the patentee."  *Sealant Sys.*, 2014
8  WL 1008183, at *6 (citation omitted).  "Because a patentee's damages include the
9  foregone use of money, compounding is needed to account for the time value of
10  money."  *Id.* (citation omitted).  Thus, "courts have approved annual compounding
11  and even daily compounding."  *Id.* (citation omitted).

12    Ms. Lawton calculated prejudgment interest on the jury award by applying
13  the prime rate compounded annually, which results in prejudgment interest of
14  $158,280,561 on the jury award through September 2019 for Apple and
15  $64,511,475 on the jury award through August 4, 2019 for Broadcom.  Lawton
16  Decl. ¶10.  Ms. Lawton will calculate the prejudgment interest on supplemental
17  damages once Defendants provide the relevant sales data.

18    **C.    Caltech Should Be Awarded Post-Judgment Interest**

19    An award of post-judgment interest at the federal statutory rate "shall be
20  allowed on any money judgment in a civil case recovered in a district court."  28
21  U.S.C. § 1961(a).  The Ninth Circuit has held that the award of post-judgment
22  interest is mandatory.  *EcoServices, LLC*, 340 F. Supp. 3d at 1034 (*citing Barnard v.*
23  *Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013)).

24    Post-judgment interest is calculated "from the date of the entry of the
25  judgment, at a rate equal to the weekly average 1-year constant maturity Treasury
26  yield . . . for the calendar week preceding the date of the judgment."  28 U.S.C. §
27  1961(a).  Post-judgment interest is computed daily and compounded annually.  *Id.* at
28  § 1961(b).  Accordingly, at the time of entry of final judgment, the Court should

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  include in its order post-judgment interest on the total money judgment (including

2  supplemental damages and pre-judgment interest) at the preceding week's weekly

3  average 1-year constant maturity Treasury yield, compounded annually.  *See, e.g.,*

4  *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290-91 (9th

5  Cir. 1995) ("[I]t is well-established . . . that post-judgment interest also applies to

6  the prejudgment interest component of a district court's monetary judgment.").

7  **IV.    MOTION FOR PERMANENT INJUNCTION OR, IN THE**

8  **ALTERNATIVE, AN ONGOING ROYALTY**

9  Since the time of the jury's verdict on January 29, 2020, Defendants have

10  continued to infringe Caltech's patents by selling the accused products as well as

11  additional products that use the same infringing encoders and decoders.   For

12  example, Apple has continued to sell the iPhone 8, iPhone 8+, and iPhone XR, each

13  of which were found by the jury to infringe.  Briggs Dec. Ex. A.[2]  Apple also has

14  continued to sell the iPhone 11, ███████████████████████████████████████████████

15  ████████████████████████████████████████ are not colorably different than the accused

16  products.  *Id.* at Ex. B; Ex. C.

17  Under 35 U.S.C. §283, the Court "may grant injunctions in accordance with

18  the principles of equity to prevent the violation of any right secured by patent, on

19  such terms as the court deems reasonable."  The Federal Circuit has found that the

20  district court's authority to "prevent the violation of any right secured by patent"

21  may take the form of either a permanent injunction, or an ongoing royalty.  *See, e.g.,*

22  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007) ("Under some

23  circumstances, awarding an ongoing royalty for patent infringement in lieu of an

24  injunction may be appropriate.").  Accordingly, Caltech respectfully requests that

25  the Court prevent Defendants' continued violation of Caltech's patent rights either

26  _____

27  [2]  "Ex." cited herein refers to an Exhibit to the Declaration of Todd M. Briggs,

28  filed concurrently herewith.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  by issuing an injunction against the future sales of the accused products and any

2  products that are not colorably different, or by awarding Caltech an ongoing royalty

3  on the same products for the life of the patents-in-suit.

4         **A.**    **Caltech Is Entitled to Entry of an Injunction**

5        "A party seeking a permanent injunction under the Patent Act must show: (1)

6  irreparable injury, (2) remedies available at law are inadequate, (3) the balance of

7  hardships favors an injunction, and (4) the public interest would not be disserved by

8  an injunction." *Johnstech Int'l Corp. v. JF Micro. SDN BHD*, No. 14-cv-02864,

9  2018 WL 3036759, at *1 (N.D. Cal. June 19, 2018), *aff'd,* 773 F. App'x 623 (Fed.

10  Cir. 2019) (citing *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

11        Defendants' continued infringement of Caltech's patents poses a risk of

12  irreparable harm that cannot be adequately remedied with monetary damages

13  because Caltech is a research institution, and unlicensed use of its inventions

14  deprive it of downstream opportunities to develop future technologies in ways that

15  are impossible to quantify.  As Frederic Farina explained at trial, Caltech is a

16  research institution that disseminates the benefits of its research through licenses to

17  commercial entities.  Dkt. 2123, 1/21/2020 Trial Tr. (Farina) at 62:21-63:4, 63:11-

18  25.  The royalties generated from its patent licensing are "reinvested in research and

19  education such as helping students who can't afford tuition at Caltech, putting the

20  money into new projects that can result in new inventions and again new knowledge

21  for the world to use and generally improving the infrastructure of Caltech for

22  research and education."  *Id.* at 76:10-14. Furthermore, Caltech competes with other

23  universities for funding, students, and faculty, and the strength of the intellectual

24  property that is developed by Caltech is one way in which Caltech advances its

25  position.  *See, e.g.*, Dkt. 2155, 1/22/2020 Trial Tr. (Lawton) at 88:7-11

26  ("[U]niversities are ranked based on the number of patents that they obtain in each

27  year. And this is a key metric for the leading research universities because it's the

28  currency in which they operate. The patents are the means by which they can

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    generate additional revenues.'")

2         In the absence of an injunction against Defendants, other potential infringers
3    will be encouraged to continue their infringement, knowing that they do not face the
4    risk of an injunction.   If these potential infringers are dissuaded from taking a
5    license and Caltech is forced to again litigate to enforce its patent rights, more
6    money is diverted away from research and the development of future technologies,
7    which results in lost opportunities that are impossible to quantify.

