# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**\*\*AMENDED\*\* CIVIL MINUTES - GENERAL**

| Case No. | CV 16-3714-GW-AGRx | Date | July 17, 2020 |
|---|---|---|---|
| Title | *The California Institute of Technology v. Broadcom Limited, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie E. Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| James R. Asperger | James M. Dowd |
| Todd M. Briggs | Joseph J. Mueller |
| Edward J. DeFranco | Mark D. Selwyn |
| Kevin P.B. Johnson | |
| Rachael McCracken | |
| Kathleen Sullivan | |

**PROCEEDINGS:      TELEPHONIC HEARING ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW (RENEWED) AND/OR A NEW TRIAL [2160; 2161]**

Court and counsel confer. The *Redacted* Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court DENIES Defendants' Motion.

|  |  : | 05 |
|---|---|---|
| Initials of Preparer | JG | |

*The California Institute of Technology v. Broadcom Limited et al.*; Case No. 2:16-cv-03714-GW-AGR
Updated Tentative Ruling on Defendants' Motion for Judgement as a Matter of Law (Renewed) and/or a New Trial

[Portions of the parties' briefing related to the pending motions addressed by this Updated Tentative Order were filed under seal.  The parties will be expected to state their positions as to whether any material should remain under seal during the hearing on the motions, including the basis for any continued request to seal.]

## I.    **Introduction**

Plaintiff The California Institute of Technology brought this patent infringement action against Defendants Broadcom Limited, Broadcom Corporation, Avago Technologies Limited (collectively, "Broadcom"), and Apple Inc. ("Apple," collectively with Broadcom, "Defendants"). *See* Docket No. 2112 (Final Jury Instructions) at 1.

Plaintiff accused Defendants of infringing Claims 20 and 22 of U.S. Patent No. 7,116,710 ("the '710 Patent"); Claims 11 and 18 of U.S. Patent No. 7,421,032 ("the '032 Patent"); and Claim 13 of U.S. Patent No. 7,916,781 ("the '781 Patent").  *Id.* at 10.  Plaintiff specifically alleged that Apple infringed the asserted claims via devices that incorporate Broadcom chips that support Wi-Fi, including Apple's iPhones, iPads, iMacs, MacBooks, AppleTV, and Airport Router products. *Id.*  As to Broadcom, the alleged infringing products were Broadcom's chips (that support Wi-Fi) themselves.  *Id.*

The action was tried before a jury for twelve days.  On January 29, 2020 the jury returned a verdict finding Plaintiff had proven patent infringement as to all asserted claims and awarding Plaintiff damages in the form of a running royalty for each Defendants' infringement.  Docket No. 2115 (sealed); *see also* Docket No. 2114 (redacted).  The jury found Plaintiff had failed to prove Defendants' infringement was willful.  *Id.*

On April 6, 3030, Defendants renewed their motion for judgment as a matter of law and alternatively moved for a new trial.  *See* Docket Nos. 2162 (redacted), 2160 (sealed), 2195 (sealed); *see also* Docket Nos. 2116, 2142 (minutes of post-trial status conferences, scheduling filing of post-trial motions).  Plaintiff has filed an opposition to the motion (Docket Nos. 2178 (redacted), 2207 (sealed)), and Defendants have replied (Docket Nos. 2197 (redacted), 2211 (sealed)).

The Court issued a Tentative Ruling on the motion and permitted each party to file additional briefing regarding the "Seven Biggest Mistakes" it believed were in the Tentative Ruling.  *See* Docket No. 2214.  Plaintiff filed a notice stating that it would submit on the Tentative Ruling.  Docket No. 2219.  Defendants filed a supplemental brief regarding the Tentative Ruling

1

(Docket No. 2215 (redacted), 2225 (sealed)) and Plaintiff filed a response (Docket No. 2227 (redacted); Docket No. 2229-1 (application to seal)).

For the reasons stated in this Order, the Court would **DENY** Defendants' motion.

## II.   Legal Standard

Considering the grant or denial of a motion for judgment as a matter of law or for a new trial presents "a procedural issue not unique to patent law, which [the Federal Circuit] review[s] under the law of the regional circuit where the appeal from the district court normally would lie." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1364 (Fed. Cir. 2006).

### A.   Judgment as a Matter of Law

Under Rule 50(a) and (b), a court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party" as to an issue on which that party has been fully heard during trial.  Fed. R. Civ. P. 50.  A party seeking judgment as a matter of law has a "very high" standard to meet.  *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002).  The jury's verdict must be upheld if, viewing the facts in the light most favorable to the nonmoving party, there is sufficient evidence for a reasonable jury to have found in the nonmoving party's favor.  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997) ("Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict."), *cert. denied*, 525 U.S. 812 (1998); *see also Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 644 (9th Cir. 1993) ("[A court] must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support only a verdict for the moving party.") (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).

In considering a motion under Rule 50(b), the district court is not free to weigh the parties' evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 n.6 (1962); *Baker*, 6 F.3d at 644.

### B.    New Trial

Under Rule 59(a), a court may grant a new trial on all or some of the issues after a jury trial "for any reason for which a new trial has been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1).  Courts are thus "bound by those grounds that have been historically recognized" for a new trial, including claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

In contrast to a motion for judgment as a matter of law, a judge considering a motion for new trial "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  Nevertheless, "a decent respect for collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Id*. (citation omitted).  If, on the other hand, having given full respect to the jury's findings and having reviewed the entire evidence, the judge "is left with the definite and firm conviction that a mistake has been committed," a new trial should be granted. *Id*. at 1372 (citation omitted); *see also EEOC v. Pape Lift, Inc*., 115 F.3d 676, 680 (9th Cir. 1997) ("*Pape Lift*") (declaring that motion for new trial should only be granted if verdict is against great weight of evidence or it is quite clear that jury has reached seriously erroneous result); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) ("[E]ven if substantial evidence supports the jury's verdict, a trial court may grant a new trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'") (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

## III.    <u>Discussion</u>

It is not possible to meaningfully count the number of separate and distinct arguments that Defendants have raised in their motion.  Suffice to say, consistent with both parties' litigation strategies for pretrial motion practice in this case, Defendants have again thrown in the kitchen sink.  Many of the arguments are raised in a highly cursory fashion, be it a footnote or a three-sentence paragraph.  Some of the arguments repeat positions that the Court considered and rejected

3

in pretrial rulings, with nothing new to support revisiting the prior legal determinations reached. Other arguments present wholly new assertions, including some that were not raised during pretrial proceedings.

The Court has carefully considered each and every one of the arguments that Defendants present.  This ruling focuses on the most critical aspects of Defendants' motion.  The Court also directs the parties, without further comment, to consider the observations of one Federal Circuit panel:

> [M]ere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument. *See, e.g., Anderson v. City of Boston,* 375 F.3d 71, 91 (1st Cir. 2004) ("When a party includes no developed argumentation on a point ... we treat the argument as waived under our well established rule."); *Tolbert v. Queens Coll.,* 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted); *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir. 1996) (same); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir. 1994), *cert. denied,* 513 U.S. 946, 115 S.Ct. 356, 130 L.Ed.2d 311 (1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (quoting *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1066 (3d Cir. 1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992)); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim . . . . Especially not when the brief presents a passel of other arguments . . . . Judges are not like pigs, hunting for truffles buried in briefs.").

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).

With those preliminary comments in mind, the Court proceeds topic-by-topic through the arguments presented in Defendants' motion.[1]

### A.   Infringement

#### a.   Waiver of a Request for a Patent-by-Patent Damages Breakdown Makes Certain of Defendants' Current Arguments About the Jury's Infringement Findings Irrelevant

Defendants challenge whether Plaintiff proved infringement of Claim 13 of the '781 Patent,

---

[1] As discussed above, the standard for JMOL is whether the evidence only permits a conclusion contrary to the jury's verdict.  *Omega Envt'l,* 127 F.3d at 1161.  The standard for a new trial is whether the "great weight" of evidence is contrary to the jury's conclusion.  *Pape Lift,* 115 F.3d at 680.  Because the new trial standard presents a lower hurdle than the JMOL standard, the Court will use the new trial standard throughout this opinion, unless application of the JMOL standard would lead to a different result.

a method claim, at trial.  Defendants argue that "judgment of no infringement for the '781 patent is required, and a new damages trial therefore needed."  Docket No. 2211 at 4.  Plaintiff argues that "a finding of infringement of '781 claim 13 is not required to sustain the judgment" because Defendants "never proposed jury instructions or a verdict form that required allocation of damages by patent."  Docket No. 2207 at 8.

Indeed, in their proposed verdict form, Defendants included a single general damages question: "If you found one or more claims of the '710, '032, or '781 patents infringed, what amount do you find is a reasonable royalty to be paid by Broadcom and/or Apple?"  Docket No. 2032-1 at 3.  Defendants' proposed question then also asked the jury to identify the "rate per unit" and "number of units" for any running royalty calculation it might reach for damages for each defendant.  *See id.*  But as discussed *infra*, even if the final verdict form had requested this additional information from the jury, it is not clear how it would have revealed what, if any, damages the jury would solely attribute to method Claim 13 under the circumstances presented here (where the jury marked each asserted claim as infringed and awarded total damages in the exact amount proposed by Plaintiff's experts at trial).  Of note, Defendants also otherwise failed to object to the Court's tentative proposed verdict form for failing to include a patent-by-patent breakdown for damages.

Defendants also assert that their proposed verdict form included a question about "the number of units that Caltech proved were used in the United States in a manner that infringes claim[ ] 13 of the '781 patent."  *See id.* at 2.  In explaining the basis for this question during a jury instruction conference on January 29, 2020, Defendants stated,

> we thought it would be useful to have a question on the quantity of use for the '781 claim.  We do think that if the jury were to find, for example, only that claim infringed as Caltech suggested in the closing arguments, there's going to be a very significant issue as to the evidence on use, of which there really was none.

> And so to the extent that the jury does find on that claim only, it would be useful to know what quantity of units they found were actually used.  But, again, we will take Your Honor's guidance on it.

Docket No. 2133 (Trial Tr. 1.29.2020 (Jury Instruction Discussion)) at 12:10-21.  In written objections submitted at 7:14 AM on January 29, 2020, *i.e.* a few hours before these statements on the record at the jury instruction conference, Defendants had stated:

> Defendants respectfully submit that the damages section in the Court's proposed verdict form should be modified to include the level of detail in

5

> Defendants' proposed verdict form.  That level of detail (e.g., requiring the jury to show its rate and unit findings for any running-royalty verdict and the number of units found to infringe for method claim 13 of the '781 patent) would facilitate review of any damages verdict.

Docket No. 2084 (Defendants' "Objections to Proposed Verdict Form and Caltech's Closing Argument").

These written objections and Defendants' accompanying statements on the record do not change the outcome.  The fact remains that Defendants proposed a general damages question that was not broken down by patent.  And again, Defendants' proposed question was phrased as "[i]f you found **one or more claims** of the **'710, '032, or '781 patents** infringed . . ."  Docket No. 2032-1 at 3 (emphasis added).  Even if both of Defendants' additional proposed questions were in the verdict form (regarding the Claim 13 number of infringing units and the total infringing units for damages), those questions would not have shed any light on this issue.  As Defendants noted during the jury instruction conference, the questions might have been helpful if the jury had identified only select asserted claims (including Claim 13) as infringed.  But the jury marked all asserted claims as infringed and awarded damages in the full amount sought by Plaintiff, including based on Plaintiff's theory that Defendants infringed the asserted patents by selling and importing the accused products into the United States.  Defendants do not explain how damages solely related to Claim 13 could be excised out under these circumstances, even with its additional jury verdict questions in the verdict form.  That is, even if Defendants were correct regarding their arguments for Claim 13 of the '781 Patent, the evidence would still support the jury's full damages verdict as compensating for infringement of either the '032 or '710 Patents, as Plaintiff's damages experts presented at trial.

By failing to propose patent-by-patent damages questions in the jury verdict, Defendants effectively waived, forfeited, or otherwise rendered irrelevant their current arguments regarding noninfringement of Claim 13.  *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, Case No. CV 07-8108 FMO (SHx), 2018 WL 6190604, at *9 (C.D. Cal. Nov. 4, 2018), aff'd, 798 F. App'x 643 (Fed. Cir. 2020).  As the court put it in *Alfred E. Mann Foundation*,

> Courts do not "allow litigants to play procedural brinkmanship with the jury system and take advantage of uncertainties they could well have avoided." *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir. 1989) (defendant who did not request special verdict as to each factual theory is prohibited from arguing general verdict erroneously rests on "unsubstantiated factual theories"); *See Mitsubishi Electric Corp. v. Ampex Corp.*, 190 F.3d 1300, 1304 (Fed. Cir.

1999), *cert. denied*, 529 U.S. 1054 (2000) (party forfeited post-trial challenge on the ground that a special verdict should have been obtained, by proposing and accepting a verdict form that did not separate the potential grounds for invalidity).   Because the court used the language in the damages questions proposed by Cochlear and because Cochlear failed to request a special verdict that allocated damages by patent, the court finds that Cochlear forfeited its right to challenge any potential ambiguity in the verdict form.   *See McCord*, 873 F.2d at 1274; *see, e.g., Goldberg v. Pacific Indemnity Co.*, 405 F.Appx. 177, 180 (9th Cir. 2010) ("[E]ven if plaintiffs' argument had merit, they waived any objection to the form of instruction by suggesting a substantially similar instruction at trial."); *EON Corp. IP Holdings, LLC v. Landis+Gyr Inc.*, 2014 WL 6466663, *11-12 (E.D. Tex. 2014), *rev'd on other grounds*, 815 F.3d 1314 (Fed. Cir. 2016) ("*EON Corp.*") (finding that defendant was not entitled to new damages trial because it did not object to jury verdict form's apportionment of damages, and because expert took into account plaintiff's view that three patents-in-suit were interrelated and thus structured his damages model to remain the same regardless of number of claims or patents infringed).