8         The balance of hardships also favors entry of an injunction.  Although there is
9    no evidence that Broadcom has ever even offered it to Apple, Defendants insisted at
10   trial that they have a non-infringing alternative ███████████████████████████
11   █████████████████████████████████ Dkt. 2156, 1/24/2020 AM Trial Tr.
12   at 25:4-27:2.  If this is true, then issuance of an injunction will pose little or no harm
13   to Defendants as they can just switch ██████████████████

14        Finally, an injunction is in the public's interest.  The research conducted at
15   Caltech is at the forefront of scientific development.  Caltech's faculty members and
16   students are routinely recognized as the world's leading scientific minds, and their
17   research leads to the development of new products and processes that greatly benefit
18   society.  Because of the significant benefits to the public from Caltech's investment
19   in research, there is a public interest in protecting the rights of Caltech as a patent
20   holder.

21        **B.    Alternatively, the Court Should Award an Ongoing Royalty**

22        If the Court determines that a permanent injunction is not justified here,
23   Caltech respectfully requests that the Court award Caltech an ongoing royalty for
24   Defendants' sales of infringing products and products that are not colorably
25   different from the adjudged infringing products, from the date of entry of final
26   judgment through expiration of the patents-in-suit.

27        **1.    Legal Standard for Ongoing Royalties**

28        As an alternative to a permanent injunction, courts routinely order payment of

-12-

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

an ongoing royalty for any future infringement. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012)("The award of an ongoing royalty instead of a permanent injunction to compensate for future infringement is appropriate in some cases."); *see also Arctic Cat, Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017)(affirming award of ongoing royalties); *EcoServices,* 340 F. Supp. 3d at 1028 (awarding ongoing royalties); *Opticurrent v. Power Integrations, Inc.*, 17-cv-03597-EMC, 2019 WL 2389150, at *17-18 (N.D. Cal. June 5, 2019)(same); *Telcordia Tech. Inc. v. Cisco Sys., Inc.*, No. 04-876-GMS, 2014 WL 1457797, at *5 (D. Del. Apr. 14, 2014)(same). "An ongoing royalty is a form of equitable relief authorized under 35 U.S.C. § 283." *Soverain Software LLC v. J.C. Penny Corp.*, 899 F. Supp. 2d 574, 588 (E.D. Tex. 2012). Ongoing royalties are necessary in the absence of an injunction because "'[a] damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales.'" *Opticurrent*, 2019 WL 2389150, at *17 (*quoting Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009)). As one court noted,

> [e]ven though a permanent injunction may no longer be proper in many patent cases in light of *eBay*, an ongoing royalty rate must still adequately compensate a patentee for giving up his right under the law to exclude others from making, using, selling, offering for sale or importing his invention. That is, the law must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property. Anything less would be manifestly unjust and violate the spirit, if not the letter, of the U.S. Constitution and the Patent Act.

*Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009). Indeed, Apple itself has acknowledged on multiple occasions that courts should award ongoing royalties if an injunction is not entered. *See, e.g.*, Ex. D (Apple's Motion for Ongoing Royalties, *Apple v. Samsung*, No. 12-cv-00630, Dkt. 1958 at 1

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

(N.D. Cal. Sept. 3, 2014))("The law is clear that when a court denies a permanent injunction an ongoing royalty is appropriate to compensate, at least in part, for ongoing and future infringing sales."); Ex. E (Apple's Opposition to WARF's Motion for Equitable Relief, *Wisconsin Alumni Research Foundation v. Apple Inc.*, No. 14-cv-00062, at p. 30 (W.D. Wis. Dec. 21, 2015))("Apple does not dispute that WARF is entitled to an ongoing royalty for any infringement occurring after the entry of final judgment.").

In determining a post-judgment ongoing royalty rate, "the rate the jury adopted is 'significant as a starting point,' but the court 'cannot simply apply the jury's pre-verdict royalty award to the post-verdict infringement, without considering the impact of changed circumstances.'" *Ecoservices*, 340 F. Supp. 3d at 1028. The Federal Circuit has been clear that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." *Amado v. Microsoft Corp*., 517 F.3d 1353, 1361 (Fed. Cir. 2008); *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018)("When patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'"). In particular, "[o]nce judgment is entered, ongoing infringement by the adjudged infringer is willful." *Paice*, 609 F. Supp. 2d at 626; *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 899 (E.D. Tex. 2011). Accordingly, "when calculating an ongoing royalty rate, the district court should consider the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'" *XY, LLC*, 890 F.3d at 1297; *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012)("[A]n assessment of prospective damages for ongoing infringement should 'take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'")

"To determine an ongoing royalty, a modified *Georgia-Pacific* analysis can

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

be conducted, which focuses on the changed circumstances from the original hypothetical negotiation and the negotiation that would occur post-judgment." *VirnetX v. Apple Inc.*, No. 13-CV-211, 2014 U.S. Dist. LEXIS 159013, at n.2 (E.D. Tex. Mar. 6, 2014); *see also Internet Machines LLC v. Alienware Corp.*, No. 6:10-cv-23, 2013 WL 4056282, at *19 (E.D. Tex. Jun. 19, 2013)("The appropriate starting point for determining post-judgment damages lies with the jury's verdict. The Court will then address any changed circumstances in light of the *Georgia–Pacific* factors. Thereafter, the Court determines whether the continued infringement is willful and calls for enhanced damages."). "[T]he Court must consider the change in the legal relationship between the parties to avoid incentivizing defendants to fight each patent case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing." *Fractus, S.A. v. Samsung Electronics Co.*, 876 F. Supp. 2d 802, 855 (E.D. Tex. June 28, 2012).

### 2. Changed Circumstances Since The Time Of The Hypothetical Negotiation Relevant to Determination of the Ongoing Royalty Rates

The jury awarded Caltech $837,801,178 in past damages from Apple and $270,241,171 in past damages from Broadcom, and determined that damages should be in the form of a running royalty. The amounts awarded by the jury correspond exactly to the amounts calculated by Caltech's expert, Dr. Teece, based on per unit royalty rates of $1.40 for Apple and $0.26 for Broadcom. The jury did not award damages for Defendants' continuing and future infringement. Accordingly, to the extent the Court does not issue an injunction, ongoing royalties are appropriate.