*Id.* at *12.

In their supplemental brief, Defendants reiterate their interpretation of the legal authority that applies to this dispute.  *See* Docket No. 2225 at 1-2.  In doing so, they cite *VirnetX Inc. v. Apple Inc*., No. 12-cv-855, 2020 WL 3635929 (E.D. Tex. Apr. 23, 2020).  The court in *VirnetX* engages in a very helpful discussion of the relevant law on this issue and its application.  *See id.* at *4-*6; *see also id.* at *6 (noting that claim-independent damages theories could provide a basis for departing from the Federal Circuit's "normal rule").  And indeed, that discussion further supports the outcome reached here.  Specifically, the jury in this case heard from damages experts who presented a damages theory that did not differentiate amongst the asserted claims.  *See infra*. Given the particular damages theory presented, in combination with both parties' proposed verdict form questions, Defendants' arguments about the applicability of the Federal Circuit's "normal rule" for this issue are unpersuasive.

The parties only discuss this waiver argument in the context of their dispute about whether Plaintiff proved that the claimed method of Claim 13 of the '781 Patent was performed in the United States.  But from the Court's perspective, the issue extends to some of Defendants' other arguments relating to noninfringement and requests for a new trial.  For example, Defendants argue that Plaintiff failed to prove inducement of any asserted claim.  *See, e.g.* Docket No. 2211 at 16. Neither party proposed special verdict forms that broke down whether Plaintiff had proven infringement of each asserted claim due to direct and/or indirect infringement.  *See* Docket No.

2032-1, 2032-2.  And moreover, Defendants' motion does not challenge the fact that Broadcom's and Apple's importation of a subset of the accused products into the United States would constitute acts of direct infringement under U.S. Patent Law (assuming all limitations of a particular asserted claim were met).[2]  With direct infringement by importation proven, whether or not Plaintiff also proved indirect infringement relating to the same accused units is again irrelevant under the circumstances.  The Court finds Defendants' arguments regarding induced infringement fail to warrant a new trial.

Similarly, Defendants offer up a slew of limitations across the asserted patents that they argue were not proven satisfied by the accused products at trial.  Given Defendants' failure to timely request a patent-by-patent damages breakdown, so long as Plaintiff proved at trial that just one of the asserted claims in the '032 or '710 Patent was infringed, that would also be enough to sustain the jury verdict (without deciding the issue as to the '781 Patent).[3]  That being said, the Court will consider each of Defendants' noninfringement challenges based on specific claim limitations in the following sections.

### b.      Infringement of Specific Claim Limitations

The Court proceeds to review Defendants' noninfringement arguments for specific claim limitations in a different order than as presented in the parties' briefs.

### i.      *"check nodes" ('032 Patent, Claim 11)*

Aside from restating an argument that the accused encoders do not have "repeat[ed]" message bits (addressed *infra*), Defendants offer only the following statements in their motion regarding this claim limitation:

---

[2] Induced infringement requires an underlying act of direct infringement.  As the parties know, direct infringement under U.S. patent law requires that an act of infringement take place in the United States.  Thus, any conduct on Apple's or Broadcom's part that could have induced a third party to infringe could only have related to the accused products actually imported by Apple and Broadcom into the United States, *i.e.* the accused products that were distributed to third parties who could perform acts of direct infringement in the United States.  *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001) ("Inducement only occurs if the party being induced directly infringes the patent . . . . The parties do not dispute that any infringement by OPTi was direct because OPTi practiced the claim method of the '899 patent in the United States.").  In other words, the Court simply notes here that Defendants' induced infringement challenge (like the Claim 13 challenge) relate to a different subset of the accused units than those Defendants challenge as "extraterritorial" sales.

[3] Plaintiff proposes that the Court could alternatively "add a ruling that substantial evidence supports the jury's infringement verdict" as to the '781 Patent.  *See* Docket No. 229-1 at 1.  Defendants also suggest that the Court should consider this issue on the merits because it "affects Defendants' substantive rights," including because "the patents have different expiration dates, which is relevant to Caltech's demand for ongoing royalties."  Docket No. 2225 at 2. (The Court notes that the expiration date for the '781 Patent is earlier than the expiration date for the '710 Patent.) The parties' positions on this issue are noted for the (already extremely lengthy) record.

> Dr. Shoemake offered no evidence that the accumulators he accused at trial for this limitation (for the first time, over Defendants' objection) *in fact check whether all input bits sum to zero* (they do not).   [footnote omitted.]   Alternatively, a new trial is needed because Dr. Shoemake should not have been permitted to offer his new opinion.

Docket No. 2195 at 25-26 (emphasis added).  Plaintiff responds that Defendants never sought a construction of "check nodes" in this case.  Docket No. 2207 at 6.  Plaintiff further states, "[t]he Court's construction of the Tanner graph (including check nodes) requires the encoder only to 'enforce constraints that determine the parity bits,' and Dr. Shoemake explained how that is met by using accumulation based on constraints to calculate parity bits."  *Id.*  Plaintiff also cites paragraphs in Shoemake's expert report where he "identified the accumulators as providing the 'constraints' corresponding to the claimed check nodes." *Id.* (citing Docket No. 1569-1 (Excerpts of Infringement Expert Report of Dr. Matthew Shoemake ("Shoemake Report")) ¶¶ 690, 696, 1308).

> In a cited excerpt of Shoemake's report, he stated:

> The "parity checks" in the Tanner graph are represented by the "V" nodes, which are also called check nodes.  ***The modulo-2/XOR sum of all bits connected to a "V" node must be zero, i.e. there is a check condition.***  The left side of each "V" node is connected to subsets of irregularly repeated message bits . . . . The right side of the "V" nodes are connected to parity bits.

Shoemake Report, Docket No. 1569-1 ¶ 690 (emphasis added).  To support their current claim construction argument, Defendants refer to Shoemake's sentence that "[t]he modulo-2/XOR sum of all bits connected to a 'V' node must be zero, *i.e.* there is a check condition."  *See* Docket No. 2211 at 15.  However, Shoemake does not state in this sentence that a check node must, in use, "in fact check whether all input bits sum to zero," as Defendants now argue.  *See* Docket No. 2195 at 25.  Elsewhere, in the same paragraph of Shoemake's report (and in later paragraphs, *e.g.*, Shoemake Report, Docket No. 1569-1 ¶ 696, 1308), Shoemake makes clear his opinion that an accumulation operation in the accused products acts as a check node to "enforce constraints that determine the parity bits," consistent with the Court's construction of the Tanner graph.  *See, e.g.* Docket No. 213 (Claim Construction Order).  By failing to timely and clearly raise a challenge to

Shoemake's opinions on this issue in pretrial proceedings or at trial, including on the basis of
Shoemake's interpretation of the claims, the Court finds Defendants have waived it.[4] *TVIIM, LLC
v. McAfee, Inc.*, 851 F.3d 1356, 1363 (Fed. Cir. 2017) ("litigants waive their right to present new
claim construction disputes if they are raised for the first time after trial." (citations omitted)).

　　Defendants also argue that a new trial is warranted because Shoemake offered new
opinions at trial and not in his expert report that certain accumulators met this claim limitation.
Elsewhere, in stating how the "check nodes . . . enforce constrains that determine the parity bits"
limitation is met by an accused product, Shoemake's expert report stated,



*Id.* ¶ 1308.  At trial, Shoemake discussed the same "r_bits" and accumulator ("accum") addressed
in this paragraph of his report to argue that this claim limitation was met by the accused products.
Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 48:24-50:8.  Defendants have thus not shown
that Shoemake offered new opinions at trial.

<i>ii.　　<u>"irregular repeat" limitations (all claims)</u></i>

　　After the claim construction hearing in this case in 2017 where the Court issued a tentative
ruling to the parties, the Court issued its final claim construction order.  The cover page of that
claim construction order included the following paragraph:

　　　On June 29, 2017, the Court issued a tentative ruling and held a Markman
　　hearing in this patent infringement action. See Tentative Ruling on Claim
　　Construction ("Tentative Ruling"), Docket No. 207. During the hearing, the

---

[4] Defendants *did* argue in pretrial proceedings, and the Court agreed, that Claim 11 requires check nodes that "enforce
constraints that determine the parity bits."  Docket No. 1213 at ECF31.  Defendants *did not* argue that the claimed
check nodes must "in fact check whether all input bits sum to zero."  Docket No. 2195 at 25.  Nor did either party
request a determination regarding "whether Plaintiff's expert applies the claim term 'Tanner Graph' to the accused
products consistent with how it is used in the asserted claims of the '032 Patent."  Docket No. 1213 at ECF31 n.19.
Given this record and Shoemake's stated opinions on the issue, Defendants' current arguments are rejected.

Court asked the parties to submit a joint supplemental brief after Defendants raised certain requests for clarification. The parties have now done so. See Joint Supplemental Brief Regarding Claim Construction ("Supp. Br."), Docket No. 212. ***Defendants essentially seek an order clarifying whether the Court's construction of "repeat" is consistent with Judge Mariana R. Pfaelzer's construction of the same term in an earlier case involving the same patents asserted here***, specifically whether "repeat": (1) means "duplicate"; and (2) does not mean "re-use." See Supp. Br. at 1. ***The Court has already addressed the related contentions by the parties in its tentative ruling to the extent necessary for construction.*** See Tentative Ruling at 8-11 (***adopting the plain and ordinary meaning of "repeat," explaining further that the term encompasses: (1) "generation of additional bits by means of duplicating the original bits" "without limiting how specifically the duplicate bits are created or stored in the memory"; and (2) choosing or "selecting the [message] bits for use without necessarily storing them at a specific location in computer memory"). Indeed, the Court emphatically added that "the claims do not articulate a specific limitation as to the exact implementation technique" (id. at 9) – as such, while the term "repeat" may encompass duplication and reuse, it surely is not limited to those specific implementation techniques***. No more clarity is warranted at this stage. Accordingly, the Court adopts its tentative ruling as its final decision on the claim construction for the reasons stated in the tentative ruling.

Docket No. 213, cover page (emphasis added). The Court thus reached a construction of "repeat" that was different from Judge Pfaelzer's earlier construction for that claim term. *See id.* (noting that Judge Pfaelzer's construction found "repeat" "does not mean 're-use'" and further stating that "the term 'repeat' may encompass duplication and reuse."). The Court otherwise provided its reasoning regarding the appropriate scope of this claim term in the body of the order. *See, e.g. id.* at 10 ("storage of redundant copies of bits in new memory locations is not a predicate to duplication or reuse of bits to create IRA codes or parity bits, especially not when the repeated bits are merely transitory to generation of parity bits.").

The issue regarding the meaning of the term "repeat" was addressed again in June 2019 in the context of a *Daubert* motion. Docket No. 1213 at ECF19 (Court's ruling, considering the issue and stating, "to the extent Defendants would argue, for instance, that by saying repeated bits are 'distinct' from the original bits, the Court somehow required difference or independence between the repeated and original bits, Defendants have not provided a basis for that position.").[5] After the

---

[5] In that ruling, the Court also addressed the parties' dispute regarding the term "repeat . . . irregularly," including as it related to an accused system that first repeated "bits" and then "punctur[ed]" bits. *See* Docket No. 1213 at ECF25. It found that the issue presented a factual question. *Id.*; *see also* Docket No. 1853 at 3 ("because the claims on their face already require 'irregular' repetition, and Plaintiff will be held to its statement that it is not arguing that the ***overall***

issue emerged a third time during pretrial proceedings, at Plaintiff's insistence and to avoid a claim construction dispute being presented to the jury, the Court determined that the proper course was to construe the term consistent with its prior determinations, and issued a tentative order on January 9, 2020 to that effect. *See* Docket No. 1926 (minutes of December 30, 2019 pretrial conference, permitting Plaintiff to brief the issue); Docket No. 1790 (Plaintiff's January 3, 2020 brief, requesting clarification of meanings of certain claim terms); Docket No. 1919 (January 9, 2020 hearing minutes, attaching rulings that included tentative construction for "repeat"); Docket No. 1909 (Defendants' response to January 9, 2020 tentative); Docket No. 1957 (minutes of trial, attaching final additional claim constructions, which adopted some of Defendants' proposed modifications to the proposed additional constructions of terms besides "repeat"); Docket No. 2112 at 9 (final jury instructions).

Despite this sequence of events, Defendants continue to clip snippets of the Court's tentative 2017 claim construction ruling (adopted as final with the clarification quoted in the cover page) for the assertion that "'repeat' at least requires '***generation of additional bits***' that are '***distinct from the original bits . . .***'" Docket No. 2211 at 13 (emphasis in original) (citing Docket No. 213 at 13). The Court adopts its previous rulings on this issue herein by this reference and finds no basis to depart from them. In reply, Defendants do not dispute Plaintiff's assertion that "[u]ltimately, Defendants' arguments depend on their previously rejected interpretation of 'irregularly repeat' as limited to specific implementations." Docket No. 2207 at 2. The Court agrees that this appears to be the case. Given the previous determinations regarding the meaning of this term and the evidence Plaintiff presented at trial (*see* Docket No. 2207 at 2 (citing same)), the Court does not find Defendants' arguments for this claim term present a basis to disturb the jury's verdict.[6, 7]

Defendants present three alternative arguments for a new trial. Each of them are unpersuasive. First, Defendants' argument that the Court "compounded its error at *Markman* . . .