The jury's rates, which reflect analysis of the *Georgia-Pacific* factors at the time of first infringement in December 2009, should be the starting point for the determination of appropriate ongoing royalty rates. *Soverain*, 899 F. Supp. 2d at 589 ("The jury's implied royalty rate provides a starting point for determining the ongoing post-judgment royalty rate."). Although they provide an appropriate

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1   starting point, certain circumstances have changed since December 2009 that
2   suggest the jury's rates are, if anything, too low.

3       First, over the past ten years the established profitability of the accused
4   products, their commercial success, and their popularity have greatly increased
5   (*Georgia-Pacific* Factor 8), as has the extent of Defendants' use of the patented
6   inventions (*Georgia-Pacific* Factor 11).[3]

  Ex. G; Ex. C.

12  Accordingly, every chip sold by Broadcom to Apple today, and nearly every WiFi
13  enabled product sold by Apple includes Caltech's patented technology.   The
14  tremendous growth in use of Caltech's patents by Defendants provides further
15  evidence of the importance and value of the technology.

16      Second, the utility and advantages of the patented invention over old modes
17  has been more firmly established since December 2009 (*Georgia-Pacific* Factor 9).[4]
18  Defendants have continually used Caltech's inventions for over 10 years.   Although
19  Defendants claimed at trial that their next generation products would utilize a non-
20  infringing ▮▮▮▮▮ (Dkt. 2156, 1/24/2020 AM Trial Tr. at 25:4-27:2),
21  Defendants offered no evidence that this alternative has been implemented in any

---

23     [3]   *Georgia Pacific* Factor 8 is "[t]he established profitability of the product made
24   under the patent; its commercial success; and its current popularity," and *Georgia-Pacific* Factor 11 is "The extent to which the infringer has made use of the
25   invention; and any evidence probative of the value of that use."   *Georgia-Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

26     [4]   *Georgia-Pacific* Factor 9 is "The utility and advantages of the patent property
27   over the old modes or devices, if any, that had been used for working out similar
28   results."   *Id.*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  Apple products, or that it has even been offered as an alternative to Apple.  In fact,

2  Defendants' damages expert claimed in his August 2018 expert report that this

3  alternative could be ███████████████████████████████████████████████

4  ████████████████████████  Ex. H at 43-44.  Yet, seventeen months later at trial,

5  Defendants still had not done so.[5]  In *Apple v. Samsung*, Apple argued that

6  "Samsung's ongoing infringement despite access to what Samsung alleges is an

7  easy and essentially costless design-around option reveals Samsung's belief that

8  Apple's patent has substantial economic value, such that Samsung would prefer to

9  continue infringing rather than remove the infringing feature."  Ex. I (Apple's Brief

10 Regarding Ongoing Royalty Rates, *Apple. v. Samsung*, No. 12-cv-00630, Dkt. 2116-

11 3 at 4 (N.D. Cal. Dec. 22, 2014)).  The same is true here.  Defendants' choice to

12 continue infringing in the face of the jury's verdict, rather than switching to a

13 purportedly acceptable low-cost alternative, justifies an increase in the royalty rate.

14 *See Creative Internet Adver. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D.

15 Tex. 2009)("[W]here the adjudged infringer chooses to continue to infringe, this

16 decision supports a higher ongoing royalty rate.").

17     Finally, Caltech's bargaining position post-verdict (*Georgia-Pacific* Factor

18 15) has been substantially strengthened by the jury's findings on infringement and

19 damages.  This change in bargaining strength, particularly in light of the fact that

20 Defendants' infringement is now willful (as discussed further below), justifies an

21 increase in royalty rates going forward.  Indeed, courts have routinely found that

22 post-judgment royalties should be higher, and in many cases substantially higher.

---

[5]   Mr. Thomas even claimed in his report that ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. H at p. 45.  Yet

Defendants did not present any evidence at trial ███████████████████████████

█████████████████ r that it would be commercially viable to do so.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*See, e.g.*, *Creative Internet*, 674 F. Supp. 2d at 861 (noting "[t]he Federal Circuit has instructed that post-verdict infringement should typically entail a higher royalty rate than the reasonable royalty found at trial") (citing *Amado*, 517 F.3d at 1361 (Fed. Cir. 2008)); *see also Telcordia*, 2014 WL 1457797, at *5 (awarding royalty at nearly twice the jury's rate); *Affinity Labs*, 783 F. Supp. 2d at 901 (noting that courts "have commonly awarded post-trial premiums in the range of 33% to 50% of the royalty rate for past damages found by the jury"); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, No. CV-03-597, 2010 U.S. Dist. LEXIS 144259, at *13-14 (D. Ariz. Sept. 8, 2010) (awarding royalty up to twice the jury's rate), *appeal dismissed*, 346 Fed. Appx. 580, 592 (Fed. Cir. 2009); *Paice*, 609 F. Supp. 2d at 630 (awarding royalty at four times the jury's rate).

### 3. Defendants' Willful Infringement Supports Enhancement of the Royalty Rates

"Following a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances." *Affinity Labs,* 783 F. Supp. 2d at 899. No such unusual circumstances exist here. Any belief that Defendants may have had that Caltech's patents were invalid or not infringed has been unambiguously eliminated by the Court and jury, and thus Defendants' decisions to continue selling the accused products are at a minimum "willful, wanton," "deliberate, consciously wrongful, [and] flagrant." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.Ct. 1923, 1932 (2016).[6]

To determine whether and how much the royalty rate should be enhanced based on Defendants' willful infringement, courts often consider the factors set forth

---

[6] The fact that the jury found that Defendants were not liable for pre-judgment willful infringement does not prevent an enhancement of the royalty rates for post-judgment acts of willful infringement. *See, e.g.*, *Affinity Labs,* 783 F. Supp. 2d at

(footnote continued)

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). *See VirnetX*, 2014 U.S. Dist. LEXIS 159013, at *14. The *Read* factors are:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct.