---

implementation of the asserted products constitutes regular repetition, the Court finds that PHE does not apply under the circumstances presented.").

[6] For these reasons, it is not necessary to address Defendants' arguments that Plaintiff's doctrine of equivalents evidence for this claim term at trial "amounted to insufficient conclusory assertions." Docket No. 2195 at 21.

[7] The Court has reviewed Defendants' arguments in their supplemental brief regarding this dispute. The Court agrees with Plaintiff that those arguments continue to mischaracterize the record relating to the construction of this term, particularly when the cover page of the final claim construction order is considered. Defendants' arguments that the verdict was not supported by substantial evidence also remain unpersuasive.

by issuing a modified construction" of "repeat" is not supported by the record, as explained *supra*.

Second, Defendants assert in two sentences that the Court erred by permitting Plaintiff to present a doctrine of equivalents theory on this claim limitation to the jury. Docket No. 2195 at 22. The Court incorporates by reference its pretrial determination rejecting Defendants' argument that the doctrine of equivalents is unavailable for this claim term. Docket No. 1853 at 3. Because Defendants say nothing more of substance to support this argument, the Court will say nothing more about it, either.

Third, Defendants argue that the Court erred by not adopting at trial a construction for the term "variable number of subsets" in Claim 13 of the '781 Patent as requiring "irregular repetition." *See* Docket No. 2195 at 22. It is important to bear in mind that, as discussed *supra*, Defendants have insisted on a very particular meaning for the claim phrase "irregular repetition" that is different from the interpretation reached in the claim construction order. By arguing that the phrase "variable number of subsets" should have been construed at trial as requiring "irregular repetition," Defendants apparently would seek to link the meaning of these two claim phrases together such that, if Defendants prevail at some point in their arguments regarding the meaning of "irregular repetition," that meaning will similarly be imputed to "variable number of subsets."

It is true that in the Court's ruling on Plaintiff's motion for summary judgment determination of no invalidity under § 101 for the '781 Patent, the Court "agree[d] with Plaintiff that the phrase 'variable number of subsets' creates a requirement in the relevant claims for irregular repetition of information bits." Docket No. 849 at 14. But in the context of that Order, the Court found, for example, that "there is 'irregular' repetition of information bits ***because $i_2$ appears in*** more subsets than $i_1$ and $i_3$." *Id.* (emphasis added); *see also id.* (noting parties had agreed to construction of "irregular" as "different number of times"). The ruling otherwise observed the parties' apparent agreement that 'variable number of subsets' limitation as meaning 'some information bits are used in more mod-2 or exclusive-OR operations (*i.e.*, more 'subsets') than others.'" *Id.* at 11. It was on this basis and broader understanding of "variable number of subsets" that the Court evaluated the claims under § 101 (and understood the phrase "irregular repetition"). The Court acted within its discretion by declining to confuse the record on this issue with Defendants' proposal to construe "variable number of subsets" as requiring "irregular repetition" at trial, particularly given Defendants' currently-raised (and rejected) arguments regarding the meaning of the latter term.

      *iii.*        <u>IRA Code ('032 Patent, Claim 11)</u>

The entire substantive argument in Defendants' motion for this claim limitation is a single sentence: "[a]s explained above, Caltech failed to offer evidence sufficient for a reasonable jury to find that the accused encoders repeat bits, much less irregularly." Docket No. 2195 at 27. For the same reasons the Court rejects Defendants' arguments regarding the irregular repeat limitations, this conclusory argument does not warrant disturbing the jury's verdict. *See also supra* n.5.

      *iv.*        <u>"sums of bits" ('781 Patent, Claim 13)</u>

Defendants raise the same argument about this claim limitation that the Court previously considered in pretrial proceedings. After agreeing with Defendants' interpretation of the claim phrase,[8] the Court found that the issue raised by the parties presented a factual question that the jury should resolve.[9] Docket No. 1639 at 10-13. Plaintiff presented evidence at trial to support the factual position that the addition of a reset value and an information bit outputs an information bit, such that the next summation step involves the addition of two information bits. Docket No. 2207 at 4 (collecting trial citations). The jury's verdict as to this claim limitation was sufficiently supported.

      *v.*        <u>Tanner Graph with "random permutation" ('032 Patent, Claims 11
          & 13)</u>

The entire substantive argument in Defendants' motion for this claim limitation is a single sentence: "Caltech offered no trial evidence about **how** the LDPC codes implemented in the accused chips were generated, or **who** generated them − including no evidence about whether a 'random or pseudo random process' was used to change the order of data elements, and Dr. Stark confirmed that it was not random." Docket No. 2195 at 23 (emphasis in original). During pretrial proceedings, the Court considered the parties' dispute regarding the Tanner Graph and the meaning

---

[8] Plaintiff's assertion in its opposition that "[t]he Court previously agreed with Caltech that 'accumulation is a form of summing'" is somewhat misleading because it does not address the meaning of the parties' agreed construction for this claim term itself. Docket No. 2207 at 3-4 (citing Docket No. 1213 at ECF27). The Court found not once, but twice, in pretrial proceedings that "the parties' agreed construction of 'sum[s of bits in subsets of information bits' . . . . requires adding together '*information bits*'" in a particular summation step. Docket No. 1639 at 11 (citing Docket No. 1213 at ECF27); *see also id.* at 12. Ultimately, however, this does not change the outcome here.

[9] Defendants' supplemental brief repeats arguments already raised and rejected during pretrial proceedings. The Court specifically found that "whether the addition of the reset value and an information bit outputs an information bit that is then added to a second information bit such that the "second" summation involves summing two information bits (as opposed to the addition of the reset value and an information bit outputting a new bit)" presents a factual question. Docket No. 1639 at 12. Defendants' competing evidence to the jury to support their position on this factual dispute does not warrant disturbing the jury's verdict.

of the term "random" as used in both the image of the Tanner Graph itself and the Court's construction of the graph.  *See, e.g.* Docket No. 1639 at 4-10.  At Plaintiff's request, the Court eventually construed the term "random permutation," adopting a construction of "changing the order of data elements by a purely random or pseudo random process."  Docket No. 1957.  Defendants' current arguments regarding this claim limitation are reminiscent of arguments it raised during pretrial proceedings and that the Court rejected.  *See* Docket No. 1639 at 4-10.  Defendants impute a meaning into the word "process" as used in the trial construction of "random permutation" that Defendants have not shown supported by the patent intrinsic record.  Sufficient evidence was introduced at trial regarding this claim limitation as it relates to the accused products.  *See* Docket No. 2207 at 4; *see also* Docket No. 1639 at 9 (noting, among other things, Defendants' position "does not address Plaintiff's argument that whether 'random permutation' is random is a fact question that depends on how much permutation has occurred").  Defendants have not shown a basis to disturb the jury's verdict on this issue.

> vi.     *"repeat said stream of bits irregularly and scramble the repeated bits" ('710 Patent, Claims 20 & 22)*

Before trial, the Court found that the claim limitation "repeat said stream of bits irregularly and ***scramble the repeated*** bits" did not include "bits . . . repeated before they are scrambled."  Docket No. 1213 at ECF33.  The Court further stated,

> [t]o the extent Plaintiff's position is simply that the two actions on a large scale can occur simultaneously, this position would likely present fact questions requiring a determination of whether, on a small scale level, repetition of a particular bit has taken place before it is scrambled.  For similar reasons, to the extent Defendants would take the position that the large scale processes of repetition and scrambling must take place completely separately and sequentially, such a position is not necessarily supported by the claim language.

*Id.*

> Defendants now argue:

> Caltech alleged this limitation is met based on bits that, under its own theory, had ***not been regularly repeated***.  Moreover, Caltech offered no evidence that the order of the bits ***output*** from the AND gates (the alleged 'irregularly repeated bits') ever changes—the order does not change, and thus the bits are never scrambled either.

Docket No. 2195 at 24 (emphasis in original).  Plaintiff responds by stating, *inter alia*, "Dr. Shoemake testified the accused products repeat and scramble at the same time, but also testified

that they perform additional scrambling after bits are irregularly repeated, enabling the jury to find infringement even under Defendants' erroneous interpretation."[10]   Docket No. 2207 at 5; *see, e.g.* Docket No. 2153 (Trial Tr. 1.17.2020 (Shoemake)) at 105:16-106:4 ("after [the information] passes through the multiplexers, it's scrambled more, and in fact, you can see the output of those multiplexers goes to something called a one hot coder . . . . And then if we look inside one of the one hot coders, we could see that the information bits are coming in, but then they're being scrambled into different locations."), 106:9-11 ("Q. Okay,  Now, what happens after the information passes through this stage of the block diagram [with the hot coders]? A. Well, there's even more scrambling . . . . There's something in the block diagram called a masked input block . . . . and that block actually performs even more scrambling.").

Defendants do not address these aspects of Shoemake's testimony in their reply brief. Defendants' position also appears to suggest Defendants have a specific interpretation of the meaning of the claim term "irregular."  This dispute seems to hearken back to their dispute regarding the meaning of the term "repeat," discussed *supra*.  *See also* Docket No. 125 at 1 (parties agree in First Amended Joint Claim Construction and Prehearing Statement that terms "irregular"/"irregularity" as they appear in other claims mean "a different number of times").  On the limited record, any additional arguments from Defendants about the meaning of the term "irregular" are rejected.  The Court finds sufficient evidence supports the jury's verdict as it relates to this claim limitation.

*vii.*    *"first coder" / "second coder" ('710 Patent, Claims 20 & 22)*

Defendants argue: (1) that a "coder" must take input bits and output parity bits; (2) what Plaintiff accused as the "first coder" "merely performs part of the equation required for a Richardson-Urbanke LDPC code," and does not itself output parity bits; and (3) therefore, "[b]ecause the whole equation must be performed before any parity bits exist, Broadcom's chips have only a single encoder − not a 'first coder' or 'second coder' as claimed."  Docket No. 2195 at 24.

The term "coder" was not construed in this case, but it was discussed in various pretrial proceedings.  Of note, in an earlier order, the Court observed:

---

[10] Plaintiff's opposition also makes characterizations of the Court's prior order and Claim 20 of the '710 Patent that are not fully supported by the record.  *See* Docket No. 2207 at 4-5.  However, given the evidence presented at trial regarding the additional scrambling in the accused products after the bits have been repeated, this does not change the outcome here.

> In its opening brief, Plaintiff argued that Defendants' experts' opinions regarding the "first coder" recited in Claim 15 of the '710 Patent are improper because Defendants' experts interpret the term to require that it must output parity bits. Docket No. 998 at 12. ***Defendants respond by stating, "Drs. Stark and Blanksby do not contend the claimed 'first coder' must output 'parity bits.'"*** Docket No. 1103 at 19.   In reply, Plaintiff argues that the parties' dispute regarding "first coder" is the same as their dispute regarding "low-density generator matrix." See, e.g. Docket No. 1174 at 6. Thus, the two disputes are considered together.

Docket No. 1213 at ECF19 n.8 (emphasis added).   The parties instead disputed whether, as Defendants argued, the outputted bits of a (LDGM) coder must be ***greater than*** or equal to the inputted bits.   The Court declined to import such a limitation into the claims and otherwise observed that the record presented by the parties about the plain meaning of "coder" was "scanty." *Id.* at ECF21.   The Court found the record "suggest[ed] that the parties' dispute regarding the meaning of the term 'coder' in applying the claims to the accused products is factual." *Id.*   The parties failed to sufficiently and clearly re-raise the issue with the Court in additional pretrial proceedings in a manner that would have permitted the Court to further consider and resolve it. *See, e.g.* Docket No. 1853 at 3 n.1.

Defendants argue that at trial, Shoemake "admitted that the ***plain meaning*** of a 'coder' requires outputting parity bits."   Docket No. 2211 at 15 (emphasis in original).   But at trial, Shoemake testified (including on cross-examination) that "the first coder doesn't have to output parity bits or codewords.   It's just not how a person of ordinary skill in the art would interpret that."   Docket No. 2129 (Trial Tr. 1.27.2020 (Shoemake)) at 209:11-20.   Ultimately, for many reasons, including Defendants' failure to adequately raise this issue in this manner during pretrial proceedings, the record does not support disturbing the jury's verdict.

### *viii.*      *"collection of parity bits" ('032 Patent, Claim 18)*

The entire substantive argument in Defendants' motion for this claim limitation is two sentences:

> The accused decoders receive log likelihood ratios (LLRs) that represent mere ***probabilities*** about what bits were transmitted, but ***never receive the actual parity bits***.   Because probabilities are not bits, as this Court has previously found Dkt. 213 at 32, judgment of no infringement should enter on this claim.

Docket No. 2195 at 25 (emphasis in original).   Plaintiff responds that "Dr. Shoemake testified, based on Broadcom source code, that the 'LLR' inputs to the accused decoders provide not only 'confidence values,' but also the information bits and parity bits themselves."   Docket No. 2207 at

5. Shoemake stated, for example,

> the claim also requires the message passing decoder to be configured to decode a received stream of data bits that include parity bits. I found that in the code . . . . There is an input called LLR inputs. And multiple things are input on this. Information bits are input, the parity bits are input, and also what are called confidences with respect to them, so, in fact, how confident how the decoder is in the parity being a 1 or 0. But information bits, parity bits and confidence values are all input on this LLR input.

Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 58:10-20. In other words, Shoemake testified that the accused decoders received "LLR" *inputs* that included parity bits. Defendants have not identified evidence in the record compelling an outcome that differs from the jury's verdict on this issue.

### ix. *"variable nodes" ('032 Patent, Claim 18)*

The entire argument in Defendants' motion for this claim limitation consists of the following:

> Judgment of no infringement for that claim is required because (1) for this limitation, Dr. Shoemake relied on evidence for an Overlap Min-Sum Decoder device that Broadcom never commercialized and that works differently from the accused chips; (2) the accused Min-Sum permuted layer decoder has no 'variable nodes,' and instead uses gamma registers to perform layered decoding that is very different from the belief-propagation scheme of the Caltech patents; and (3) gamma registers perform no calculations and thus are not variable nodes.

Docket No. 2195 at 25. In response, Plaintiff argues: (1) Shoemake testified at trial that gamma registers satisfy this claim limitation, (2) the "variable nodes" limitation does not include a requirement that the nodes perform calculations, and (3) Shoemake discussed an "Overlap Min-Sum Decoder" to explain "the operation of the larger family of 'min-sum decoders'" but referred to the accused decoders themselves (and their gamma registers) to prove infringement. Docket No. 2207 at 5-6.

The trial record sufficiently supports Plaintiff's points (1) and (3) and shows that Shoemake testified in the manner Plaintiff states. *See* Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 58:23-59:4; Docket No. 2129 (Trial Tr. 1.27.2020 (Shoemake)) at 124:3-127:4. Regarding point (2), the parties present an issue that neither party states was raised for the Court's consideration in pretrial proceedings and for which Defendants now offer only the most cursory of assertions. The Court refuses to disturb the jury's verdict on this basis. To the extent the issue relates to claim construction, it was waived. *TVIIM*, 851 F.3d at 1363. To the extent it presents a factual issue

regarding the application of the plain meaning of the claim language to the accused products, it was resolved in Plaintiff's favor by the jury, with the backing of sufficient evidence at trial.

> x.    *"decoder . . . configured to decode the received data stream that has been encoded in accordance with" the Tanner Graph ('032 Patent, claim 18)*

The entire argument in Defendants' motion for this claim limitation is a single sentence:

> Judgment of no infringement should enter on this claim because Caltech offered no evidence that the accused decoders are used with the accused Broadcom encoders in this manner [(*i.e.*, "to decode the received data stream that has been encoded in accordance with" the Tanner Graph)]—which they are not, as Drs. Stark and Blanksby confirmed.

Docket No. 2195 at 26. In reply, all Defendants add is that Plaintiff's "cited testimony does not support [the] assertion" that "the accused decoders are configured to be able to decode data encoded by an accused decoder." Docket No. 2211 at 15. However, the Court finds that Plaintiff's cited trial testimony adequately supports the assertion, and Defendants' cited testimony from their expert does not warrant overturning the jury's verdict. Docket No. 2207 at 7 (citing Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 58:12-60:17; Docket No. 2123 (Trial Tr. 1/21/2020 (Shoemake)) at 20:3-22:21. To the extent Defendants' argument is somehow premised on Defendants' assertions regarding other claim limitations, including arguments relating to the Tanner graph limitation, it is rejected for the reasons stated in the other portions of this order addressing those limitations. Substantial evidence supports the jury's verdict on this issue.

> xi.   *"stream of bits" / "a received data stream that includes a collection of parity bits" ('710 Patent, Claims 20 & 22)*

Defendants raise the same claim construction argument previously considered and rejected by the Court. Docket No. 1213 at ECF28-29; *see also* Docket No. 1853 at 2 (rejecting Defendants' prosecution history estoppel argument premised on such a construction of this term). The jury's verdict as to these claim limitations was sufficiently supported. Docket No. 2207 at 7 (collecting citations of trial testimony regarding this limitation).

> xii.   *"low-density generator matrix coder" ('710 Patent, Claim 20)*

The entire substantive argument in Defendants' motion for this claim limitation is two sentences: "the evidence shows that the accused chips encode bits (using the different RU method) by using the ***parity-check matrices*** defined in the 802.11 standards—***not*** by using a 'generator matrix,' as claimed. Moreover, if a generator matrix from the 802.11 standards were used, as Caltech says, it would be ***high-density***." Docket No. 2195 at 27 (emphasis in original). Plaintiff

responds that Defendants' argument "is a red herring because the evidence shows the accused products use ***both***" low-density parity check matrices and low-density generator matrices.  Docket No. 2207 at 7 (emphasis in original).  Plaintiff states, "Dr. Shoemake testified that the encoders use generator matrices (as construed by the Court) that are based on the left sides of the LDPC matrices in the 802.11n standard, and computed the densities of those matrices to show they are low density." *Id.*  Defendants reply by stating, "Caltech argues that the accused products use 'both' a low-density parity check matrix and a low-density generator matrix–but the accused products use only one type of matrix, which is a low-density ***parity check*** (LDPC) matrix."  Defendants support this assertion in reply by citing back solely to the same two sentences in their original motion.  Docket No. 2211 at 15-16.  In their supplemental brief, Defendants appear to suggest that this issue relates to a factual dispute, not a claim construction dispute.  *See* Docket No. 2225 at 10.

Based on the parties' competing citations to the record, all Defendants have shown is a battle of the experts that Plaintiff won on the verdict.  *See, e.g.* Docket No. 2153 (Trial Tr. 1.17.2020 (Shoemake)) at 110:2-112:3; 116:11-118:21, 128:6-12, 130:5-131:18; Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 24:24-26:22.  It does not support disturbing the jury's verdict on this basis.

### B.      Damages

#### a.      Background (Plaintiff's Damages Presentation at Trial)

At trial, Plaintiff presented a reasonable royalty theory of damages under the *Georgia-Pacific* framework.  Plaintiff presented its damages theory through two experts: Catherine Lawton and David Teece.  To set the stage for its damages theory, Plaintiff's experts opined that Plaintiff would have engaged in two simultaneous hypothetical negotiations – one with each Defendant – in December 2009.  *See* Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 78:16-20; *see also id.* at 73:1-78:20; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 56:2-12.  In reaching this determination, the experts opined that Inforon - a company owned by Dr. Jin that in 2009 had an exclusive license to the asserted patents - would not be at the hypothetical negotiation table.  *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 106:1-107:5; *see also* Docket No. 2155 (Tr. 1.22.2020 (Farina)) at 28:18-31:16 (stating that Plaintiff would not have permitted Inforon to negotiate a license for the asserted patents with large companies like Defendants, nor would Inforon have entered into agreements with any company without Plaintiff's full consent and involvement).  Teece presented the further opinion that even if it had been Inforon - not Plaintiff - negotiating for a license, it

would not matter.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 107:6-21.  The experts opined that the hypothetical negotiations would have involved running royalties, *i.e.* a royalty calculated on a per-product basis, and not a lump sum amount.  Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 17:15-23, 17:24-18:5; *see also id.* at 18:6-19:6.

Lawton presented opinions regarding how to calculate the royalty base, *i.e.* the number of accused products that should be considered in the damages calculation for the two hypothetical negotiations.  Lawton first conducted an analysis of the locations of certain activities that occurred between Broadcom and Apple to determine whether sales of accused products occurred within the United States, such that those sales would constitute infringing acts under 35 U.S.C. § 271.  *See, e.g.* Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 98:22-100:3.  Lawton's inquiry included, among other things, an evaluation of the parties' two master development and supply agreements ("MDSA"); the proposal, design, and development process between Apple and Broadcom for Broadcom's chips (which Lawton referred to as a "design win" cycle); the process for approval of purchase orders for Broadcom chips; and ███████ practices between the two parties after purchase orders were fulfilled.  *Id.* at 100:9-101:1, 102:9-124:12.  Lawton concluded based on the various activities between the companies that the sale of Broadcom chips to Apple occurred in the United States, even as to chips that never physically entered the United States.  *Id.* at 100:9-101:1

In calculating the royalty base, Lawton ultimately concluded that the Plaintiff-Broadcom hypothetical negotiation would have involved a "chip-level" negotiation for: (1) "chips that Broadcom sold to Apple in the United States that go into Apple devices that are not imported into the United States" (1.03 billion chips) and (2) chips Broadcom itself imports into the United States that are not sold to Apple (51 million chips).  Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 136:2-137:8; *see also* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 9:7-10:8, 51:24-52:2; 52:16-22, 55:17-56:24; Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 102:16-21.  Lawton concluded that the Plaintiff-Apple hypothetical negotiation would have involved a "device-level" negotiation for the Apple devices that Apple imports into the United States and that include the accused Broadcom chips (598.4 devices).  *See* Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 136:2-137:8; *see also* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 9:7-10:8; Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 101:20-102:1.

Both experts emphasized their opinion that separate "chip-level" and "device-level" negotiations would have been proper, rather than a single hypothetical negotiation for all of the

accused products.  *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 23:3-6; Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 101:20-102:1, 102:16-21; *see also id.* at 103:3-24, 104:15-105:9.  They rejected the notion that the ██████████████ of Broadcom and Apple's MDSA should be considered in reaching that conclusion and in considering the hypothetical negotiation construct.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 78:24-79:3; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 50:9-51:7, 52:14-53:13, 91:10-13.  They opined that because Broadcom and Apple are separate infringers, there would be no "cross-talk" between the two Defendants as they each engaged in their own hypothetical negotiation with Plaintiff.  Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 140:19-141:7; *see also* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 75:8-19; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 50:9-51:7, 52:14-53:13.

To calculate the royalty rate, the experts first evaluated an "anchor" or "benchmark" comparable license as to each hypothetical negotiation.  *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 15:15-18; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 6:19-23, 6:24-7:1, 8:3-6, 56:13-18, 63:21-66:10.  For the Plaintiff-Apple negotiation, the experts identified a license agreement between Plaintiff and Hughes that settled a prior litigation involving the asserted patents.  Lawton identified similarities and differences in the circumstances surrounding the "Caltech-Hughes" agreement compared to the hypothetical negotiation that would occur between Plaintiff and Apple in this case.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 11:7-13:11, 28:16-30:5; *see also* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 111:1-112:16.  Among other things, the Caltech-Hughes agreement involved a lump-sum payment, it related to accused satellite communication technology (not wi-fi technology), and was the result of litigation (not a pure license agreement).  Docket No. 2125 (Tr. 1.22.2020 (Teece) at 12:7-12, 13:5-13.  It related to end-devices – specifically, set-top boxes.  *Id.* at 11:25-12:6.  It was signed in 2016, after the 2009 hypothetical negotiation.  *Id.* at 60:24-25.  Lawton also testified that it was the "one and only time someone has paid Caltech for the three patents in this case."  *Id.* at 60:14-16.

For the Plaintiff-Broadcom negotiation, the experts relied on a settlement agreement between the Australian research institute, the Commonwealth Scientific and Industrial Research Organization ("CSIRO," *see* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 118:13-15)) and Broadcom.  Lawton again identified similarities and differences in the circumstances surrounding the "CSIRO-Broadcom" agreement compared to the hypothetical negotiation that would occur between Plaintiff and Broadcom in this case.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 16:5-

13, 17:2-15, 57:6-15, 58:4-59:4; *see also* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 154:6-11, 155:20-156:14.  The CSIRO-Broadcom agreement also involve**d** ██████████████ **an**d was the result of litigation (not a pure license agreement).  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 17:10-15, 57:11-13.  The litigation itself involved a single standard-essential patent relating to a previous generation of wi-fi technology compared to the technology claimed by the asserted patents, and the accused products included some of the same Broadcom chips accused in this case.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 117:18-118:8.  Although it was the result of litigation involving just a single wi-fi patent, the final CSIRO-Broadcom agreement involved ████████ ██████████████  Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 71:19-72:13.  The agreement was signed in 2012.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 16:8-10.

From each of the identified benchmark licenses, Lawton calculated an "imputed" or "effective" royalty rate.  *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 13:21-24, 14:16-24, 17:19-18:6.  The Caltech-Hughes agreement stated the lump-sum royalty payment amount, as well as the number of infringing products implicated by the agreement.  Lawton divided the lump sum settlement amount by the number of listed infringing products to arrive at an imputed royalty rate of $1.13 per product.  *Id.* at 14:23-24.  The CSIRO-Broadcom agreement stated ██████████ royalty payment amount, but not the number of infringing products.  Lawton estimated the number of Broadcom chips covered by the agreement.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 17:24-18:6.  This estimate accounted for Broadcom chip amounts after litigation between Broadcom and CSIRO began; Lawton did not have sales data for the six years prior to the parties' litigation.  *See* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 58:4-59:4, 59:7-60:8.  ██████ ███████████████████████████████████████████████████████████████████ ████████████████████████████  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 18:4-18:6.