*Id.*   In this case, factors 1 and 8-9 are neutral, but factors 2-7 each favor enhancement of the royalty rates.

Factors 2 and 5 strongly favor enhancement. Defendants' invalidity defense was rejected by the PTAB and by the Court on summary judgment, and the jury rejected Defendants' defenses of non-infringement. Following the jury's verdict "Defendants cannot assert a good-faith belief of non-infringement or invalidity, and the case is no longer a close one." *Soverain*, 899 F. Supp. 2d at 589; *see also Internet Machines*, 2013 WL 4056282 at *20. Indeed, the jury rendered its verdict after just a few hours of deliberation, further reflecting that this was not a close case.

Factors 3 and 4 also favor enhancement. As discussed further in Section V below, Defendants engaged in significant litigation misconduct, which included efforts to inhibit Caltech's discovery and repeated attempts to introduce untimely evidence in violation of the Court's scheduling order. Defendants' scorched earth approach to litigation was fueled by their tremendous size and wealth. In at least some quarters Apple has earned an average of approximately $1 billion in revenues *per day*. Ex. J. And Broadcom is one of the largest semiconductor companies in the

---

899-906 (enhancing ongoing royalty based on willful infringement even where pre-judgment infringement was not determined to be willful).

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1   world, posting 2019 revenues of over $22 billion.  *Id.* at Ex. K.  Even putting aside

2   Defendants' litigation conduct, the disparity in size and wealth between Defendants

3   and Caltech alone justifies enhancement.  *Internet Machines*, 2013 WL 4056282 at

4   *20 ("Defendants are large companies while Internet Machines is considerably

5   smaller by comparison.  This alone would balance in favor of enhanced royalties.")

6       Finally, Factors 6 and 7 also justify enhancement.  Defendants have been

7   infringing Caltech's patents for over a decade, and have done so with full

8   knowledge of Caltech's patents and allegations of infringement for nearly four

9   years.  In all of that time, Defendants did nothing to avoid infringement.  And now

10   that the jury has determined that Defendants are in fact infringing, Defendants' plan

11   seems to be to just continue with the same conduct.  Such wanton disregard for

12   Caltech's rights justifies enhancement of the royalty rates going forward.

13       In view of the changed circumstances since the time of the hypothetical

14   negotiation, and the fact that Defendants' ongoing infringement is willful, Caltech

15   respectfully requests that the Court order Defendants to pay ongoing royalties at two

16   times the rates determined by the jury ($0.52 for Broadcom and $2.80 for Apple).

17   Such an enhancement is consistent with what other courts have done in similar

18   situations.  *See, e.g.*, *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 PJH,

19   2012 WL 761712, at *14 (N.D. Cal. Mar. 8, 2012) (awarding ongoing royalty at

20   twice the jury's implied rate); *Telcordia*, 2014 WL 1457797, at *5 (awarding royalty

21   at nearly twice the jury's rate); *VirnetX,* 2014 U.S. Dist. LEXIS 159013, at *15

22   (awarding ongoing royalty at nearly twice the jury's implied rate); *Bard Peripheral*

23   *Vascular*, 2010 U.S. Dist. LEXIS 144259, at *13-14 (awarding royalty up to twice

24   the jury's rate), *appeal dismissed*, 346 Fed. Appx. 580, 592 (Fed. Cir. 2009); *Paice*,

25   609 F. Supp. 2d at 630 (awarding royalty at four times the jury's rate).

26       **4.    The Ongoing Royalties Should Apply To The Adjudicated Products And Products That Are Not Colorably Different**

27       Where a court orders an ongoing monetary award in lieu of an injunction, the

28   award of ongoing royalties extends not only to infringing products but also to

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

products not more than colorably different from the infringing products. *See I/P Engine, Inc. v. AOL Inc.*, No. 2:11-cv-512, 2014 U.S. Dist. LEXIS 7876, at *9-11 (E.D. Va. Jan. 21, 2014) (applying ongoing royalty to adjudicated product and any new products "not more than colorably different"); *Mondis Tech., Ltd. v. Chimei Innolux Corp.*, No. 2:11-cv-378-JRG, 2012 U.S. Dist. LEXIS 60004, at *6-8 (E.D. Tex. Apr. 30, 2012) (same); *Creative Internet*, 674 F. Supp. 2d at 855 (same); *Bianco v. Globus Medical, Inc.*, No. 2:12–CV–00147–WCB, 2014 U.S. Dist. LEXIS 89777, at *36–37 (E.D. Tex. July 1, 2014) same); *VirnetX*, 2014 U.S. Dist. LEXIS 159013, at *16 (same), *rev'd in part*, 767 F.3d 1308 (Fed. Cir. 2014); *Hynix Semiconductor, Inc. v. Rambus Inc.*, No. 5:00-cv-20905-RMW, ECF No. 3911, slip op. at 5 (N.D. Cal. Mar. 10, 2009) (same).

In *Apple v Samsung*, Apple argued that "[a]s with injunctive relief, any ongoing royalties extend not only to ongoing sales of products found to infringe by the jury, but also to products 'not more than colorably different' therefrom." Apple's Motion for Ongoing Royalties, *Apple v. Samsung*, No. 12-cv-00630, Dkt. 1958 at 1 (N.D. Cal. Sept. 3, 2014). The court there agreed, finding that "[s]everal district courts have used [the not colorably different] language when imposing ongoing royalties." *Apple v. Samsung*, No. 12-cv-00630, Dkt. 2074 at p. 20 (N.D. Cal. Nov. 25, 2014). The same standard should apply here.