Teece relied on Lawton's opinions, including her imputed royalty rates from the Caltech-Hughes and CSIRO-Broadcom agreements, to determine the appropriate royalty rate for the hypothetical negotiations in this case under the *Georgia-Pacific* factors.  In conducting his analysis, Teece also relied on certain technical opinions from Shoemake.  For Apple, he used the imputed $1.13 royalty from the Hughes agreement as the starting point.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 110:14-15, 112:24-25.  He then adjusted upward on the basis of: (1) a "premium" for the fact that the patents are assumed valid and infringed, (2) Lawton's opinions that

wi-fi was critical to Apple's ecosystem in 2009 and Apple was requiring it in its products, (3) Shoemake's opinions about the improved rate, range, reliability, battery consumption, and size offered by the patented technology, (4) Shoemake's opinions about a lack of acceptable non-infringing alternatives.   Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 113:8-20, 113:25-115:3, 115:8-117:13.   Teece also "took comfort" in the fact that, in the prior Hughes litigation, Hughes' expert, Vincent Thomas, had opined that the appropriate range for a royalty rate was $1 to $2 per device.  *Id.* at 153:2-21; *see also* Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 58:13-19.  Based on these considerations, Teece concluded that $1.40 was the appropriate royalty rate as to Apple. Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 110:11-12; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 57:25-58:22 (no mathematical formula employed to get from $1.13 to $1.40).

For Broadcom, Teece used the imputed ▇▇▇ from the CSIRO-Broadcom agreement as the starting point.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 157:8-9.  Teece adjusted upward on the basis of: (1) a "premium" for the fact that the patents are assumed valid and infringed, (2) Lawton's opinions that Broadcom needed to rely on the best wi-fi technology to maintain a competitive advantage, and that Apple was requiring it in its products, (3) Shoemake's opinions about the improved rate, range, and reliability offered by the patented technology and its importance to the device "ecosystem," (4) Shoemake's opinions that the CSIRO technology in the CSIRO-Broadcom agreement was not as good as Plaintiff's technology, (5) Shoemake's opinions about a lack of acceptable non-infringing alternatives, and (6) ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇ since the time of the hypothetical negotiation.  Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 8:10-21; Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 157:6-158:1, 158:7-9, 158:15-159:5, 161:4-8, 159:6-14, 159:19-160:5, 160:11-161:3.  As a "check," Teece also considered an internal email between an employee in Plaintiff's technology transfer office and an individual at SpectraLicensing, a company that assisted Plaintiff in licensing its patents.  The email attached a draft license agreement where SpectraLicensing proposed attempting to license out Plaintiff's patents covering turbo code technology at a $0.30 royalty rate.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 160:11-161:3; *see also* Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 8:21-9:1.  Based on these considerations, Teece concluded that $0.26 was the appropriate royalty rate as to Broadcom.  Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 153:24-154:3; Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 67:18-68:13 (no mathematical formula employed to get from ▇▇▇ to $0.26).

Using these inputs, Teece calculated the total per-unit running royalty for each hypothetical negotiation by multiplying his royalty rate by Lawton's royalty base.  Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 19:7-12.  He opined that $837,801,178 would be the appropriate total running royalty for Apple, and $270,241,171 would be the appropriate total running royalty for Broadcom.  *Id.* at 19:13-19, 19:22-20:20.

*At trial, Defendants did not present a competing damage case, and instead rested their case-in-chief after having called no damages experts of their own.*  The jury found infringement and awarded damages to Plaintiff in the form of a running royalty for the same amounts Plaintiff had sought.  *See* Docket No. 2115.

**b.    Analysis**

Defendants' motion requests judgment as a matter of law or a new trial based on criticisms of almost every single aspect of Plaintiff's damages case.  The Court considers Defendants' challenges in turn.

*i.    Hypothetical Negotiation Dates*

During pretrial proceedings, some of the debate surrounding Plaintiff's damages theory focused on the date of the hypothetical negotiations.  Defendants urged that the evidence presented, including in Plaintiff's experts' reports, supported that Broadcom would negotiate first.  Plaintiff argued that Apple would negotiate first, take its license, and leave the balance of the chips for Plaintiff and Broadcom's negotiation.  The Court found that the date of first infringement for each party, and thus the date of the hypothetical negotiation, was disputed and presented a question of fact for the jury.  *See* Docket No. 1630 (sealed) at 6-7; *see also* Docket No. 1924 (redacted).

At trial, Plaintiff's experts submitted that the two negotiations would have occurred simultaneously.  They identified the importation of sample chips in December 2009 as the act of first infringement triggering the hypothetical negotiations for both Defendants.

Defendants did not object during trial under Rule 37(c) to Plaintiff's experts' "simultaneous hypothetical negotiation" theory,[11] and it was fully presented to the jury. Defendants did not cross examine either of Plaintiff's experts on it, whether by questioning the

---

[11] The Court makes this comment regarding Rule 37(c) simply because during pretrial proceedings, Plaintiff appeared to be advocating for a hypothetical negotiation with Apple ***before*** the one with Broadcom, not ***simultaneously***.  *See* Docket No. 1630 at 6.  Plaintiff's expert reports had disclosed a damages theory where Apple negotiated before Broadcom "conceptually if not chronologically."  Supplemental Expert Report of David J. Teece ("Supp. Teece Report"), Docket No. 1376-1 ¶ 19.

experts on the consistency of their trial testimony about the hypothetical negotiation date compared to their reports, or by questioning the experts about other evidence that could support different hypothetical negotiation dates for the two Defendants. Defendants did not bring their own trial witnesses to rebut the account, either. The record, instead, shows that Lawton's simultaneous hypothetical negotiation theory went essentially unrebutted at trial, and that she supported it by identifying the first importation of chip samples into the United States.

In reply in support of their motion (not in the motion itself), Defendants for the first time argue that an exhibit shows "unrefuted trial evidence that Broadcom imported samples on December 21, 2009, ***before*** making samples available to Apple a month later." Docket No. 2199-1 at 10 (emphasis in original) (citing PTX-635.26-27). Of note, Defendants did not cross-examine Lawton on this exhibit or otherwise identify at trial how it supports their current, late-raised position.[12]

Substantial evidence supported Lawton's simultaneous hypothetical negotiation theory. In addition to relying on the date the sample chips were imported, Lawton presented evidence regarding the relationship between Apple and Broadcom in the design and development of the chips. *See, e.g.* Docket No. 2155 (Tr. 1.22.2020 (Lawton)) at 75:5-11, 78:1-13; *see also id.* at 112:3-113:9. The jury had substantial evidence before it, including based on Lawton's testimony, to conclude that the activities between Apple and Broadcom supported a simultaneous hypothetical negotiation date based on when the first sample of a chip that Broadcom sold to Apple was imported into the United States.

> ii.  *Inforon (Parties to the Hypothetical Negotiation)*

Defendants maintain that Inforon, not Plaintiff, should have been at the bargaining table at the hypothetical negotiation. In pretrial proceedings, Broadcom similarly argued that Plaintiff's damages theory should be excluded on the basis that Plaintiff was not the correct party to the negotiation. The Court considered Defendants' argument that the contract between Plaintiff and Inforon was the sole piece of evidence that should be considered in the determination, and found it was "not necessarily clear that this is indeed a matter of contract interpretation" such that the contract conclusively established as a matter of law that Inforon was the correct party to the

---

[12] That Defendants discussed this exhibit in their Rule 50(a) motion (Docket No. 2018-1 at 6-7) and cited the exhibit in their opening brief in support of their renewed JMOL motion does not change these facts about the record presented to the jury. In any event, as discussed herein, substantial evidence supported the jury's verdict.

negotiations. Docket No. 1630 (sealed) at 6-7; *see also* Docket No. 1924 (redacted). Instead, the Court left the issue open for the jury. That pretrial ruling is incorporated herein by this reference. *See id.* In their post-trial briefs, Defendants still fail to cite any legal authority supporting that, where contracts regarding patent rights exist, the question of who is the proper party to the hypothetical negotiation is necessarily governed by legal contract interpretation alone. This position is rejected, and the Court finds that the issue was properly presented to the jury as factual and in a manner where they were permitted to consider all relevant evidence, including but not limited to the Inforon-Caltech agreement.

At trial, Plaintiff presented evidence to show that Inforon would not have been permitted to conduct negotiations with Broadcom and Apple. This included evidence of the fact that Plaintiff maintained enforcement rights under the Inforon-Caltech agreement, testimony that Plaintiff would not have permitted Inforon to negotiate a license with companies like Apple or Broadcom, and testimony about the working relationship between Plaintiff and Dr. Jin. Docket No. 2155 (Tr. 1.22.2020 (Farina)) at 28:18-30:10. Ultimately, there was substantial evidence presented at trial to support the conclusion that Caltech would have negotiated with Apple and Broadcom, and thus also the jury's verdict.

Defendants cite five brief passages of testimony at trial to support "Inforon's (1) status in 2009 as a small, profit-less, and cash-hungry startup, (2) low valuation of its own assets, including its license to the Caltech patents, and (3) lack of interest in Wi-Fi as of 2009." Docket No. 2195 at 10 n.10 (citing Docket No. 2199 (Tr. 1.16.2020 (Jin)) at 31:4-32:5, 32:12-22, 35:13-40:3; Docket No. 2155 (Tr. 1.22.2020 (Farina)) at 26:15-27:6, 30:4-7). There was also testimony, however, that Jin understood the asserted patents were valuable at the time. *See, e.g.* Docket No. 2199 (Tr. 1.16.2020 (Jin)) at 32:6-9. Teece also testified that the outcome of the hypothetical negotiation would have been the same if Inforon had negotiated instead. Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 107:6-21. Defendants did not present any expert witness testimony to the contrary, such as to explain how Inforon's status in 2009 would impact the outcome of an evaluation under the *Georgia-Pacific* factors. Even if Inforon was the correct party to the negotiation, the jury was entitled to credit, without any alternative expert opinion, Teece's determination that the outcome would have been the same, including because Inforon would still have the benefit of the book of wisdom in its negotiations. *See id.*

        iii.        <u>*"Extraterritorial" Broadcom Chips in the Royalty Base*</u>

All of the accused chips in this case were manufactured by Broadcom.  Most of them made their way into Apple devices.  Of those Apple devices with Broadcom chips, some percentage remained physically outside of the United States.  In pretrial proceedings, Broadcom moved for summary judgment on the basis that no act of infringement occurred in the United States as to these chips.  The Court denied the motion, finding that questions of fact existed regarding the location of Broadcom's sales of the chips to Apple.  *See generally* Docket No. 1212 (sealed); *see also* Docket No. 1431 (redacted).  Among other evidence, the Court considered Defendants' MDSA, the parties' dispute regarding whether the Apple-Broadcom relationship involved "design wins," and certain ██████ practices between the two Defendants as far as chip prices.  *Id.* at 8-14.

At trial, much the same evidence was presented to the jury.  Defendants now largely repeat the same arguments that were rejected at the summary judgment stage.[13]  Namely, citing *Halo*, they argue as a matter of law that the foreign purchase orders between Broadcom and third parties should define the location of the sales.  The Court incorporates its pretrial ruling regarding extraterritorial sales by reference herein, and rejects Defendants' repeated legal arguments on the same bases.  *See generally id.*  Substantial evidence was presented at trial to support the jury's verdict on this issue, including testimony about the legal obligations created by ████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████[14]  *See* Docket No. 2207 at 12-14 (collecting citations from trial transcripts).  This evidence included sufficient evidence to distinguish this case from the facts at issue in *Halo*.

Defendants alternatively argue that a new trial is warranted based on "multiple erroneous jury instructions."  *See, e.g.* Docket No. 2199-1 at 3.  Defendants argue the Court improperly

---

[13] The Court has considered the arguments in Defendants' supplemental brief regarding extraterritorial sales.  They also largely repeat arguments presented by Defendants (1) during pretrial proceedings and (2) in the originally-submitted briefing regarding JMOL.  *See* Docket No. 2225 at 3.  They are found unpersuasive for the same reasons stated herein and in the Court's prior orders.

[14] The parties dispute whether substantial evidence would support a jury conclusion that Broadcom and Apple's sales model rested on "design wins."  As Plaintiff notes, its experts cited design wins as just one evidentiary factor of many to support that Broadcom's sales of accused products to Apple occurred in the United States.  Docket No. 2207 at 11-12.  Moreover, the jury was entitled to credit Lawton's testimony, based on her review of Defendants' documents and testimony, that under her understanding of "design win," Broadcom had obtained design wins from Apple with respect to the accused products.  *See id.* at 13-14.

instructed the jury, identifying portions of the following instruction to support their argument:

> Whether a sale occurs in the United States may depend on the facts including where the legal commitment to buy and sell occurred and where other substantial activities of the sales transactions occurred, such as negotiating and contracting. A sale agreed to in the United States can be completed in the United States even though delivery is to be made outside the United States in the future. Also, a sale can occur in the United States based on the 'design win' process. In a design win market, the sales are design wins made in the United States where the design of the products or method occurs in the United States and the buyer selects that design in the United States, not a steady flow of discrete product sales outside the United States. The United States sales cycle leading to design wins could also trigger United States sales.

Docket No. 2112 at 12.

First, Defendants argue that the instruction's references to "negotiating and contracting" (or "pricing and contracting negotiations") are incorrect under *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1376 (Fed. Cir. 2016). Those aspects of the instruction are supported by both *Halo* and *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1311 (Fed. Cir. 2015) ("*CMU*"). In *CMU*, the Federal Circuit stated:

> [t]he standards for determining where a sale may be said to occur do not pinpoint a single, universally applicable fact that determines the answer, and it is not even settled whether a sale can have more than one location. *See Halo*, 769 F.3d at 1378-79 (collecting cases; relying in part on *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994)). Places of seeming relevance include a place of inking the legal commitment to buy and sell and a place of delivery, *see id.*; *Transocean*, 617 F.3d at 1311; *cf. Norfolk & W. Ry. Co. v. Sims*, 191 U.S. 441, 447, 24 S.Ct. 151, 48 L.Ed. 254 (1903), and perhaps also a place where other "substantial activities of the sales transactions" occurred, *Halo*, 769 F.3d at 1379 & n. 1 (focusing on where "substantial activities of the sales transactions" occurred, but declining to decide whether the location of contract formation on the facts of that case would have established a sales location).