## V.   MOTION FOR AN AWARD OF ATTORNEYS' FEES

This case is "exceptional" under 35 U.S.C. § 285. Throughout the case, Defendants repeatedly and unreasonably pursued extreme and unsupportable positions. These actions forced both the Court and Caltech to unnecessarily expend significant resources re-litigating the same issues. Moreover, as demonstrated by the fact Defendants lost virtually all of their substantive motions before this Court and their IPRs on the asserted claims before the PTAB and Federal Circuit, Defendants' legal positions were weak. Defendants nonetheless continued to take unreasonable positions and disregard Court orders rejecting those positions.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Defendants' unreasonable approach and overly-aggressive legal positions in this case spanned all phases of the case – impacting discovery, briefing , and trial. Examples of the exceptional circumstances that justify an award of attorneys' fees in each of those three areas are set forth below.  Defendants' conduct in any one of these areas alone was egregious, but taken together are truly egregious and warrant a finding of exceptionality.  Findings on exceptional cases under Section 285 are fact-intensive and focused on whether, in view of the totality  of the circumstances, the case "stands out from others" with respect to the "substantive strength" of Defendants' litigation positions and the "unreasonable manner in which the case was litigated."  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014); *see also SRI Int'l v. Cisco Systems,* 930 F.3d 1295, 1310 (Fed. Cir. 2019) (§ 285 awards reviewed under "highly deferential" abuse of discretion standard).   In this district, facts similar to those present here have been found to warrant the award of fees.  *Munchkin, Inc. v. Luv N' Care, Ltd.*, No. CV 13-06787 JEM, 2018 WL 7504404, at *6 (C.D. Cal. Dec. 27, 2018) (finding case exceptional where the non-prevailing party was "objectively unreasonable in persisting in all out litigation" in the face of a substantively weak case); *Tannas v. Multichip Display, Inc.*, No. SACV1500282AGJCGX, 2018 WL 1033219, at *4 (C.D. Cal. Feb. 21, 2018) (finding exceptional case award warranted due to party "prevail[ing] on nearly every substantive issue" and the non-prevailing party's litigation "actions have forced [its adversary] to commit significant additional time and resources in this case."), *appeal dismissed*, No. 18-55527, 2018 WL 5099246 (9th Cir. Aug. 22, 2018).

### A.    Defendants' Unreasonable Conduct During Discovery

Throughout discovery, Defendants unreasonably impeded Caltech's efforts to establish its case by using improper litigation tactics, including coaching witnesses to feign an inability to understand basic questions and consume deposition time with long pauses and excessive review of exhibits, obstructing third-party discovery, and

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1   withholding evidence only to belatedly produce it long after the applicable
2   deadlines.   Examples of this conduct, which occurred throughout discovery, are
3   detailed below.

4   *First,* the deposition of Alvin Lin, one of the two engineers who created
5   Broadcom's infringing error correction source code, is emblematic of Defendants'
6   unreasonable and overzealous litigation tactics.   Mr. Lin met with Wilmer Hale
7   attorneys five times prior to his deposition, including for two full days with two
8   partners immediately before his deposition.   Ex. N at 39:24-45:16.   At the
9   deposition, he nonetheless refused to answer basic questions,[7] sat silently for long
10  periods of time before answering even basic questions, and spent excessive time
11  reviewing documents (including lengthy reviews of blank pages).[8]

12  Instead of encouraging Mr. Lin to be forthcoming, Defendants' counsel did
13  the opposite.   For example, Defendants' counsel improperly instructed Mr. Lin not
14  to answer the simple question "Mr. Lin, when did you first learn about Cal Tech's
15  patents?" and then litigated the merits of the objection at trial.   Dkt. 2119, 1/16/2020
16  PM Trial Tr. at 6:15-7:23; 7:6-13 ("THE COURT: I can't imagine why you raised
17  that objection. It was wrong. Simple. . . . It was a really bad objection.").   This was
18  not an isolated occurrence.   Defendants' counsel improperly instructed Mr. Lin not

19

20  ───────────────

[7]   Accordingly, the complete deposition video is separately lodged as Exhibit L.

21  [7]   *See, e.g.,* Ex. N [Lin Dep. Tr.] at 10:25-11:9, 11 ████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  [8]   The full deposition transcript is attached as Exhibit N.   The transcript,
27  however, does not capture the repeated delays and evasive tactics engaged in by Mr.
28  Lin.   Accordingly, the complete deposition video is separately lodged as Exhibit L.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER  SEAL**

1  to answer non-privileged questions, including questions about scheduling conflicts

2  with the trial date and his college GPA, throughout his deposition.[9]

3      Defendants' counsel also encouraged Mr. Lin's obstructive behavior by

4  repeatedly advising him, in the midst of excessive delays, to take additional time to

5  respond.   For example, Mr. Lin was asked to review a single page in a 25-page

6  presentation, but refused to answer any questions relating to this one page for nearly

7  20 minutes while purportedly reviewing the presentation.   Nearly 15 minutes into

8  Mr. Lin's review of a single document, rather than encouraging the witness to

9  cooperate and timely respond, Mr. Dowd encouraged the witness to delay further,

10  stating:

11

12

13                Ex. N at 55:20-56:1; *see also id.* at 53:23-54:4, 55:3-9.   This occurred

14  multiple times throughout Mr. Lin's deposition.[10]   In total, Mr. Lin wasted over

15  three and a half hours of deposition time through excessive time reviewing exhibits

16

17  ───────────────

18  [9]  *See, e.g.,* Ex. N [Lin Dep. Tr.] at 105:16-107:24

19

20

21

22

23

24  [10]  *See, e.g.,* Ex. N at 22:20-22

25

26

27

28

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED
UNDER SEAL**

1   (only review beyond two minutes was counted) and responding to questions (only
2   pauses longer than 15 seconds were counted).