*Id.* at 1308. Of note, the jury instructions also clarified, consistent with *Halo*, that:

> if substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as well as the delivery and performance under that sales contract occurs entirely outside the United States, then pricing and contracting negotiations in the United States alone do not constitute or transform those extraterritorial activities into a sale within the United States.

Dkt. 2112 at 12-13; *see Halo Elecs., Inc.*, 831 F.3d at 1378 ("when substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as

well as the delivery and performance under that sales contract, occur entirely outside the United States, pricing and contracting negotiations in the United States alone do not constitute or transform those extraterritorial activities into a sale within the United States for purposes of § 271(a).").  The suggestion made in Defendants' challenge is that the place of sale can only be where the "legal commitment to buy and sell" occurs (and Defendants argue that in this case, that "legal commitment to buy and sell" can only be the purchase orders).  This suggestion is not supported by *CMU*, which is not so restrictive.  The Court's jury instruction was not legally erroneous.

Second, Defendants argue that the Court erred in the portions of its instruction relating to the design win process.  Defendants argue that under *Halo*, "mere 'design win' activities cannot convert a foreign sale into a domestic one."  Docket No. 2195 at 3.  As an initial matter, the jury instruction stated that "a sale **can** occur in the United States based on the 'design win' process . . . . The United States sales cycle leading to design wins **could also trigger** United States sales."  Docket No. 2112 at 12 (emphasis added).  These instructions were made in the context of other instructions explaining that where a sale occurs may depend on "where the legal commitment to buy and sell occurred and where other substantial activities of the sales transactions occurred, such as negotiating and contracting" and warning that a sale cannot occur in the United States where "if substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as well as the delivery and performance under that sales contract occurs entirely outside the United States."  *Id.*  Moreover, *Halo* did not discuss the design win process, whereas *CMU* did.  *CMU* remanded the case for a new trial as to certain accused products after noting that evidence at trial included evidence of a design win cycle related to the defendants' accused products:

> Chip designers like Marvell sell customized chips with designs specifically tailored for incorporating into customers' products . . . .  Because of the customized nature of the chips, designers and potential customers put themselves through a lengthy "sales cycle" involving extensive joint work over several years, before any sale is made and chips enter mass production. Only at the end of that sales cycle, if the chip designer is successful, does it secure a "design win," but that win generally results in a customer's exclusive use of that designer's customized chip for a certain period, amounting to tens or hundreds of millions of chips over several years.

*CMU*, 807 F.3d at 1309.  *CMU* thus signaled that the factual evidence related to the design win process could be relevant to determining a location of sales.  The Court's jury instructions reflects

the Court's consideration of this discussion in *CMU*.[15]

Finally, Defendants argue that the Court erred "by not instructing on the presumption against the extraterritorial reach of patent law."  Docket No. 2195.  The Court gave a jury instruction specifically focused on the place of sale, including by presenting the issue as one of whether a sale has occurred in the United States.  Docket No. 2112 at 12 ("Whether a sale occurs in the United States may depend on . . .").  This is exactly what *CMU* had found lacking.  *See CMU*, 807 F.3d at 1310-11.  That the Court did not explicitly include a statement advising against the extraterritorial reach of patent law does not make the instructions erroneous.

### iv. Plaintiff's "Two-Tier" Damages Theory

Defendants' most critical challenge relates to Plaintiff's presentation of a "two-tier" damages theory, *i.e.* a theory that involves two separate hypothetical negotiations with different resulting royalty rates as between each of the two Defendants.

Defendants cite general legal authority for the proposition that there can be only one hypothetical negotiation per case.  *See* Docket No. 2195 at 6 (citing, *e.g.*, *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012)).  None of Defendants' cited cases address the circumstance presented here: a single lawsuit and trial against both the chip manufacturer and end-product seller.  Defendants opted to litigate the case together, waiting until three years of pretrial proceedings had passed before moving for severance and stay of the claims against Apple under the customer-suit exception.  *See* Docket No. 1923 at 12-14.  But even if the suit against Apple had been severed and stayed pending Plaintiff's trial against Broadcom, there is no basis to say that Plaintiff could not have still separately sought damages from the two Defendants in the manner it ultimately did.  Patent owners will sometimes seek damages from accused infringers at different levels in the supply chain, and so long as they do not attempt to obtain a double recovery or violate other legal principles like patent exhaustion, they are free to do so.

That those separate hypothetical negotiations resulted in separate royalty rates does not change the outcome, either.  As Plaintiff notes, the reasonable royalty damages inquiry focuses on

---

[15] Moreover, as noted, the testimony at trial regarding whether or not Broadcom and Apple engaged in design win sales cycles provides just on factor combined with significant other evidence that the jury considered regarding U.S. activities between the two companies relating to chip sales.  *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 641 (Fed. Cir. 2011) ("when the error in a jury instruction could not have changed the result, the erroneous instruction is harmless . . . . Where the procedural error was 'harmless,' *i.e.,* where the evidence in support of the verdict was so overwhelming that the same verdict would necessarily be reached absent the error, or the error was cured by an instruction, a new trial would be mere waste." (internal quotations omitted).)

the amount of value that the patented technology adds to a product.  Docket No. 2207 at 16 (citing *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)).  For Broadcom and Apple, different companies at different levels in the supply chain, those "products" were different.  This difference was similarly reflected in the different comparable license agreement that Lawton and Teece used to "anchor" each negotiation: the Caltech-Hughes agreement considered end-products, while the CSIRO-Broadcom agreement considered some of the same Broadcom chips at issue in this case.  These agreements reflect that Broadcom's and Apple's relative position in the supply chain created commercial considerations under the *Georgia-Pacific* factors that were relevant to the inquiry.  *See also, e.g.*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("We have recently reiterated that use of past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties.")

Defendants suggest that the doctrine of patent exhaustion supports their position.  As with some of Defendants' other arguments, this one is intertwined with their assertion that "Broadcom's alleged infringement occurred first," such that the hypothetical negotiation between Plaintiff and Broadcom would have occurred first.  *See, e.g.* Docket No. 2199-1 at 8.  But as already discussed, substantial evidence was presented at trial for the jury to find that the hypothetical negotiations occurred simultaneously.  This intertwined argument is also rejected.

The discussion and analysis provided in *Carucel Investments, L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838 (S.D. Cal. Apr. 3, 2017) is instructive.  In the context of *Daubert* motions, the court considered the parties' disputes over whether there should be separate hypothetical negotiations for two defendants in the case.  The defendants' expert had opined, for example "that there would be no hypothetical negotiation between Plaintiff and Verizon because the hypothetical negotiation between Plaintiff and Novatel would have covered Verizon's infringement."  *Id.* at *9.  The district court agreed with the plaintiff that each defendant would have had to separately negotiate in a hypothetical negotiation.  The district court stated,

> [t]he Federal Circuit has explained that a separate and distinct infringement "requires a separate evaluation of reasonable royalty damages." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1362 (Fed. Cir. 2006). Further, because the hypothetical negotiation presumes "a willing licensor and licensee," *LaserDynamics*, 694 F.3d at 75-76, Dr. McDuff cannot assert that Verizon would not have engaged in the hypothetical negotiation with Plaintiff.  Whether Verizon would have actually negotiated with Plaintiff is

irrelevant to the hypothetical negotiation.  *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 171 (2d Cir. 2001), *as amended* (May 15, 2001).

In addition, the primary cases relied on by Defendants in support of Dr. McDuff's position—*Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed. Cir. 1983) and *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 857 (Fed. Cir. 2006)— are distinguishable from the present situation at this stage in the proceedings. In *Stickle*, the Federal Circuit explained that when damages are based on a reasonable royalty, "a reasonable royalty is not to be separately calculated against each successive infringer.  Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal additional damages may be awarded against another with respect to the same device." 716 F.2d at 1562; *see also Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006) ("[A] party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product."). Here, there has not yet been a full recovery from one infringer with respect to the accused products. Thus, *Stickle* and *Glenayre* are inapplicable at this time.  *See Cambrian Sci. Corp. v. Cox Comm'ns, Inc.*, No. SACV111011AGJPRX, 2012 WL 12894475, at *3 (C.D. Cal. Nov. 19, 2012) (finding *Stickle* distinguishable because at the stage of the litigation "full recovery has not been obtained from any of the alleged infringers"). Accordingly, the Court grants this aspect of Plaintiff's *Daubert* motions.  The Court excludes Dr. McDuff's opinion that there would have been no hypothetical negotiation between Carucel and Verizon.

*Carucel*, 2017 WL 1215838, at *9; *see also id.* at *12 ("[plaintiff's expert] can perform this separate reasonable analysis despite the existence of an indemnity agreement between Novatel and Verizon.").

    Defendants argue, however, that *Carucel* ultimately supports their position.  Later in the order, when addressing the defendants' challenge to plaintiff's expert's separate hypothetical negotiations, the district court added a warning about plaintiff's ultimate recovery:

the Court expressly notes that although Plaintiff through Dr. Kennedy may present to the jury a reasonable royalty analysis as to Novatel and a separate reasonable royalty analysis as to Verizon, Plaintiff may not recovery both reasonable royalties.  In *Stickle*, the Federal Circuit explained that when damages are based on a reasonable royalty, "a reasonable royalty is not to be separately calculated against each successive infringer. ***Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal additional damages may be awarded against another with respect to the same device.***" 716 F.2d at 1562; *see also Glenayre Elecs.*, 443 F.3d at 864 ("[A] party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that

product.").  Dr. Kennedy clearly states in his expert reports that he has performed two separate reasonable royalty analyses based on two separate hypothetical negotiations—one involving Carucel and Novatel and one involving Carucel and Verizon—to determine what Novatel would have paid for a license to the patents-in-suit and what Verizon separately would have paid for a license. (See Doc. No. 187-1, Kennedy Report at 19, 51-55; Doc. No. 187-1, Kennedy Supp. Report at 2, 54-61.)  Because these reasonable royalty determinations are separate as to the two successive infringers, Plaintiff may not recover both royalties.  *See Stickle*, 716 F.2d at 1562; *Glenayre*, 443 F.3d at 864; *see also* Donald S. Chisum, Chisum on Patents § 20.03[7][b][iii]2 (2017.) ("[R]ecovery of an appropriate royalty-based award against an infringing manufacturer should preclude any further recovery against resellers or users of the products in question.").

*Carucel*, 2017 WL 1215838, at *13 (emphasis added).  These statements in *Carucel* make sense when damages calculations against two defendants involve overlapping royalty bases.  This would have occurred, for example, if Plaintiff had sought royalties from Broadcom for the Broadcom chips that were incorporated into Apple products imported into the United States, and then sought royalties from Apple for the ***same*** Apple products with Broadcom chips imported into the United States.  The effect would have been that the exact same "particular infringing device[s]" would be tagged for two rounds of reasonable royalties.  But that did not occur here.  Instead, Plaintiff sought to recover for less than the full royalty base it could have technically sought from Broadcom, and instead sought royalties for that portion of the royalty base from Apple.   There was no double recovery, and without it, the concerns discussed by *Carucel* and *Stickle* about the ultimate recovery under multiple reasonable royalties are not present here.  Instead, the Court finds *Carucel* largely consistent and instructive in finding that the plaintiff's two separate hypothetical negotiations against two different defendants was appropriate.[16]

Defendants also urge that under their MDSA, ███████████████████████ ████████████████████████████████████ Defendants state there is no evidence that "Apple would have paid—█████████████████—a royalty rate ***five times more*** than what Broadcom was paying for the same chips."  Docket No. 2195 at 8 (emphasis in original).  But as Plaintiff notes, the ████████████████ assumes that ongoing infringement has already occurred and a suit has been filed; the hypothetical negotiation is intended to assume neither.  Instead, the hypothetical negotiation seeks to preemptively strike a deal as soon at the

---

[16] The Court has considered the additional arguments in Defendants' supplemental brief regarding the proper interpretation of the legal authority addressed in this section of the ruling and finds those arguments unpersuasive.

time the first infringing act occurs.  Moreover, as Plaintiff notes, the hypothetical negotiation is a legal construct focused exclusively on valuing the technology at issue as between the two negotiators; who is ultimately liable is not at issue.  This understanding is consistent with the fact that in other patent lawsuits where the single defendant in the suit might be ▮▮▮▮▮▮ by an unnamed third party, damages are calculated as to its infringing conduct anyway, without consideration given to that ▮▮▮▮▮▮ for purposes of trial and damages calculation.[17]

Defendants also urge that concepts relating to apportionment and the smallest salable patent-practicing unit support their position.[18]  They state that the "drastically different rates based on the *same* accused functionality confirm that Caltech failed to use a smallest salable patent-practicing unit analysis."  Docket No. 2195 at 7-8 (emphasis in original).  But Plaintiff's experts did not present a damages theory that relied on the identification of the smallest salable patent-practicing unit and apportionment of that SSPU.  Instead, as discussed, Plaintiff's damages theory focused on comparable license agreements as the starting point in the damages analysis.  This approach is permitted by Federal Circuit authority.  *See also Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (noting that royalty rate calculated based on consideration of a "public rate card" license offer for the asserted patent "already built in apportionment" and further stating, "otherwise comparable licenses are not inadmissible solely because they express the royalty rate as a percentage of total revenues, rather than in terms of the smallest salable unit."); *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019).  The Caltech-Hughes agreement involved the same asserted patents and accused end products, and testimony supported that the CSIRO-Broadcom agreement involved litigation of a precursor Wi-Fi technology in some of the same accused Broadcom chips in this case.  Teece used these comparable licenses as inputs, and adjusted based

---

[17] **In their supplemental brief**, Defendants argue that in making these statements, the Court "announces a blanket rule that ▮▮▮▮▮▮ **are irrelevant to a hypothetical** negotiation analysis."  Docket No. 2225 at 7.  The Court clarifies here that its discussion of the ▮▮▮▮▮▮ **is related to the specific circ**umstances of this case.  The Court observes that neither party has cited a case where an ▮▮▮▮▮▮ **ha**s been a relevant consideration in a *Georgia-Pacific* hypothetical negotiation, but the Court cannot **say that such a circumstance** could never arise.  The Court further notes that some of Defendants' arguments about the ▮▮▮▮▮▮ in this case are premised on the assumption that Apple negotiated first, not on the theory the parties negotiated simultaneously.  *See* Docket No. 2225 at 8.