3          *Second*, Defendants' unreasonable and obstructionist conduct pervaded
4   discovery, including document discovery and third-party depositions as well. For
5   example, the Wi-Fi Alliance ("WFA"), a third-party organization of which both
6   Defendants were active members with board representatives, had documents that
7   established the importance and value of the LDPC feature in Defendants' products.
8   *See, e.g.*, PTX-378.   Knowing these documents were harmful to their case,
9   Defendants attempted to block Caltech's discovery and use of these documents at
10  every turn.  Caltech had to obtain these documents from WFA because Defendants
11  refused to produce them, even though, as the Court noted, "the information
12  submitted by the parties suggests that at least a few of Defendants' employees were
13  involved in WFA and had access to the WFA document databases." Dkt. 673 at 6,
14  n.2.  Defendants then sought to bar Caltech from using WFA documents and to
15  prevent Caltech from deposing a representative from the organization and moved to
16  strike Caltech's expert's opinions relating to WFA documents.  Dkts. 563, 608.
17  Both motions were denied. *See* Dkt. 673 at 4-6 (denying both motions).  After the
18  WFA produced documents, Defendants refused to stipulate to their admissibility,
19  forcing Caltech to depose the WFA.  In what should have been an uncontroversial
20  authentication deposition, Defendants' counsel injected ***over 300 meritless***
21  ***objections*** over the course of Caltech's 1 hour and 40 minutes of questioning to
22  simply authenticate WFA documents and obtain basic background information.[11]

───────────

[11]  *See, e.g.*, Ex. O [WFA Dep. Tr.] at 36:121-37:1 ███████████

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

*Third*, Defendants played games with the documents they did produce.  For example, Defendants failed to produce the purported prior art evidence from their paid technical experts until the morning of those experts' depositions, in March and April 2019, despite receiving subpoenas and document requests that undisputedly covered those documents at least two years prior to the depositions [12] and acknowledging their relevance.  As the Court recognized, Defendants' failure to produce all responsive documents from those experts' files during fact discovery[13]—despite having access to and selectively producing other documents from those same files—was "very problematic."  *See* Dkt. 1470, 6/17/2019 Hearing Tr. at 68:2-14 ("[T]he failure to disclose his knowledge on this particular point, it is just so mind-boggling.").[14]  Instead, Defendants belatedly produced them to bolster their new, and equally belated, "known or used" theory.  After examining several rounds of briefing on the issue, the Court concluded Defendants' conduct with respect to the documents was "highly prejudicial," and concluded Defendants "have known for quite some time" that the documents were "relevant - indeed, central - to some of Defendants' invalidity arguments."  Dkt. 1929-1 at 15.  Despite a clear order excluding these materials, Defendants nonetheless included them on their trial exhibit list and invalidity proffer.  *See* Dkt. 2008 at 173-176; Dkt. 1763.

---

[12]   *See, e.g.*, Dkt. 1024-12 (Caltech's First Set of Common Requests for Production of Documents and Things, served September 2016) at Request No. 20 ("All Documents and Things concerning the validity or invalidity of the Asserted Patents.").

[13]   Defendants produced documents from Dr. Pfister's files during discovery under Defendants' own Bates label, DEF-CAL, confirming that they controlled and had access to Dr. Pfister's files.  *See* Dkt. 1040-3.

[14]   *See also id.* at 64:7-17 ("That basically impacts the entire case. . . . [S]upposedly you guys knew it way before and never disclosed it to them earlier on.").

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## B.   Defendants' Unreasonable Pursuit of Defenses Lost on Summary Judgment

Defendants pled and pursued nearly every possible defense in this action, long past the point at which it became clear that the vast majority of those defenses were not tenable.  By the time this case was tried, Defendants had one remaining defense – non-infringement.  Defendants did so to make litigation as expensive and complex as possible for Caltech (and burdensome to the Court) as a litigation tactic to delay trial and pressure Caltech to abandon its case.  The three examples below illustrate the frivolous nature of Defendants' positions on their defenses.

*First*, years into this litigation, Defendants contrived a brand new, undisclosed "known or used" invalidity theory when it became clear that the *inter partes review* challenges ("IPRs") would be rejected and potentially estop them from asserting prior art-based invalidity defenses at trial.  Defendants spent nearly a year claiming that this "known or used" theory was disclosed and different from the printed publication theories rejected in the IPRs (and later on summary judgment of IPR estoppel), but refusing to identify those differences or where the theory was disclosed.[15]  As noted above in the discovery discussion, Defendants also played games in discovery with alleged evidence supporting those theories by belatedly producing hundreds of pages of purported supporting evidence on the morning of depositions, despite having access to the information for years.  Defendants' conduct, detailed below, was sufficiently egregious that in rejecting Defendants' purported "known or used" theories, the Court stated expressly in its order that the issue "will be on the Court's mind if this case reaches the point of requiring an exceptionality determination under 35 U.S.C. § 285."  Dkt. 1929-1 at 11-12.

---

[15]   *See* Dkt. 1929 at 12 (noting that Defendants "were suggesting" their "known or used" theories "[a]s early as May 2018" but "did not meaningfully disclose" them).

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED
UNDER SEAL**

1   In December 2018, the Court already "voiced concerns" with Defendants'

2   "failure to present a meaningful 'known or used' theory." Dkt. 1929-1 at 13 (citing

3   Dkt. 828); *see also* Dkt. 828 at 17 ("Defendants' position regarding the status of its

4   prior art as falling under the 'known or used' prong of § 102(a) is slightly

5   specious."). Defendants nonetheless continued to assert the theory, but continued to

6   evade identifying the underlying facts and alleged differences for another eight

7   months of briefing and discovery. Defendants took a kitchen-sink approach to

8   identification, thereby "obscur[ing]" the issue (and the lack of any meaningful

9   disclosure). Dkt. 1929-1 at 17. For example, after reviewing Defendants' original

10  lengthy proffer on their "known or used" theory, the Court ordered Defendants to

11  "file a new listing of particularized evidence." Dkt. 1172 at 1. Instead of submitting

12  a straightforward chart "focused specifically on showing how evidence related to

13  [the 'known or used' theories] would be used" (Dkt. 1929-1 at 17), Defendants

14  expanded their 57-page "proffer" (Dkt. 1118) to over 850 pages of tables that relied

15  largely on the printed publications (Dkt. 1186). Defendants' revised submission

16  defied the Court's instructions, complicated resolution of this issue, and required the

17  Court and Caltech to sort through what the Court itself called "irrelevant and indeed

18  unhelpful" submissions to attempt to ascertain their theories. Dkt. 1929-1 at 17-18.