[18] Defendants argue again that Plaintiff's experts failed to properly apportion in another section of their motion.  Docket No. 2195 at 11.  For the reasons stated here, and based on the nature of the benchmark agreements that Plaintiff's experts discussed and considered (discussed *infra*), Defendants' arguments in that separate section of its motion are also rejected.

on the particular circumstances surrounding this case.

Defendants stress that real-world circumstances and common sense require finding the two-tier hypothetical negotiation inappropriate as a matter of law or otherwise necessitate a new trial. *See, e.g.* Docket No. 2195 at 8.  The jury was presented with Plaintiff's damages theory, including its experts' arguments that Plaintiff would have sought to negotiate at both the chip and device level for infringement of its patents.  Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 23:3-6; Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 101:20-102:1, 102:16-21, 103:3-24, 104:15-105:9.  The jury was also presented with Defendants' competing position, including through cross-examination and closing arguments.  Defendants opted not to present damages experts with a competing theory to the two-tier hypothetical negotiation model.  Ultimately, Defendants have failed to show that the theory was legally unsupportable or that the jury's verdict was against the weight of the evidence.  For the reasons already explained, including both the practical realities of patent infringement actions and the contours of the hypothetical negotiation construct, the Court finds the two-tier hypothetical negotiation theory sufficiently supported by the evidence.

*v.*     *Waived Arguments Regarding Benchmark License Agreements*

Defendants' motion also challenges Plaintiff's experts' use of the Caltech-Hughes and CSIRO-Broadcom agreements as comparable license agreements, on many bases.  In opposition to Defendants' motion, Plaintiff identifies seven of Defendants' arguments that it asserts have been waived.  The Court has rearranged and regrouped those arguments as follows:

Defendants' current arguments that were not presented to the Court during pretrial proceedings *or* to the jury:

- "the Hughes settlement was not comparable because it covered a Caltech patent not asserted here."[19]

- "the CSIRO License is not comparable because the parties were 'economically different'"

- "settlement agreements require a downward adjustment"[20]

---

[19] Plaintiff also argues that "[e]ven if not waived, Defendants failed to introduce any evidence that the other patent, which is a continuation of the patents-in-suit, delivered any unique value."  Docket No. 2207 at 27 n.17.  The Court agrees.

[20] Defendants argue that during pretrial proceedings, they challenged Plaintiff's reliance on settlement agreements.  It is true that during pretrial proceedings, Defendants quoted from *LaserDynamics*, where the Federal Circuit noted that a disputed settlement agreement "ostensibly reflects not the value of the claimed invention but the strong desire to avoid further litigation under the circumstances."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 78 (Fed. Cir. 2012).  Neither Defendants' pretrial arguments nor this quote from *LaserDynamics* specifically relates to a

The Court agrees that these arguments were not adequately preserved during pretrial proceedings or at trial.

Defendants' argument that was presented to the Court during pretrial proceedings, where the Court declined to find the argument as a basis to exclude the agreement (*see* Docket No. 1630 at 7-8; Docket No. 1298 at 25), but the argument was not presented to the jury as a factor to consider:

- "the CSIRO license is not comparable because ██████████████████████"

The Court agrees that Defendants waived this argument by failing to preserve it at trial. Moreover, the Court maintains its original determinations regarding this argument. *See* Docket No. 1630 at 7-8; Docket No. 1298 at 25.

Defendants' arguments that were not presented to the Court during pretrial proceedings, but were (briefly) raised before the jury in cross-examination and rejected in the verdict:

- "the Hughes and CSIRO licenses are not comparable because they post-date the [hypothetical negotiation]"[21]
- "the CSIRO License is not comparable because ██████████████"
- "Ms. Lawton's analysis of the imputed royalty for the CSIRO license was not accurate"

Defendants made numerous arguments about Plaintiff's experts' reliance on and analysis of these license agreements during pretrial proceedings, yet these three arguments were not among them. The Court agrees that under these circumstances, particularly where the jury also heard and considered Defendants' assertions on these topics, the Court will not further consider them here. As explained in *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010),

> [d]espite potential flaws in Finjan's damages theory, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i*

---

downward adjustment to the hypothetical negotiation for a settlement agreement. The disputed settlement agreement in *LaserDynamics* involved circumstances where the accused infringer settled on the eve of trial and would have been "at a severe legal and procedural disadvantage" at trial "given the numerous harsh sanctions imposed on it by the district court." *Id.* Here, the evidence presented regarding the Caltech-Hughes and CSIRO-Broadcom agreements did not suggest a similar record. Teece explained that his upward adjustment was warranted because the uncertainty regarding whether the asserted patents were invalid and infringed in the context of these settlement agreements was lifted in the hypothetical negotiation construct in the context of this case. *See, e.g.* Docket No. 2126 (Tr. 1.23.2020 (Teece)) at 113:4-20. There was no meaningful cross-examination on this issue or presentation of an alternative opinion about the facts surrounding the execution of these settlement agreements, and Teece sufficiently explained this basis for his upward adjustment.

[21] Plaintiff also notes that "[m]any cases have confirmed use of comparable licenses that post-date the [hypothetical negotiation]." Docket No. 2207 at 27 n.18 (citing, *e.g.*, *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)).

> *Limited Partnership, Infrastructure for Information Inc. v. Microsoft Corp.,* 598 F.3d 831, 856 (Fed. Cir. 2010). "In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes," *C & F Packing Co. v. IBP, Inc.,* 224 F.3d 1296, 1304 (Fed. Cir. 2000)—provided that the record does not "rest on faulty assumptions and a lack of reliable economic testimony," *Oiness v. Walgreen Co.,* 88 F.3d 1025, 1032 (Fed. Cir. 1996).

*Id.* Particularly here, where the issues were not raised by Defendants in pretrial proceedings, the jury acted within its bounds in considering and rejecting them. As also discussed further herein, the Court otherwise finds that the Hughes-Caltech and CSIRO-Broadcom agreements were sufficiently comparable for Plaintiff's experts to rely on them as benchmarks in their damages calculations at trial.

vi.     *"Benchmark" License Agreements*

Defendants present a bucket list of other arguments beyond the seven discussed in the preceding section to argue that the Hughes-Caltech and CSIRO-Broadcom agreements are not comparable license agreements. *See* Docket No. 2195 at 12-14, 15-16.

The Federal Circuit has discussed the use of prior license agreements to determine a reasonable royalty, stating, *inter alia,*

> [w]e have held that in attempting to establish a reasonable royalty, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent,* 580 F.3d at 1325. "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics,* 694 F.3d at 79. However, we have never required identity of circumstances; on the contrary, we have long acknowledged that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.' " *Lucent,* 580 F.3d at 1325 (quoting *Unisplay,* 69 F.3d at 517). Thus, we have cautioned that "district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patent in suit," *ResQNet,* 594 F.3d at 869, and "must account for differences in the technologies and economic circumstances of the contracting parties," *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1211 (Fed. Cir. 2010).
>
> *       *       *
>
> In *ResQNet,* we faulted the district court for relying on licenses with "no relationship to the claimed invention," nor even a "discernible link to the claimed technology." 594 F.3d at 870. And in *Lucent,* we rejected reliance on licenses from "vastly different situation[s]" or where the subject matter of certain agreements was not even ascertainable from the evidence presented at

38

trial. 580 F.3d at 1327-28. The licenses in this case—though not immune from challenge—bear a closer relationship to the hypothetical negotiation that would have occurred.

This case is therefore much more akin to the circumstances in *Finjan* and *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.,* 694 F.3d 1312 (Fed. Cir. 2012). In *Finjan,* there were several differences between the single license relied upon and the hypothetical negotiation, most notably that Finjan did not compete with the licensee as it did with the defendant in the case, and that the license involved a lump sum rather than a running royalty. 626 F.3d at 1212. Nevertheless, we affirmed the damages award based on that license because "[those] differences permitted the jury to properly discount the . . . license." *Id.* And in *ActiveVideo,* the damages expert relied on two agreements, one of which post-dated the hypothetical negotiations by two years, did not involve the patents-in-suit, and did not cover the technologies in the case, while the other agreement covered both patents *and* software services. 694 F.3d at 1333. Nevertheless, we concluded that the "degree of comparability" of the license agreements was "[a] factual issue[ ] best addressed by cross examination and not by exclusion." *Id.* Similarly, here, though there were undoubtedly differences between the licenses at issue and the circumstances of the hypothetical negotiation, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd* [564 U.S. 91] (2011).

*VirnetX*, 767 F.3d at 1330-31 (emphasis and alterations in original). In *Ericsson*, the Federal Circuit further explained,

licenses may be presented to the jury to help the jury decide an appropriate royalty award. *See, e.g., Monsanto Co. v. McFarling,* 488 F.3d 973, 978 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention...."); *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970) (finding that "royalties received by the patentee for the licensing of the patent in suit" is a relevant factor for the jury to consider). Prior licenses, however, are almost never perfectly analogous to the infringement action. *VirnetX,* 767 F.3d at 1330. For example, allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or, as here, be calculated as some percentage of the value of a multi-component product. Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention. Recognizing that constraint, however, the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility. *See Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1326 (Fed. Cir. 2014) ("Here, whether these licenses are sufficiently comparable such that Motorola's calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility."); *accord ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.,* 694 F.3d 1312, 1333 (Fed. Cir.

2012) ("Although we may not have decided these evidentiary issues the same way had we presided over the trial, the district court did not abuse its discretion."). In each case, district courts must assess the extent to which the proffered testimony, evidence, and arguments would skew unfairly the jury's ability to apportion the damages to account only for the value attributable to the infringing features.

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014).

With these requirements guiding the Court's inquiry in both pretrial and post-trial proceedings (*see* Docket No. 1630), Defendants' arguments that Plaintiff should not have been permitted to rely on the Hughes-Caltech and CSIRO-Broadcom agreements for its damages calculations must fail. There were undoubtedly differences between those agreements and the hypothetical negotiation. Those differences were submitted to the jury. *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Lawton)) at 11:7-13:11, 16:5-13, 17:2-15, 28:16-30:5, 57:6-15, 58:4-59:4; *see also* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 111:1-112:16, 154:6-11, 155:20-156:14; *Finjan*, 626 F.3d at 1212.

As already discussed, the Hughes-Caltech agreement is the only existing agreement to the asserted patents. *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1381 (Fed. Cir. 2017) ("The BlackBerry settlement agreement was relevant here because it contained a license of the very patents Samsung was found to infringe."); *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421, 2014 WL 1389304, at *3 (E.D. Tex. Mar. 6, 2014) (Dyk, J.) (noting the Federal Circuit's "longstanding disapproval of relying on settlement agreements" but concluding that expert's testimony regarding two settlement agreements would not be excluded because "these licenses are the *only* licenses in the record and cover the patents-in-suit, plus one additional, closely-related patent." (emphasis in original).).

Testimony, meanwhile, supported a determination that the CSIRO-Broadcom agreement involved a precursor Wi-Fi technology to that of the asserted patents, and implicated some of the same accused products in this case. *See, e.g.* Docket No. 2125 (Tr. 1.22.2020 (Teece)) at 117:18-118:8; *see also ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (plaintiff's expert permitted to rely on license agreements even though they "did not involve the patents-in-suit and did not cover any of the technologies in the case"), Docket No. 2207 at 26 (identifying additional citations to trial testimony).