19  Ultimately, the Court concluded, as it had observed eight months earlier, that

20  "the invalidity expert report that Defendants served in August 2018 did not

21  meaningfully disclose a 'known or used' theory of invalidity separate and apart from

22  a review of the prior art documents themselves" (Dkt. 1929-1 at 12), nor did the

23  supplemental Frey report which simply included "three perfunctory sentences that

24  reference a 'known or used' theory" and "focuse[d] on the disclosure within the text

25  of the documents themselves" (*id.* at 13). Defendants' pursuit of this "known or

26  used" theory, including their claims that this theory was adequately disclosed in

27  their expert's report, their attempt to support this theory by belatedly producing

28  documents from their own experts that they had access to for years, and their

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1 attempts to obfuscate the lack of support for their theory in multiple voluminous
2 submissions, weighs heavily in favor of an exceptionality finding.  Defendants'
3 "doggedness in the face of almost certain defeat was unreasonable and makes this
4 case stand out from other cases." *Munchkin*, 2018 WL 7504404, at *6.

5         *Second*, Defendants continued to litigate their inequitable conduct defense—
6 including theories they never pled— long past the point of viability, going so far as
7 to amend their answer to assert a brand new theory *after* the Court found summary
8 judgment against them was appropriate on that same theory.  Defendants' pled
9 inequitable conduct theories lost all viability after the PTAB issued final decisions
10 determining that the asserted references were not material to patentability.  Yet
11 Defendants continued to pursue those theories until they were eliminated at
12 summary judgment.[16]  Defendants also pursued unpled inequitable conduct theories
13 for years—a strategy that the Court itself observed was "not appropriate" and was
14 an effort to circumvent "pleading obligations under Rule 9(b)."  Dkt. 1305 at 4.
15 After the Court issued its tentative order granting summary judgment of no
16 inequitable conduct on both Defendants' pled and unpled theories (Dkt. 1207),
17 Defendants attempted to circumvent summary judgment and revive their unpled
18 theories by filing a belated motion for leave to amend their answer—and in doing
19 so, violated the Court's express order not to file additional motions without leave.
20 Dkt. 1289.  The Court struck the motion *sua sponte*, finding that Defendants' delay
21 was unwarranted and would cause undue prejudice.  Dkt. 1301 at 2.

22         *Third*, Defendants' continued pursuit of 35 U.S.C. § 101 defenses against the
23 '032 and '710 patents, after Defendants, as the Court recognized, "essentially did

---

[16]   Defendants continued to argue that the Luby97 and Luby98 references were "but-for" material *after* the PTAB's ruling establishing that these references were not material.  Dkt. 1518 at 9.  Similarly, Defendants maintained their argument that Richardson99 was material even though they admitted this reference "provides a

(footnote continued)

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  everything short of saying the explicit phrase 'the asserted claims of the '710 and
2  '032 Patents are not drawn to an abstract idea,'" was similarly frivolous. Dkt. 1923
3  at 9 (granting § 101 summary judgment motion on the '032 and '710 patents).
4  Defendants originally moved for summary judgment that the asserted claims of the
5  '781 patent were invalid under § 101 and in those motions made admissions that the
6  Court itself recognized essentially conceded that if the '781 patent is patent eligible,
7  then the '032 and '710 patents must be as well. *See* Dkt. 108 ('781 motion); Dkt.
8  1923 at 9 (in view of "Defendants' statements" regarding the '032 and '781 patents,
9  "the Court's § 101 analysis as to the '781 Patent would mandate the same outcome
10  as to the '710 and '032 Patents"). After multiple rounds of briefing, the Court
11  issued a final order denying Defendants' motion (*see* Dkt. 849), but Defendants
12  unreasonably maintained their § 101 defenses against the '032 and '710 patents,
13  forcing another round of summary judgment.

14  The above tactics resulted in a resource-intensive and "frustrating game of
15  Whac-A-Mole" that increased the litigation burden on Caltech and make this case
16  exceptional. *See Oplus Techs., Ltd. v. Vizio, Inc*., 782 F.3d 1371, 1374–76 (Fed.
17  Cir. 2015); *see also, e.g.*, *Tannas*, 2018 WL 1033219, at *4 ("This case stands out as
18  exceptional. Plaintiff has prevailed on nearly every substantive issue. More
19  importantly, Defendants have continuously engaged in poor litigation conduct
20  resulting in prolonged and unnecessary litigation.").

21  **C.  Defendants' Unreasonable Conduct During Trial**

22  At trial, Defendants had one remaining defense: non-infringement. Despite
23  clear instructions from the Court to abide by the Court's orders entering judgment
24  against them on invalidity and only assert properly disclosed non-infringement
25  positions, Defendants nonetheless sought to introduce invalidity arguments at trial
26  that were specifically barred by the Court and advanced non-infringement theories

27  _____

28  similar disclosure" to Luby98. *Id*. The Court rejected both of these unreasonable
(footnote continued)

-30-

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    that were not disclosed prior to trial, were not included in any expert report, and

2    expressly violated the Court's prior rulings. *See SRI*, 930 F.3d at 1310-11

3    (upholding exceptional case finding where defendant pursued defense contrary to

4    the court's rulings). The three examples below illustrate Defendants' flagrant

5    disregard for Court orders during trial.

6      *First*, throughout this case, the Court repeatedly rejected Defendants'

7    proposed constructions of the claim term "random," intended to prop up untenable

8    non-infringement theories. *See, e.g.*, Dkt. 213 at 23 (finding Defendants' proposed

9    construction "frivolous on its face"); Dkt. 1639 at 9 (finding Defendants "did not

10    have evidence in the record to support th[eir] assertion" regarding "random

11    permutation"). Defendants nonetheless attempted to elicit testimony from Dr.