That the agreements involved ███████████████ does not warrant a different outcome. *See VirnetX*, 767 F.3d at 1331. The Court also previously considered and rejected Defendants'

argument that certain self-serving statements in the agreements about how the agreements could (or could not) purportedly be used in conducting hypothetical negotiations warranted exclusion. *See* Docket No. 1630 at 7. Ultimately, Defendants' challenges properly went to the weight, not admissibility, of the agreements.[22]

> vii.    *Upward Adjustments to Imputed Royalty Rates to Arrive at Royalty Rates for this Case*

Defendants' challenges to Plaintiff's expert's upward adjustments to the imputed royalty rates from the Caltech-Hughes and CSIRO-Broadcom agreements are also unpersuasive. Defendants cite no legal authority supporting that a mathematical formula is required to perform such an adjustment. Plaintiff's experts also provided substantial evidence to support them, such that they were not plucked "out of thin air." Docket No. 2125 (Tr. 1.22.2020 (Teece) at 113:8-20, 113:25-115:3, 115:8-117:13, 157:6-158:1, 158:7-9, 158:15-159:5, 161:4-8, 159:6-14, 159:19-160:5, 160:11-161:3; Docket No. 2126 (Tr. 1.23.2020 (Teece) at 8:10-21; *cf. LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (a "one-third apportionment" "based on vague qualitative notions of the relative importance of [accused] technology" was akin to "arbitrariness of the '25% Rule'"). Some of Defendants' characterizations of the testimony Plaintiff's experts presented at trial on this issue are not persuasive, and overall, Defendants' challenges do not warrant judgment as a matter of law or a new trial.[23]

> viii.    *Exclusion of Defendants' Alleged Comparable Licenses, FRAND-Related Damages Concepts, and Technical Apportionment Opinions*

During pretrial proceedings, the Court considered motions to exclude a vast range of the parties' proffered expert opinions. Among (many) other determinations, the Court found that

---

[22] In a different section of its motion, Defendants re-raise an argument that it was unfair that Plaintiff's expert could rely on the CSIRO-Broadcom agreement, which involved a standard essential patent, when Defendants' experts were precluded from relying on damages theories associated with standard essential patents and FRAND rates (including concepts of royalty stacking and evaluation of patent pools) to support their competing damages theories. Docket No. 2195 at 19. The circumstances presented by the Plaintiff's reliance on the CSIRO-Broadcom agreement and Defendants' FRAND-related damages theories are not analogous. The Court also notes that Defendants' expert's opinions "based on facts and evidence regarding the circumstances present when the parties entered the CSIRO-Broadcom Agreement" were not excluded during pretrial proceedings. Docket No. 1630 at 7.

[23] Defendants' supplemental brief re-raises their argument that Teece should not have been permitted to rely on the SpectraLicensing proposal to support his upward adjustment for Broadcom. *See* Docket No. 2225 at 8. During pretrial proceedings, the Court considered and rejected-in-part Defendants' request that opinions regarding the SpectraLicensing proposal be excluded. *See* Docket No. 1630 at 8-9. The Court similarly finds Defendants' current arguments regarding the SpectraLicensing proposal unpersuasive.

Defendants' technical expert, Stark, had offered improperly conclusory expert opinions: (1) in his comparison of the accused technology to other features on the Broadcom chips and (2) in his review of technology at issue in certain third party patent portfolios, both in comparison to the asserted patents in this case and to the 802.11 standard.  Docket No. 1630 at 3-4 (sealed); *see also* Docket No. 1924 (redacted).  The Court further found that Defendants' damages expert, Thomas, had relied on Stark's faulty opinions and thus did not have a sound basis for his damages opinions building on assumptions from Stark's work.  *Id.* at 5-6.  Moreover, the Court concluded that "Thomas has not adequately shown that his reliance on damages calculation methodologies that involve SEP/RAND-encumbered patents, including based on royalty stacking opinions and . . . patent pools, are appropriate given the facts of this case."  *Id.* at 6.  The Court noted that no party intended to argue at trial that the asserted patents were "standard essential."  *Id.* at 5.

The Court incorporates those determinations by this reference.  Although Defendants continue to emphasize the number of paragraphs and page length of Stark's opinions (Docket No. 2195 at 18), the amount of space an expert's opinions take up on a page is not the proper test for determining admissibility.  Defendants also continue to raise the assertion that Plaintiff held out its patents as standard essential in pretrial proceedings.  *Id.* at 18-19.  The Court excluded Thomas's opinions because they relied on Stark's excluded opinions, rendering this dispute irrelevant.  But a comment on this issue is warranted.  It is true that Plaintiff's representations about the nature of its patents during pretrial proceedings were unclear, making them subject to misinterpretation.  But Plaintiff provided sufficient explanation during pretrial proceedings to show that it did not intend through those representations to cast its asserted patents as standard essential (Docket No. 1281 at 1; Docket No. 1457 at 1-2), and the Court does not find sufficient evidence to show Plaintiff intentionally shifted positions on the issue.  More importantly, Defendants still have never explained to the Court how, where both Plaintiff and Defendants have no intention of arguing the asserted patents are standard essential at trial, Defendants could introduce a damages analysis based on the assumption that the patents were standard essential without that analysis being irrelevant, prejudicial, and confusing.  This is particularly the case given the nature of the FRAND-related theories (like royalty stacking) that Defendants sought to introduce.  Defendants' renewed arguments regarding Stark's and Thomas's excluded expert opinions remain rejected.

### C.      Other Arguments in Defendants' Motion

#### a.      Defendants' Comments Regarding Plaintiff's Allegedly "Changed Trial Position" Compared to its § 101 and Inequitable Conduct

**Positions and Request that the Court "Revisit" Earlier Summary Judgment Rulings**

Defendants argue that "Caltech's trial arguments contradicted representations Caltech made to obtain summary judgment of no invalidity under Section 101 (and no inequitable conduct)." Docket No. 2211 at 16; *see also* Docket No. 849 (summary judgment order regarding patent eligibility of asserted claims of '781 Patent); Docket No. 1518 (summary judgment order regarding inequitable conduct). But it is not entirely clear what relief Defendants seek on this basis. Defendants state that Plaintiff shifted positions at trial by arguing that Claim 13 of the '781 Patent[24] (1) did not require circuitry and (2) did not require "irregular repetition of the information bits." Docket No. 2195 at 29-30. Defendants also provide some characterizations of the Court's previous orders. *Id.* at 28-29. Defendants then state, "[g]iven Caltech's shift, the Court would be justified in revisiting its earlier summary judgment rulings." *Id.* at 30.

Including for reasons already discussed regarding the parties' dispute over the meaning of the phrase "irregular repetition," the Court does not agree with all of Defendants' characterizations of the record or its impact on the prior orders in this case. *See, e.g.* Docket No. 2121 (Trial Tr. 1.17.2020 (Shoemake)) at 37:19-24; Docket No. 2129 (Trial Tr. 1.27.2020 (Shoemake)) at 107:11-109:10 (Shoemake stating, *inter alia*, "it's related to irregular repetition, but . . . this is a method claim."), 156:1-21 (Shoemake during cross-examination, stating "this last limitation does relate to irregular repetition of information bits, but this is a method claim. So you don't look for hardware doing irregular repetition, you look for exactly what's in this limitation, and you look at the – to see if the information bits appear in the subsets."). In any event, without a more concrete request for some type of relief, the Court declines to engage in the type of involved, *sua sponte* "revisiting" exercise that Defendants are suggesting.

**b.      Defendants' Arguments Regarding the Court's Prior Art Rulings**

Defendants assert in one sentence that the Court's grant of summary judgment of IPR estoppel was erroneous. Docket No. 2195 at 30. Defendants then argue that the Court further erred by "limiting Defendants' trial evidence regarding state of the prior art ***to just five references–***

---

[24] As a reminder, this is the sole asserted claim in the '781 Patent. It is the method claim that, as discussed, Defendants argue Plaintiff failed to adequately prove infringed at trial (even though Defendants failed to seek a special jury verdict that would break down damages on a patent-by-patent basis, rendering Defendants' challenge on that basis irrelevant). The Court separately granted Plaintiff's motion for summary judgment of no invalidity under § 101 as to the asserted claims of '710 and '032 Patents including on the basis that Defendants had not preserved such a claim as to those two patents after they had embarking on a finely-detailed compare-and-contrast discussion for the claims of those two patents when arguing for § 101 invalidity of the claims of the '781 Patent. *See* Docket No. 1923 at 8-9.

***of Caltech's choosing***." *Id.* (emphasis in original).

The current record does not support revisiting the Court's pretrial rulings regarding the various IPR estoppel motions, and the Court does not do so here. *See generally* Docket Nos. 830, 1432, 1923. Defendants' arguments about the prior art references that they allegedly should have been permitted to introduce at trial to show the state of the art were also addressed in pretrial rulings. *See* Docket Nos. 1777 at 2-3, 1926, 1919, 1926 at 1. Those determinations are incorporated by this reference, and Defendants' renewed arguments (including Defendants' characterization of the references as being "of Caltech's choosing") are rejected for the same reasons previously stated.

But the "state of the art" issue does deserve some further comment. In patent parlance, this phrase is generally used to refer to the overall technological landscape at the time the invention is filed. The proposition that a party would need to use a specific prior art reference to present adequate evidence regarding the state of the art is not entirely persuasive. Indeed, Plaintiff presented evidence in broad strokes of the state of the art at trial without getting into technical weeds regarding particular prior art references and the patent limitations at issue. *See, e.g.* Docket No. 2118 (Trial Tr. 1/15/2020 (Hasibi)) at 84:4-88:18. But as an objected-to line of cross-examination questions early in the trial showed, it appears Defendants would ideally have sought to get into exactly that type of technical, patent limitation-by-limitation weeds with a "state of the art" presentation. *See id.* at 105:2-13. As the Court cautioned during pretrial, the result of such a tactic would have essentially allowed Defendants to backdoor invalidity arguments into the trial. Defendants' current arguments that they were not allowed to use their "***best*** state-of-the-art evidence" suggest that exact problem would have continued to arise. *See* Docket No. 2211 at 18. What Defendants believed was their "***best*** state-of-the-art evidence" was, indeed, the key prior art references that they had previously included in their invalidity arguments, not all of which were necessarily cited in their infringement or damages expert reports to support "state of the art" concepts and the rest of which still raised significant prejudice concerns.

Defendants also object to a snippet of the Court's preliminary jury instructions. The disputed paragraph stated:

> You are not being asked to determine whether the asserted patents are valid or invalid in this case. Therefore, you should not let any opinions regarding invalidity or prior art impact the determinations you are being asked to make in this case regarding infringement, except for limited purposes which the

> Court will advise you during the course of trial. This means that even though you may hear about certain prior art at trial, *that prior art cannot be a basis for ruling against Caltech in this case* on infringement, excerpt for limited purposes which the Court will advise you during the course of trial. Your job in this trial is to determine whether Caltech has proved that Apple and Broadcom infringe Caltech's asserted claims, and the amount of damages to be awarded to Caltech if you find infringement.

Docket No. 2159 at 2 (emphasis added). The bolded portion is cited in Defendants' brief as an "erroneous instruction." Docket No. 2195 at 31. When placed in the context of the full paragraph, Defendants fail to show it warrants a new trial. The sole instance where Defendants maintained a request for final jury instructions regarding prior art was with respect to a doctrine of equivalents instruction. Docket No. 2059-1 at 14-15; *see also* Docket No. 2036-2 at 31. Based on the arguments presented by the parties regarding that proposed instruction and the arguments presented at trial, Defendants' version of that final jury instruction was rejected. This is not a basis for a new trial.

### c.  Defendants' Arguments that the Trial was Unfair

The Court has considered Defendants' additional arguments that there was a "cumulative impact of the Court's one-sided rulings [that] led to an unfair trial, and biased juror opinions in the case." Docket No. 2211 at 18-19. First, the Court rejects the notion that trial was unfair because Plaintiff was permitted 55% of total trial time. Defendants did not have affirmative defenses to prove at trial; only Plaintiff had a burden to prove its infringement and damages cases. Nor do Defendants identify instances in the record where they asked the Court for additional time. Defendants' suggestion that the Court "refused to specify the total time for trial" is also unsupported by the record.

Second, Defendants' argument that the Court "preconditioned" the jury because it made a joke during questioning of a prospective juror in voir dire is unpersuasive.[25]   At Defendants'

---

[25] Defendants also characterize the transcript as showing the Court "encouraged" the prospective juror's story about a school district superintendent who spent money on Apple products for schools instead of on raises for the teachers. According to Defendants, the story was highly prejudicial towards them. This is one example where Defendants reframe the record to support their arguments of general unfairness at trial. The prospective juror's comments were not "encouraged" by the Court in some nefarious way, but were made in reaction to the Court asking "is there any one of you who feels that there is something we should know about you before we decide whether or not you should be a juror in this case? In other words, you know, anything like – it could be like your Jerry Springer moment." Docket No. 2117 (Trial Tr. 1.14.2020 (voir dire)) at 134:10-14. The prospective juror explained that she felt the need to share the story to be honest. *Id.* at 136:11-18. And after further questioning, she made clear that she blamed the superintendent, not Apple, for the way the funds were spent. *See id.* at 136:6-8.

counsel's request, the Court clarified with the jury that it was a joke.  *See* Docket No. 2117 (Trial Tr. 1.14.2020 (voir dire)) at 142:14-143:18.  In their motion, Defendants now complain that in that clarification, the Court "used the word 'kickback' three more times."  Docket No. 2195 at 33 n.23.  Defendants got the clarification they wanted on the record.  For them to now complain that the clarification compounded "unfairness" to them is unpersuasive.  As the jury's reaction to the clarification showed, the prospective jurors understood it was a joke.

Third, the parties agreed to include a question about the importance of Wi-Fi in their joint juror questionnaire.  Docket No. 1868-1 at 8.  That the Court asked prospective jurors questions about it during voir dire did not render the trial unfair, nor did the manner in which the Court phrased its questions.

Regarding the remainder of Defendants' challenges for general unfairness, the Court finds that the trial record speaks for itself.  Defendants' assertions that the Court made "slanted comments and rulings unfairly in Caltech's favor" and applied "different standards to the parties for the proper scope of expert testimony" are not supported by that record.  *See* Docket No. 2195 at 33; *see also id.* at 33-35.  A new trial is not warranted on these bases.

## IV.  Conclusion

For the reasons stated in this Order, the Court would **DENY** Defendants' motion.