12    Shoemake at trial based on those rejected constructions. Dkt. 2154, 1/21/2020 AM

13    Trial Tr. at 100:23-101:6 ("Q: Sir, you don't even know how the left-hand side of

14    these matrices were constructed, do you. A: That's irrelevant to my analysis. … Q:

15    But -- but you -- … Q: -- don't even know whether they were selected randomly or

16    with a particular purpose."). The Court sustained Caltech's objection to this line of

17    questioning, finding that it had already ruled on the issue. *Id.* at 103:18-24 ("I made

18    a ruling in this area. The question you're asking him is whether he knows how the

19    particular item was, I guess, developed. . . . [W]e already made the ruling insofar as

20    randomness is concerned."). Defendants' conduct violated the Court's clear

21    instructions to the parties not to attempt to raise previously-rejected arguments and

22    theories during trial. Dkt. 1853 at 3 n.1 ("The Court will consider sanctions for

23    repeated insistence of explicitly-rejected arguments and theories, including attempts

24    to inject them into a trial presentation.").

25      *Second*, Defendants attempted to elicit testimony from Dr. Blanksby to

26    present non-infringement theories based on expert opinions that were not disclosed

27    _____

28    arguments. *Id.*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1    in his expert report.  Critically, the Court had previously ordered Defendants to

2    submit an expert report from Dr. Blanksby disclosing all of his expert opinions.

3    Dkt. 746 at 3 (striking Dr. Blankby's expert disclosure and requiring, among other

4    things, Dr. Blanksby to provide an expert report disclosing opinions).   After it

5    became apparent that Defendants intended to offer non-infringement opinions

6    beyond the scope of Dr. Blanksby's report at trial, Caltech sought the Court's

7    assistance, and the Court repeatedly instructed Defendants that all non-infringement

8    arguments raised at trial must be disclosed in expert reports.  *See, e.g.*, Dkt. 1691,

9    12/9/2019 Hearing Tr. at 9:2-6 ("If the stuff is not included as listed specifically, I

10   will not allow it to be litigated in front of the jury.  In other words, this has to be

11   contained. If it is not contained, I will not allow it to be presented to the jury,

12   because I will have deemed it waived"); *id.* at 55:14-21 ("THE COURT: . . . Well,

13   let me ask defense counsel to show at some point, not today obviously, but at some

14   point in time where it is in the expert report, and if it's in, then the plaintiff loses. If

15   it's not in, then the plaintiff wins.").

16         Despite these instructions, Defendants attempted to elicit undisclosed non-

17   infringement opinions from Dr. Blanksby.   After Caltech objected, Defendants'

18   counsel (violating the Court's rule that objections were not to be addressed before

19   the jury absent the Court's express request for a response) falsely represented to the

20   Court and the jury that the undisclosed opinion was found in 25 cites in the expert

21   report. *See* Dkt. 2127, 1/23/2020 Trial Tr. at 152:21-23 ("MR. MUELLER: At the

22   start, there is about 25 there.  I'll keep -- if I may, Your Honor, they can check those

23   and I can keep going.").  At sidebar, the Court concluded the opinion was not

24   disclosed and chastised Defendants for "wasting time" by providing numerous

25   inapplicable cites. *Id.* at 153:23-154:10; 157:14-22.  When the Court enforced its

26   prior orders and sustained Caltech's objection to the undisclosed theory, Defendants

27   went so far as to threaten to move for a mistrial.   *Id.* at 157:23-24 ("MR.

28   MUELLER: If you don't let us testify about this, I'm moving for a mistrial.");

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

166:11-15 ("THE COURT: Well, let me put it this way. . . if you are going to explain it through expert testimony, it's supposed to be included in an expert report, and if you fail to include it in an expert report, then you have lost the case prior to it being started.").

*Third*, Defendants sought to resurrect and backdoor their invalidity defenses at trial, violating multiple Court orders. For example, Defendants included prior art references this Court specifically excluded in its orders on their exhibit list and in their list of invalidity references for trial, necessitating supplemental pre-trial briefing. Dkt. 2008; Dkt. 1763. In that briefing, Defendants failed to clearly disclose and identify their positions, instead citing dozens of inapplicable references already rejected by the Court. *See, e.g.*, Dkt. 2157, 12/30/2019 Hearing Tr. at 38:2-10 ("[THE COURT]:You cited to so many different things . . .  you threw a bunch of stuff up. I resent that."). Similarly, during trial, Defendants disclosed references that were the poster children for IPR estoppel as exhibits to use with Dr. Hassibi, the first witness at trial, and introduced one of those references before the jury without leave from the Court. *Compare* Dkt. 2118, 1/15/20 PM Trial Tr. at 104:14-22 (introducing Luby97 as a prior art reference) *with* Dkt. 1919 (adopting prior order prohibiting use of Luby97 and holding "permitting Defendants to introduce their main invalidity references to a jury is inappropriate under FRE 402 and 403."). The Court struck the reference, but only after Defendants presented it as prior art to the jury in direct violation of numerous prior Court orders. *See, e.g.*, Dkt. 2118, 1/15/20 PM Trial Tr. at 106:1-107:14.

\* \* \*

Defendants litigated this case in an unreasonable manner by advancing positions of ever-worsening merit, obstructing discovery, treating Court orders as compliance-optional, requiring multiple rounds of briefing on nearly every issue, and presenting evidence to the jury that Court orders excluded. For these reasons,

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1 | this case should be deemed exceptional and Caltech should be awarded attorneys'

2 | fees and associated costs under § 285.

3 | **VI.   CONCLUSION**

4 | For the reasons set forth above, Caltech respectfully requests that the Court

5 | award supplemental damages, pre- and post-judgment interest, attorneys' fees, and a

6 | permanent injunction or on-going royalties.

7 | DATED: April 6, 2020                    Respectfully submitted,

10 |                     By  /s/  Jim Asperger

11 |                         James R. Asperger
                            jimasperger@quinnemanuel.com
12 |                         QUINN EMANUEL URQUHART &
                            SULLIVAN, LLP
13 |                         865 S. Figueroa St., 10th Floor
                            Los Angeles, California 90017
14 |                         Telephone:  (213) 443-3000
                            Facsimile:  (213) 443-3100
15 |

16 |                         *Attorneys for Plaintiff California*
                            *Institute of Technology*